IN THE DISTRICT COURT OF ELLIS COUNTY
STATE OF OKLAHOMA

F I L E D
COURT CLERK'S OFFICE
Ellis County, Okla.

MAY 2 4 2024

Time_____M
SALLY WAYLAND, Court Clerk
By_____

SHATTUCK BANCSHARES, INC., and )
SNB BANK, N.A., )
          )
            **Plaintiffs,** )
          )
v. )
          )
ERIC HANNELIUS, MICHAEL )
SHVARTSMAN, OKSANA MOORE, KARLA )
KNIGHT, ELENA POPOVA, JUSTIN )
SOULEN, BILL MY BNK, LLC, BT ASSETS )
GROUP, INC., EFT BUSINESS SERVICES, )
LLC, ENCOMPAY, INC., )
HANNELIUS-KNIGHT FAMILY TRUST, )
MG FAMILY TRUST, ONE PAY CLOUD, )
LLC, OST, LLC, PEPPER PAY, LLC, )
ROCKET HOLDINGS, LLC, SALT MONEY, )
INC., SKYLIGHT BUSINESS SERVICES, )
LLC, TRANSACT FIRST, INC., and )
TRANSACTION PROCESSING SERVICES, )
INC., )
          )
            **Defendants.** )

Case No. CJ-2024- 9

## PETITION

    1.     Plaintiffs Shattuck Bancshares, Inc., and SNB Bank, N.A. ("SNB") (collectively,

the "Plaintiffs"), bring this breach of contract and tort action seeking monetary relief as a result of

Defendants' consistent, material misrepresentations regarding their business activities, reasons for

certain wire transfers, and authority to conduct certain transactions.

    2.     Specifically, Defendants Bill My Bnk, LLC ("Bill My Bnk"), BT Assets Group,

Inc. ("BT"), EFT Business Services, LLC ("EFT"), EnComPay, Inc. ("EnComPay"), Hannelius-

Knight Family Trust, MG Family Trust, One Pay Cloud, LLC ("One Pay Cloud"), OST, LLC

("OST"), Pepper Pay, LLC ("Pepper Pay"), Rocket Holdings, LLC ("Rocket Holdings"), Salt

EXHIBIT
1

Money, Inc. ("Salt Money"), Skylight Business Services, LLC ("Skylight"), Transact First, Inc. ("Transact First"), and Transaction Processing Services, Inc. ("TPS") (collectively, the "Business Defendants"), acting through Defendants Eric Hannelius, Michael Shvartsman, Oksana Moore, Karla Knight, Elena Popova, and Justin Soulen (collectively, the "Individual Defendants"), falsely represented to SNB that they did not operate marijuana-related businesses and/or cashless automated teller machines ("ATMs").    Moreover, Mr. Hannelius, in his capacity as the sole beneficial owner for Transact First, falsely represented that approximately $8.4 million in wire transfers into the Transact First account was from interested investors when in fact it was related to Mr. Shvartsman's insider trading activities, which ultimately resulted in Mr. Shvartsman's guilty plea to securities fraud.  Finally, through their representative Ms. Moore, acting as an agent and at the direction of Mr. Hannelius, EFT, Transact First, and EnComPay caused numerous unauthorized transactions, violating the Terms and Conditions of Your Account that the Defendants voluntarily agreed to and which applied to all accounts opened by the Defendants.[1]

3.    Over the course of several months, SNB received subpoenas from the United States Department of Justice, including the United States Attorney's Office for the Southern District of Florida and the United States Attorney's Office for the Southern District of New York, and Homeland Security Investigations ("HSI"), a law enforcement agency within the United States Department of Homeland Security.  Following Ms. Moore's transactions, HSI ordered a freeze of EFT's account with SNB.  Only after implementing the freeze did SNB learn that the Defendants

---

[1] *See* Account Agreement Executed by Eric Hannelius and Oksana Moore on March 5, 2021 ("The undersigned certifies the accuracy of the information he/she has provided and acknowledges receipt of a completed copy of this form. . . . The undersigned also acknowledge the receipt of a copy and agree to the terms of the following agreement(s) and disclosure(s): Terms and Conditions . . . ."), Exhibit A; Terms and Conditions of Your Account § 2 ("If you sign the signature card or open or continue to use the account, you agree to these rules."), Exhibit B.

had been operating marijuana-related businesses and/or cashless ATMs, in direct contravention of their numerous representations to SNB.

4.      As a consequence of Defendants' actions, omissions, and misrepresentations, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  SNB moreover incurred substantial damages related to examinations by federal banking regulators.  As a consequence of the investigations and examinations, SNB has also incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.  Had the Defendants truthfully disclosed the nature of their business activities from the start, SNB would have declined to open business accounts for them and to work with them on any initiatives.

<u>PARTIES</u>

5.      Upon information and belief, Defendant Mr. Hannelius is a citizen of the United States and resides in Florida and Maine.

6.      Upon information and belief, Defendant Mr. Shvartsman is a citizen of Canada and resides in Florida.

7.      Upon information and belief, Defendant Ms. Moore is a citizen of the United States and resides in Florida.

8.      Upon information and belief, Defendant Ms. Knight is a citizen of the United States and resides in California, Connecticut, Florida, and Maine.

9.      Upon information and belief, Defendant Ms. Popova is a citizen of the United States and resides in Florida.

10.     Upon information and belief, Defendant Mr. Soulen is a citizen of the United States and resides in Florida.

11.     Upon information and belief, Defendant Bill My Bnk is a limited liability company registered in Delaware with its principal place of business in Aventura, Florida.

12.     Upon information and belief, Defendant BT is a corporation organized under Delaware law with its principal place of business in Aventura, Florida.

13.     Upon information and belief, Defendant EFT is a limited liability company registered in Delaware with its principal place of business in Aventura, Florida.

14.     Upon information and belief, Defendant EnComPay is a corporation organized under Puerto Rico law with its principal place of business in Aventura, Florida.

15.     Upon information and belief, Defendant Hannelius-Knight Family Trust is a trust organized under Florida law.

16.     Upon information and belief, Defendant MG Family Trust is a trust organized under Russian law.

17.     Upon information and belief, Defendant One Pay Cloud is a limited liability company registered in Delaware with its principal place of business in Aventura, Florida.

18.     Upon information and belief, Defendant OST is a limited liability company registered in Maine with its principal place of business in Aventura, Florida.

19.     Upon information and belief, Defendant Pepper Pay is a limited liability company registered in Nevada with its principal place of business in Aventura, Florida.

20.     Upon information and belief, Defendant Rocket Holdings is a limited liability company registered in the United States Virgin Islands with its principal place of business in Aventura, Florida.

21.     Upon information and belief, Defendant Salt Money is a corporation organized under Delaware law with its principal place of business in Aventura, Florida.

22.     Upon information and belief, Defendant Skylight is a limited liability company registered in Delaware with its principal place of business in Aventura, Florida.

23.     Upon information and belief, Defendant Transact First is a corporation organized under Delaware law with its principal place of business in Aventura, Florida.

24.     Upon information and belief, Defendant TPS is a corporation organized under Delaware law with its principal place of business in Aventura, Florida.

25.     Plaintiff Shattuck Bancshares, Inc., is a closely held corporation organized under Oklahoma law with its principal place of business in Shattuck, Oklahoma.

26.     Plaintiff SNB is a national bank organized under federal law with its principal place of business in Shattuck, Oklahoma.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over SNB's claims pursuant to the Constitution of the State of Oklahoma, Article 7, § 7(a).

28.     This Court has specific personal jurisdiction over the Defendants because SNB's claims arise out of Defendants' purposeful contacts with SNB in Oklahoma.

29.     Venue is proper in this Court pursuant to Okla. Stat. tit. 12, § 187 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district and the Plaintiffs both have their principal place of business in this district.[2]

## FACTUAL ALLEGATIONS

### Mr. Hannelius and His Business Associates Opened Several Accounts with SNB

---

[2] Additionally, pursuant to the ATM and Debit Sponsorship Agreement ("Pepper Pay Agreement"), Pepper Pay "waive[d] any objection to venue with respect to actions brought in [Oklahoma state] courts."  Pepper Pay Agreement § 12.6, Exhibit C.

30.    In mid-November 2020, Mr. Hannelius was introduced to SNB and expressed an interest in opening several business accounts.

31.    On November 16, 2020, in an email to SNB's President and Chief Executive Officer, L. Clay Stuart, Mr. Hannelius represented that his company, Transact First, processed transactions for traditional ATMs as opposed to cashless ATMs. Exhibit D. Mr. Hannelius consistently represented this at all times following his introduction to SNB, including when SNB conducted customer due diligence prior to opening the account and when SNB conducted account monitoring throughout the life of the account from January 22, 2021, until November 3, 2023, at which point SNB learned that marijuana-related business funds were flowing through the account.

32.    Traditional ATMs allow an individual to deposit or withdraw cash. Cashless ATMs, on the other hand, "simulate[] a debit card payment by letting consumers initiate a cash withdrawal, then direct[] those funds to the merchant." *See* Sarah Wynn, *Cashless Atms: An Imperfect Solution To Legal Pot's Bank Problem*, American Banker (Aug. 11, 2017, 11:24 AM), https://www.americanbanker.com/news/do-cashless-atms-really-solve-legal-pots-payments-problem?tag=0000015c-c71f-dc44-a57c-e75fca7c0000. Unlike with a debit card, however, cashless ATMs usually only permit payment in certain increments and always require a PIN. *See* John Adams, *Cannabis Sellers Are Still Using Prohibited Payment Workarounds*, American Banker (June 8, 2023, 3:54 PM), https://www.americanbanker.com/payments/news/cannabis-sellers-are-still-using-prohibited-payment-workarounds.

33.    Transactions using cashless ATMs appear on bank statements and regional banking networks as withdrawals, disguising the nature of the transactions. *Id.*

34.    Cashless ATMs are typically associated with the marijuana industry. *Id.*

6

35.     Cashless ATMs impede compliance with the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311-5336, and related regulations, 12 C.F.R. §§ 21.11, 21.21.

36.     On January 22, 2021, Transact First, acting through its beneficial owner, Mr. Hannelius, opened its first account with SNB.

37.     On February 11, 2021, Transact First, acting through its beneficial owner, Mr. Hannelius, opened nine additional accounts with SNB.

38.     The Financial Crimes Enforcement Network ("FinCEN"), a bureau of the United States Department of the Treasury, had previously issued guidance regarding banks' provision of services, risk factors, and reporting requirements under the BSA and related regulations for marijuana-related businesses. *BSA Expectations Regarding Marijuana-Related Businesses*, FinCEN (Feb. 14, 2014), https://www.fincen.gov/sites/default/files/guidance/FIN-2014-G001.pdf.

39.     On February 19, 2021, Ms. Moore was added as an authorized signer to all ten Transact First accounts. As part of this process, Ms. Moore completed an Account Practice Questionnaire, on which she represented that Transact First was not a marijuana-related business. Exhibit E.

40.     On February 19, 2021, as part of its due diligence process for the Transact First accounts and the EFT account opened on March 5, 2021, SNB's Assistant Vice President and Cashier emailed Mr. Hannelius to inquire about his association with an apparent marijuana-related business. Exhibit F.

41.     On February 22, 2021, in the same email chain initiated by SNB's Assistant Vice President and Cashier, Mr. Hannelius represented that there "[a]bsolutely will not be" any marijuana-related business flowing through the Transact First accounts or the EFT account. *Id.*

7

42.     Also as part of its due diligence process, SNB physically inspected several Transact First ATMs onsite and verified they appeared not to be cashless ATMs.

43.     On March 5, 2021, EFT, acting through its beneficial owner, Mr. Hannelius, opened an account with SNB.  As part of that process, both Mr. Hannelius and Ms. Moore completed an Account Practice Questionnaire, on which they represented that EFT was not a marijuana-related business.  Exhibit G.

44.     On December 10 and 14, 2021, in four different wire transfers, Rocket Holdings transferred $8,444,226.68 from an account at another financial institution into the Transact First account ending in 880.  Over the next two months, Transact First wire transferred $6,625,095.02 from its account ending in 880 into three separate accounts at three other financial institutions.

45.     SNB questioned Mr. Hannelius regarding the four different wire transfers.  Mr. Hannelius represented that the funds transferred into the Transact First account were from potential investors in his companies, who had ultimately decided not to invest the amount originally suggested.  Although not mentioned by name, Mr. Hannelius referenced an individual, who SNB would later identify as Mr. Shvartsman.

46.     On February 22, 2022, TPS, acting through its beneficial owner, Mr. Hannelius, opened six accounts with SNB.  As part of that process, both Mr. Hannelius and Ms. Moore completed an Account Practice Questionnaire covering all the accounts, on which they represented that TPS was not a marijuana-related business.  Exhibit H.

47.     At that time, Mr. Hannelius represented that the new TPS accounts were part of a restructuring of Transact First.  According to Mr. Hannelius, the restructuring was undertaken to avoid confusion with other businesses using similar names.

48.     On April 19, 2022, Ms. Moore, acting as an agent and at the direction of Mr. Hannelius, closed eight Transact First accounts at SNB.

49.     On or about June 2022, through an intermediary, Mr. Hannelius proposed SNB become involved with a new business, Bill My Bnk. Bill My Bnk was intended to allow consumers to make payments directly from their bank accounts.

50.     On July 1, 2022, Ms. Moore, acting as an agent and at the direction of Mr. Hannelius, closed another Transact First account.

51.     On July 6, 2022, Bill My Bnk, acting through its beneficial owner, Mr. Hannelius, opened two accounts with SNB. As part of that account opening process, Mr. Hannelius, Ms. Moore, and Ms. Popova each completed an Account Practice Questionnaire, on which they represented that Bill My Bnk was not a marijuana-related business. Exhibit I.

52.     On September 6, 2022, one Bill My Bnk account was closed due to lack of funding.

53.     In late-2022, Mr. Hannelius introduced Mr. Shvartsman to Mr. Stuart at SNB.

54.     On January 5, 2023, Salt Money, acting through its beneficial owner, Mr. Hannelius, opened an account with SNB. As part of that process, Mr. Hannelius, Ms. Moore, and Ms. Popova each completed an Account Practice Questionnaire, on which they represented that Salt Money was not a marijuana-related business. Exhibit J.

55.     On February 2, 2023, Transact First, acting through its beneficial owners, Mr. Hannelius, Mr. Shvartsman, and Ms. Knight, reopened one account.

56.     On February 2, 2023, BT, acting through its beneficial owners, Mr. Hannelius, Mr. Shvartsman, and Ms. Knight, opened an account with SNB. Mr. Hannelius and Ms. Knight were acting in their capacities as trustees of the Hannelius-Knight Family Trust. Mr. Shvartsman was acting in his capacity as a trustee of the MG Family Trust. As part of the account opening process,

Mr. Hannelius, Mr. Shvartsman, Ms. Moore, Ms. Popova, and Ms. Knight each completed an Account Practice Questionnaire, on which they represented that BT was not a marijuana-related business.[3] Exhibit K.

57.     On February 2, 2023, Skylight, acting through its beneficial owners, Mr. Hannelius, Mr. Shvartsman, and Ms. Knight, opened an account with SNB.  Mr. Hannelius and Ms. Knight were acting in their capacities as trustees of the Hannelius-Knight Family Trust.  Mr. Shvartsman was acting in his capacity as a trustee of the MG Family Trust.  As part of the account opening process, Mr. Hannelius, Mr. Shvartsman, Ms. Moore, Ms. Popova, and Ms. Knight each completed an Account Practice Questionnaire, on which they represented that Skylight was not a marijuana-related business.  Exhibit L.

58.     On February 3, 2023, EnComPay, acting through its beneficial owners, Mr. Hannelius, Mr. Shvartsman, and Ms. Knight, opened an account with SNB.  Mr. Hannelius and Ms. Knight were acting in their capacities as trustees of the Hannelius-Knight Family Trust.  Mr. Shvartsman was acting in his capacity as a trustee of the MG Family Trust.  As part of the account opening process, Mr. Hannelius, Mr. Shvartsman, Ms. Moore, Ms. Popova, and Ms. Knight each completed an Account Practice Questionnaire, on which they represented that EnComPay was not a marijuana-related business.  Exhibit M.

59.     On February 3, 2023, One Pay Cloud, acting through its beneficial owners, Mr. Hannelius, Mr. Shvartsman, and Ms. Knight, opened an account with SNB.  Mr. Hannelius and Ms. Knight were acting in their capacities as trustees of the Hannelius-Knight Family Trust.  Mr. Shvartsman was acting in his capacity as a trustee of the MG Family Trust.  As part of the account

---

[3] While Mr. Hannelius checked both "yes" and "no" for the marijuana-related business question, the Plaintiffs assume this is a typographical error given that Mr. Shvartsman, Ms. Moore, Ms. Popova, and Ms. Knight all only marked "no."

opening process, Mr. Hannelius, Mr. Shvartsman, Ms. Moore, Ms. Popova, and Ms. Knight each completed an Account Practice Questionnaire, on which they initially represented that One Pay Cloud was a marijuana-related business. However, after SNB questioned them, they stated they confused One Pay Cloud with another company and agreed to resubmit corrected Account Practice Questionnaires. Exhibit N.

60.     On February 22, 2023, OST, acting through its beneficial owner, Mr. Hannelius, opened an account with SNB. Mr. Hannelius was acting in his capacity as a trustee of the Hannelius-Knight Family Trust. As part of the account opening process, Mr. Hannelius completed an Account Practice Questionnaire, on which he represented that OST was not a marijuana-related business. Exhibit O.

61.     On March 7, 2023, MG Family Trust, acting through its beneficial owner, Mr. Shvartsman, opened an account with SNB. As part of that process, Mr. Shvartsman completed an Account Practice Questionnaire, on which he represented that MG Family Trust was not a marijuana-related business. Exhibit P.

62.     On March 7, 2023, Rocket Holdings, acting through its beneficial owner, Mr. Shvartsman, opened an account with SNB. As part of that process, Mr. Shvartsman, Ms. Moore, and Ms. Popova each completed an Account Practice Questionnaire, on which they represented that Rocket Holdings was not a marijuana-related business. Exhibit Q.

63.     On March 20, 2023, MG Family Trust, acting through its beneficial owner, Mr. Shvartsman, opened a second account with SNB.

64.     On March 20, 2023, OST, acting through its beneficial owner, Mr. Hannelius, opened a second account with SNB.

65.     On March 31, 2023, SNB closed the Rocket Holdings account.

66.     On June 22, 2023, Pepper Pay, a PIN debit and ATM processing company, acting through its beneficial owner, Mr. Hannelius, opened an account with SNB.

67.     Several months earlier, in an email to SNB's Assistant Vice President and Cashier, Associate General Counsel for Pepper Pay, Mr. Soulen, represented Pepper Pay was not a marijuana-related business.  Exhibit R.

68.     Moreover, as part of the Pepper Pay Agreement, Pepper Pay, acting through its beneficial owner, Mr. Hannelius, agreed not to operate cashless ATMs.  Pepper Pay Agreement, Recitals (b); § 1.1.

69.     SNB's policy was not to process cashless ATM transactions, and SNB never changed this policy.

70.     On June 30, 2023, Ms. Moore was added as an authorized signer to both MG Family Trust accounts.  As part of this process, Ms. Moore completed an Account Practice Questionnaire, on which she represented that MG Family Trust was not a marijuana-related business.  Exhibit S.

71.     On July 21, 2023, Salt Money, acting through its beneficial owner, Mr. Hannelius, opened three additional accounts with SNB.

72.     On August 10, 2023, Rocket Holdings, acting through its representative, Ms. Moore, reopened its account.

73.     On October 19, 2023, Pepper Pay, acting through its beneficial owner, Mr. Hannelius, opened seven additional accounts with SNB.

74.     On October 19, 2023, TPS, acting through its beneficial owner, Mr. Hannelius, opened an additional account.

**Government Investigations**

75.     In April 2023, the United States Attorney's Office for the Southern District of Florida sent a subpoena to SNB.

76.     SNB responded to the United States Attorney's subpoena and continues to supplement as necessary.

77.     On June 29, 2023, Mr. Shvartsman and others were indicted in the United States District Court for the Southern District of New York for Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371; Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and Securities Fraud, in violation of 18 U.S.C. §§ 1348 and 2.

78.     In the superseding indictment, Mr. Shvartsman was also charged with Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. §§ 1957 and 2.

79.     Mr. Shvartsman ultimately pleaded guilty to Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. The public plea agreement entered into by Mr. Shvartsman as well as Mr. Shvartsman's public request for a change of trial venue both reference Plaintiff SNB Bank, N.A.

80.     Upon information and belief, the approximately $8.4 million in wire transfers from December 2021 are related to Mr. Shvartsman's crime. The funds were transferred into the Transact First account from a Rocket Holdings account at another bank, and Mr. Shvartsman owns and operates Rocket Holdings. In fact, he was the beneficial owner for the Rocket Holdings account at SNB.

81.    In September, October, and December 2023, the United States Attorney's Office for the Southern District of New York sent subpoenas to SNB.

82.    SNB responded to the United States Attorney's subpoenas and continues to supplement as necessary.

83.    SNB was at all times subject to regular examination and supervision by federal regulators.

84.    These investigations and the HSI investigation, discussed below, are ongoing.

### ACH Transactions and NACHA Rules

85.    SNB conducts transactions using the Automated Clearing House ("ACH") Network.

86.    The National Automated Clearing House Association ("NACHA") is the Administrator of the ACH Network.

87.    The NACHA Operating Rules govern the ACH Network.

88.    As part of the Terms and Conditions of Your Account, an account holder agrees "to be bound by automated clearing house association rules," *i.e.*, the NACHA Operating Rules. Terms and Conditions of Your Account, ACH and Wire Transfers § 21.

89.    A transaction using the ACH Network involves four parties: an originator, an originating depository financial institution ("ODFI"), a receiver, and a receiving depository financial institution ("RDFI"). *How ACH Works: ACH Participants*, NACHA: Payments Innovation Alliance, https://achdevguide.nacha.org/how-ach-works (last visited May 22, 2024).

90.    There are two types of transactions, or entries, using the ACH Network: an ACH credit and an ACH debit. *How ACH Works: Types of Payments*, NACHA: Payments Innovation Alliance, https://achdevguide.nacha.org/how-ach-works (last visited May 22, 2024).

91.     An ACH credit, otherwise known as a "push," transfers funds from the originator's account at the ODFI to the receiver's account at the RDFI. *Id.*

92.     An ACH debit, otherwise known as a "pull," transfers funds from the receiver's account at the RDFI to the originator's account at the ODFI. *Id.*

93.     A file is a group of entries, or transactions. NACHA Operating Rules § 8.42.

94.     Under the NACHA Operating Rules § 2.9, "[a]n Originator or an ODFI may initiate a Reversing File to reverse all Entries of an Erroneous File." *Id.* § 2.9.1. If it initiates a reversing file, the originator or ODFI also "must concurrently initiate a Correcting File corresponding to the Erroneous File, unless the Erroneous File was a duplicate." *Id.* § 2.9.2. The originator or ODFI must transmit a reversing file "within five Banking Days after the Settlement Date of the Erroneous File." *Id.* § 2.9.3.

95.     "An ODFI that initiates a Reversing File or Correcting File shall indemnify each Participating [Depository Financial Institution] and ACH Operator from and against any and all claims, demands, losses, liabilities, and expenses, including attorneys' fees and costs, that result directly or indirectly from the debiting or crediting of any Entry in the Reversing File or corresponding Correcting File to the Receiver's account." *Id.* § 2.9.4.

96.     Under the NACHA Operating Rules § 2.10, "[a]n Originator or ODFI may initiate a Reversing Entry to correct an Erroneous Entry previously initiated to a Receiver's account." *Id.* § 2.10.1. An originator or an ODFI must transmit a reversing entry "within five Banking Days after the Settlement Date of the Erroneous Entry." *Id.*

97.     "An ODFI that initiates a Reversing Entry shall indemnify each RDFI and ACH Operator from and against any and all claims, demands, losses, liabilities, and expenses, including

15

attorneys' fees and costs, that result directly or indirectly from the debiting or crediting of the Reversing Entry to the Receiver's account." *Id.* § 2.10.3.

98.    Under the NACHA Operating Rules § 2.4, when an ODFI initiates a transaction, it warrants that "[t]he Entry has been properly authorized by the Originator and the Receiver." *Id.* § 2.4.1.1(a).

99.    When an ODFI initiates a pull transaction, it warrants that "[t]he debit Entry is: (a) for an amount that will be due and owing to the Originator from the Receiver on the Settlement Date; (b) for a sum specified by the Receiver to be paid to the Originator; (c) to correct a previous credit Entry that was an Erroneous Entry; or (d) to reclaim from an RDFI an amount received by a recipient after death or legal incapacity of the recipient or the death of a beneficiary." *Id.* § 2.4.1.6.

100.    Under the NACHA Operating Rules § 2.8, except in limited circumstances, "[n]either an Originator nor an ODFI has the right to recall an Entry or File, to require the return of or adjustment to an Entry, or to stop payment or posting of an Entry, once the Entry or File has been received by the Originating ACH Operator."

101.    Under the NACHA Operating Rules § 2.13, except in limited circumstances, "[a]n ODFI must accept Return Entries and Extended Return Entries that comply with these Rules and that are Transmitted by the RDFI within the time limits established by these Rules." *Id.* § 2.13.1.

**Origination Agreements**

102.    On March 2, 2021, EFT, Transact First, and EnComPay, acting through Ms. Moore and Mr. Hannelius, completed and signed two agreements: (1) an ODFI Origination Agreement for Credits, and (2) an Origination Agreement Bill Collection (collectively, the "Origination

Agreements"). These agreements contained several provisions regarding authorization required to initiate ACH transactions. Origination Agreements, Exhibit T.

103.   The ODFI Origination Agreement provides, "It shall be the responsibility of [EFT, Transact First, and EnComPay] that the origination of ACH transactions complies with U.S. law. This includes but is not limited to sanctions enforced by the Office of Foreign Assets Control (OFAC)." ODFI Origination Agreement ¶ 3.

104.   The ODFI Origination Agreement also requires EFT, Transact First, and EnComPay to "promptly provide immediately available funds to indemnify [SNB] if any debit entry is rejected after [SNB] has permitted [EFT, Transact First, and EnComPay] to withdraw immediately available funds in the amount thereof or if any adjustment memorandum that relates to any such entry is received by [SNB]." ODFI Origination Agreement ¶ 13.

105.   The ODFI Origination Agreement further requires EFT, Transact First, and EnComPay to "indemnify [SNB] if [SNB] incurs any loss or liability on account of [a] breach with respect to any entries initiated by [EFT, Transact First, and EnComPay], or any of the warranties of an Originating Bank contained in the [NACHA Operating] Rules, except due to [SNB's] own negligence." ODFI Origination Agreement ¶ 15.

106.   Moreover, the Origination Agreement Bill Collection specifies that EFT, Transact First, and EnComPay agree

> that (a) each person shown as the Receiver on an entry received by [SNB] from [EFT, Transact First, and EnComPay] has authorized the initiation of such entry and the crediting of its account in the amount and on the Effective Entry Date shown on such entry, [and] (b) such authorization is operative at the time of transmittal or crediting by [SNB] as provided herein[.]

Origination Agreement Bill Collection ¶ 14.

## Pepper Pay Agreement

107.    On July 12, 2023, Pepper Pay, acting through Mr. Hannelius, executed the Pepper Pay Agreement.

108.    Under the Pepper Pay Agreement, SNB agreed to provide "sponsorship into certain ATM and Debit card networks[.]" Pepper Pay Agreement, Recitals (b).   The Pepper Pay Agreement expressly excluded cashless ATMs from the transactions that SNB agreed to sponsor. Pepper Pay Agreement § 1.1.

109.    During the negotiation, drafting, and execution of the Pepper Pay Agreement, Pepper Pay, acting through Mr. Hannelius, represented that no transactions subject to the Pepper Pay Agreement would be processed through cashless ATMs.

110.    Pursuant to the Pepper Pay Agreement, Pepper Pay agreed to indemnify and hold SNB harmless

> from and against any damages, awards, judgments, settlement amounts, fines, penalties, losses, costs and expenses (including reasonable legal fees and expenses and costs of investigation) and other liabilities . . . arising out of any law suit, action, claim, demand, administrative action, arbitration or other legal proceeding . . . brought or asserted against [SNB] as a result of or in connection with: (i) any untrue or inaccurate representation or warranty made by [Pepper Pay] under or pursuant to this Agreement, or (ii) any failure on the part of [Pepper Pay] to perform or comply with any covenant or obligation required to be performed or complied with by [Pepper Pay] under or pursuant to this Agreement; or (iii) any violation of or noncompliance with Legal Requirements by [Pepper Pay] or any of its contractors, agents or representatives[.]

Pepper Pay Agreement § 12.1(a).

## Ms. Moore's Transactions

111.    On information and belief, with respect to the following transactions, Ms. Moore acted as an agent and at the direction of Mr. Hannelius.

18

112.    On or about May 6, 2021, Ms. Moore, on behalf of Transact First, instructed SNB to initiate a pull transaction to a third-party for settlement on or about May 7, 2021.  In response to Ms. Moore's request, SNB transmitted instructions to the RDFI, which returned the transaction on or about May 11, 2021, providing "Account Frozen/Return Per OFAC" as the reason for the return.

113.    From approximately September 3, 2021, to September 8, 2021, Ms. Moore, on behalf of Transact First, instructed SNB to initiate six push transactions and two pull transactions for settlement on various dates.  In response to Ms. Moore's request, SNB transmitted instructions to the RDFIs, which returned these push and pull transactions on approximately September 8, 9, and 10, 2021, providing "Account Frozen/Return Per OFAC" as the reason for each return.

114.    On or about November 5, 2021, Ms. Moore, on behalf of EFT, asked SNB to initiate eight pull transactions to Skylight for settlement on or about November 8, 2021.  In response to Ms. Moore's request, SNB transmitted instructions to the RDFI, which returned the transaction on or about November 9, 2021, providing "Account Frozen/Return Per OFAC" as the reason for the return.

115.    Thereafter, from approximately January 6, 2022, to September 27, 2023, Ms. Moore, on behalf of EFT, EnComPay, and Transact First, asked SNB to authorize 160 ACH Transactions, all of which were returned by the RDFIs, providing "Account Frozen/Return Per OFAC" as the reason.  The transactions totaled $8,025,996.40 in pull transactions and $174,564.05 in push transactions.

116.    In total, Ms. Moore initiated 176 ACH transactions totaling $8,908,696.45 that were returned to SNB by the RDFIs, providing "Account Frozen/Return Per OFAC" as the reason.

117.    On October 16, 17, 18, and 19, 2023, Ms. Moore entered several push transactions from the EFT account to various other accounts ("October 16-19 transactions").

118.    On October 20, 2023, Ms. Moore placed requests with SNB for reversing entries for the October 16-19 transactions.

119.    On or about October 20 or 23, 2023, Ms. Moore represented that she made the reversal requests because she had accidentally entered the October 16-19 transactions as push transactions instead of pull transactions.

120.    On October 23, 2023, Ms. Moore entered multiple pull transactions to the EFT account from the same accounts as the October 16-19 transactions ("October 23 pull"). That same day, SNB authorized the transactions.

121.    Over the preceding several months, however, EFT had routinely pushed funds to these same accounts on a daily basis.

122.    On October 24, 2023, the provisional credit for the October 23 pull posted to the EFT account.

123.    On October 25, 2023, an HSI Special Agent emailed a subpoena to SNB's counsel.

124.    SNB promptly responded to the subpoena.

125.    After SNB responded, over both October 25 and 26, 2023, the RDFIs returned approximately 98.5% of the October 23 pull.

126.    On October 26, 2023, the HSI Special Agent emailed SNB's counsel, ordering the warrantless freeze and seizure of the EFT account.

127.    On October 26, 2023, SNB implemented the freeze.

128.     On October 26, 2023, Mr. Stuart emailed Mr. Hannelius, advising him that a freeze had been implemented on the EFT account.  Mr. Stuart followed this email with a phone call and text message.

129.     SNB did not authorize any transactions from the EFT account following its receipt of the freeze order.

### SNB's Subsequent Communications with Mr. Hannelius

130.     On the evening of October 26, 2023, Mr. Stuart called Mr. Hannelius to ask him a series of questions regarding the EFT account.  In response to the question of whether any ATMs involved in his businesses were cashless ATMs, Mr. Hannelius stated that all the ATMs were cash dispensing, but a small number might be cashless ATMs.

131.     Over the next several days, Mr. Hannelius began to process transactions with the same receivers associated with the EFT account but through other accounts at SNB.

132.     On the morning of November 2, 2023, Mr. Stuart notified Mr. Hannelius that he would be sending an email to ask clarifying questions about the use of cashless ATMs.  At that point, Mr. Hannelius informed Mr. Stuart for the first time that 50% of the ATMs involved in his businesses were cashless ATMs.  Mr. Stuart advised Mr. Hannelius this was a significant issue.

133.     On November 3, 2023, Ms. Moore disclosed to SNB for the first time that funds from the cashless ATMs were sent to marijuana dispensaries.  Exhibit U.

134.     On November 5, 2023, SNB suspended the ability of signors on certain accounts to initiate online transactions.

135.     On November 6, 2023, SNB froze certain accounts and advised Mr. Hannelius that the accounts would be closed within seven business days.

136.    On November 10, 2023, SNB closed the remaining Bill My Bnk account, one MG Family Trust account, a Pepper Pay account, and the reopened Rocket Holdings account.

137.    On November 11, 2023, SNB closed the remaining MG Family Trust account.

138.    On November 15, 2023, SNB closed several accounts linked to Mr. Hannelius and Mr. Shvartsman, including the reopened Transact First account, the seven TPS accounts, the BT account, the EnComPay account, the One Pay Cloud account, seven Pepper Pay accounts, the four Salt Money accounts, and the Skylight account.

139.    The EFT account remained frozen, but was closed shortly thereafter.

140.    On November 15, 2023, SNB advised Mr. Hannelius that under the Terms and Conditions of Your Account, he would be liable for SNB's costs and attorney's fees.

141.    SNB has received several deposits into certain closed accounts, which it has frozen and will keep frozen until such time as this dispute is resolved.

142.    Upon information and belief, Defendants purposefully concealed the nature of their ACH transactions by altering the receiver's name or providing only a portion of the name of the receiver to disguise the receiver's true identity.  When a customer initiates a transaction through SNB's online banking platform, which Defendants used, the customer enters the receiver's account number and name.  As an example, an SNB customer could provide instructions to push funds to "ABC" and provide the corresponding account number.  SNB would only be able to see what the customer enters, while the full recipient's name may in fact be "ABC Dispensary."

<u>Terms and Conditions of Your Account</u>

143.    The Terms and Conditions of Your Account are binding "[i]f [the customer] . . . open[s] or continue[s] to use the account." Terms and Conditions of Your Account § 2.

22

144.    The Terms and Conditions of Your Account further provide, "This agreement is subject to applicable federal laws, the laws of the state of Oklahoma and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws)." Terms and Conditions of Your Account § 2.

145.    The Terms and Conditions of Your Account further provide that the customer "will be liable for [SNB's] costs as well as for [its] reasonable attorneys' fees, to the extent permitted by law, whether incurred . . . in any other dispute involving [the customer's] account." Terms and Conditions of Your Account § 3. "This also includes any action that [the customer] or a third party takes regarding the account that causes [SNB], in good faith, to seek the advice of an attorney, whether or not [SNB] become[s] involved in the dispute." *Id.*

146.    The Terms and Conditions of Your Account further provide that "[SNB] may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt any [customer] owe[s] [SNB] now or in the future." Terms and Conditions of Your Account § 15.

147.    The Terms and Conditions of Your Account further provide that "in [its] discretion, [SNB] may freeze the assets in [an] account and not allow any payments out of the account until a final court determination regarding [any] legal action." Terms and Conditions of Your Account § 30. Moreover, "[a]ny fees or expenses [SNB] incur[s] in responding to any legal action (including, without limitation, attorneys' fees and [SNB's] internal expenses) may be charged against [the customer's] account." *Id.* The Terms and Conditions of Your Account define legal action as "a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to [the customer's] account." *Id.*

23

## CLAIMS

### First Claim for Relief –
### Breach of Contract as to the Terms and Conditions of Your Account

148.    SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

149.    Defendants breached contracts formed with SNB in violation of Oklahoma law.  In particular, the Individual Defendants, acting for certain Business Defendants, breached contracts with SNB through their improper statements, actions, and omissions, including, but not limited to, causing transactions in violation of the NACHA Operating Rules, operating marijuana-related businesses and cashless ATMs, and violating anti-money laundering laws and policies.

150.    In his capacity as a beneficial owner of EFT, Transact First, and EnComPay, when opening accounts, Mr. Hannelius entered EFT, Transact First, and EnComPay into contracts with SNB.  Among other things, the contracts between SNB and EFT, Transact First, and EnComPay each included the Terms and Conditions of Your Account, which incorporated the requirement to comply with the NACHA Operating Rules.  Terms and Conditions of Your Account §§ 2, 21.

151.    In her capacity as a representative of EFT, Transact First, and EnComPay and while acting as an agent and at the direction of Mr. Hannelius, Ms. Moore breached the contracts between EFT, Transact First, and EnComPay and SNB by causing unauthorized transactions, in violation of the NACHA Operating Rules § 2.4.1.1(a).  Specifically, Ms. Moore initiated 176 ACH transactions totaling $8,908,696.45 that were returned to SNB by the RDFIs, providing "Account Frozen/Return Per OFAC" as the reason.  Moreover, RDFIs returned approximately 98.5% of the October 23 pull, indicating such transactions were not authorized.

152.    As a consequence of these unauthorized transactions, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the

24

Terms and Conditions of Your Account §§ 2 and 3. EFT, Transact First, EnComPay, Mr. Hannelius, and Ms. Moore are liable for "costs as well as for . . . reasonable attorneys' fees." Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge the EFT, Transact First, and EnComPay accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action (including, without limitation, attorneys' fees and [SNB's] internal expenses)." As a consequence of these investigations, SNB has incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

153.     Additionally, when acting for certain Business Defendants in forming contracts with SNB, the Individual Defendants represented that certain Business Defendants were not marijuana-related businesses.   Mr. Hannelius moreover represented that certain Business Defendants did not process transactions for cashless ATMs.

154.     Certain Business Defendants breached their contracts by operating marijuana-related businesses and/or cashless ATMs.

155.     As a consequence of these breaches, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.   Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, the Defendants are liable for "costs as well as for . . . reasonable attorneys' fees."   Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge certain Business Defendants' accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action."   As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

156.     Additionally, when acting as beneficial owners in forming contracts with SNB, Mr. Hannelius and Mr. Shvartsman represented that certain Business Defendants would comply with

"applicable federal laws, the laws of the state of Oklahoma and other applicable rules," which include anti-money laundering laws and SNB's marijuana-related policies. Terms and Conditions of Your Account § 2.

157. Certain Business Defendants breached their contracts and violated anti-money laundering laws and SNB's marijuana-related policies by operating marijuana-related businesses and/or cashless ATMs.

158. Certain Business Defendants also breached their contracts and violated anti-money laundering laws and SNB's marijuana-related policies by engaging in unauthorized transactions. Specifically, Mr. Hannelius represented that the approximately $8.4 million in wire transfers from December 2021 was from investors when in fact it was related to Mr. Shvartsman's insider trading activities. Additionally, when entering the 176 ACH transactions totaling $8,908,696.45 and the October 23 pull, Ms. Moore represented she had authority to conduct the transactions when in fact she did not have that authority.

159. As a consequence of these breaches, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations. Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, the Defendants are liable for "costs as well as for . . . reasonable attorneys' fees." Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge certain Business Defendants' accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action." As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

26

### Second Claim for Relief –
### Breach of Contract as to the Origination Agreements

160.    SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

161.    EFT, Transact First, and EnComPay, acting through Mr. Hannelius and Ms. Moore, breached their contracts with SNB in violation of Oklahoma law.  In particular, EFT, Transact First, and EnComPay, acting through Mr. Hannelius and Ms. Moore, breached the Origination Agreements by initiating unauthorized transactions.

162.    When completing and signing the Origination Agreements for EFT, Transact First, and EnComPay, Ms. Moore and Mr. Hannelius entered EFT, Transact First, and EnComPay into a contract with SNB.  The contract contained several provisions regarding the authorization required to initiate ACH transactions.

163.    Ms. Moore, acting as a representative of EFT, Transact First, and EnComPay and as an agent and at the direction of Mr. Hannelius, breached the contracts between EFT, Transact First, and EnComPay and SNB by initiating unauthorized transactions, in violation of Origination Agreement Bill Collection ¶ 14.  Specifically, Ms. Moore initiated 176 ACH transactions totaling $8,908,696.45 that were returned to SNB by the RDFIs, providing "Account Frozen/Return Per OFAC" as the reason.  Moreover, RDFIs returned approximately 98.5% of the October 23 pull, indicating such transactions were not authorized.

164.    In other words, the RDFIs did not "authorize[] the initiation of such entr[ies]." Origination Agreement Bill Collection ¶ 14.

165.    The ODFI Origination Agreement requires Defendants to indemnify SNB.  The ODFI Origination Agreement contains two non-exclusive indemnification provisions,

27

emphasizing the importance of proper authorization prior to initiating a transaction. ODFI Origination Agreement ¶¶ 13, 15.

166.     As a consequence of these breaches, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations. EFT, Transact First, EnComPay, Mr. Hannelius, and Ms. Moore must indemnify SNB under the ODFI Origination Agreement for both the amount of the transaction improperly initiated and "loss or liability on account of the breach," which includes attorney's fees incurred by SNB on account of the breaches described herein. As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

### Third Claim for Relief –
### Breach of Contract as to the Pepper Pay Agreement

167.     SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

168.     Pepper Pay, acting through Mr. Hannelius, breached its contract with SNB in violation of Oklahoma law. In particular, Pepper Pay, acting through Mr. Hannelius, breached the Pepper Pay Agreement by operating cashless ATMs, which were expressly excluded from permitted ATM types.

169.     In executing the Pepper Pay Agreement, Mr. Hannelius agreed that while SNB would provide "sponsorship into certain ATM and Debit card networks," ATMs would not include "cashless ATMs." Pepper Pay Agreement, Recitals (b); § 1.1 (definition of "ATM").

170.     During the negotiation, drafting, and execution of the Pepper Pay Agreement, Pepper Pay, acting through Mr. Hannelius, represented that no transactions subject to the Pepper Pay Agreement would be conducted through cashless ATMs.

171.    The Pepper Pay Agreement requires certain Defendants to indemnify SNB in connection with untrue or inaccurate representations by Pepper Pay under the Agreement, any failure by Pepper Pay to perform or comply with any covenant or obligation under the Agreement, and any violation or noncompliance with legal requirements.  Pepper Pay Agreement § 12.1(a).

172.    As a consequence of these breaches, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pepper Pay and Mr. Hannelius must indemnify SNB under the Pepper Pay Agreement for "damages, [] losses, costs and expenses (including reasonable legal fees and expenses and costs of investigation) and other liabilities."  As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

### Fourth Claim for Relief – Fraud

173.    SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

174.    Defendants made numerous fraudulent representations to SNB in violation of Oklahoma law.  In particular, when acting for certain Business Defendants, the Individual Defendants falsely represented that certain Business Defendants were not marijuana-related and/or that they did not operate cashless ATMs.  Mr. Hannelius additionally made false representations regarding approximately $8.4 million in wire transfers into a Transact First account during December 2021, and Ms. Moore, acting as an agent and at the direction of Mr. Hannelius, falsely represented she had the authority to conduct numerous transactions from the EFT, Transact First, and EnComPay accounts.

175.   When acting for certain Business Defendants, the Individual Defendants made false, material representations to SNB.  Specifically, the Individual Defendants represented that certain Business Defendants were not marijuana-related businesses when in fact they were.  Mr. Hannelius moreover represented that certain Business Defendants did not process transactions for cashless ATMs when in fact they did.

176.   The Individual Defendants knew these representations were false, or at least made these representations recklessly without knowledge of the truth.

177.   The Individual Defendants made these representations with the intention of inducing SNB to open accounts.

178.   SNB relied on these representations in conducting due diligence for the accounts.

179.   As a consequence of opening these accounts, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, the Defendants are liable for "costs as well as for . . . reasonable attorneys' fees."  Moreover, pursuant to the Terms and Conditions of Your Account § 32, SNB may charge certain Business Defendants' accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action."  As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

180.   Had SNB known about the marijuana-related activities and cashless ATMs, it would not have opened the respective accounts and would not have proceeded with the business initiatives.

181.   Additionally, Mr. Hannelius, in his capacity as a beneficial owner of Transact First, made false, material representations to SNB.  Specifically, Mr. Hannelius represented that the

approximately $8.4 million in wire transfers from December 2021 was from investors when in fact it was related to Mr. Shvartsman's insider trading activities.

182.    Mr. Hannelius knew these representations were false, or at least made these representations recklessly without knowledge of the truth.

183.    Mr. Hannelius made these representations with the intention of convincing SNB to leave open the Transact First accounts.

184.    SNB relied on these representations in leaving open the Transact First accounts.

185.    As a consequence of leaving open these accounts, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations. Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, Transact First and Mr. Hannelius are liable for "costs as well as for . . . reasonable attorneys' fees." Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge the Transact First accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action." As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

186.    Had SNB known the transactions were related to insider trading, it would have immediately closed the accounts, ceased engaging in these transactions and doing business with Mr. Hannelius, and not done business with Mr. Shvartsman in the future.

187.    Additionally, Ms. Moore, in her capacity as a representative of EFT, Transact First, and EnComPay and while acting as an agent and at the direction of Mr. Hannelius, made false, material representations to SNB. Specifically, Ms. Moore represented she had authority to conduct transactions when in fact she did not have that authority. Accordingly, Ms. Moore committed per

se fraud by causing unauthorized transactions, in violation of the Terms and Conditions of Your Account and the Origination Agreements.

188.    Ms. Moore knew these representations were false, or at least made these representations recklessly without knowledge of the truth.

189.    Ms. Moore made these representations with the intention of inducing SNB to authorize the transactions.

190.    SNB relied on these representations in authorizing the transactions.

191.    As a consequence of authorizing these transactions, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations. Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, EFT, Transact First, EnComPay, Mr. Hannelius, and Ms. Moore are liable for "costs as well as for . . . reasonable attorneys' fees." Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge the EFT, Transact First, and EnComPay accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action." As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

192.    Had SNB known Ms. Moore did not have the authority to conduct the transactions, it would not have authorized them.

## Fifth Claim for Relief – Negligent Misrepresentation

193.    SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

194.    Defendants negligently made numerous misrepresentations to SNB in violation of Oklahoma law. In particular, when acting for certain Business Defendants, the Individual

Defendants falsely represented that certain Business Defendants were not marijuana-related and/or that they did not operate cashless ATMs. Mr. Hannelius additionally made false representations regarding approximately $8.4 million in wire transfers into a Transact First account during December 2021, and Ms. Moore, acting as an agent and at the direction of Mr. Hannelius, falsely represented she had the authority to conduct numerous transactions from the EFT, Transact First, and EnComPay accounts.

195.    When acting for certain Business Defendants, the Individual Defendants supplied false information in the course of business with SNB. Specifically, the Individual Defendants represented that certain Business Defendants were not marijuana-related businesses when in fact they were. Mr. Hannelius moreover represented that certain Business Defendants did not process transactions for cashless ATMs when in fact they did.

196.    The Individual Defendants had a pecuniary interest in their relationship with SNB.

197.    The Individual Defendants failed to exercise reasonable care or competence in obtaining or communicating the above information.

198.    SNB justifiably relied on the above information in opening accounts.

199.    As a consequence of opening these accounts, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations. Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, the Defendants are liable for "costs as well as for . . . reasonable attorneys' fees." Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge certain Business Defendants' accounts for "[a]ny fees or expenses . . . incur[ed] in responding to any legal action." As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

200.    Had SNB known about the marijuana-related activities and cashless ATMs, it would not have opened the respective accounts and would not have proceeded with the business initiatives.

201.    Additionally, Mr. Hannelius, in his capacity as a beneficial owner of Transact First, supplied false information in the course of business with SNB.  Specifically, Mr. Hannelius represented that the approximately $8.4 million in wire transfers from December 2021 was from investors when in fact it was related to Mr. Shvartsman's insider trading activities.

202.    Mr. Hannelius had a pecuniary interest in his relationship with SNB.

203.    Mr. Hannelius failed to exercise reasonable care or competence in obtaining or communicating the above information.

204.    SNB justifiably relied on the above information in leaving open the Transact First accounts.

205.    As a consequence of leaving open these accounts, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, Transact First and Mr. Hannelius are liable for "costs as well as for . . . reasonable attorneys' fees."  Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge the Transact First accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action."  As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

206.    Had SNB known the transactions were related to insider trading, it would have immediately closed the accounts, ceased engaging in these transactions and doing business with Mr. Hannelius, and not done business with Mr. Shvartsman in the future.

207.    Additionally, Ms. Moore, in her capacity as a representative of EFT, Transact First, and EnComPay and while acting as an agent and at the direction of Mr. Hannelius, supplied false information in the course of business with SNB.  Specifically, in violation of the Terms and Conditions of Your Account and the Origination Agreements, Ms. Moore represented she had authority to conduct transactions when in fact she did not have that authority.

208.    Ms. Moore had a pecuniary interest in her relationship with SNB.

209.    Ms. Moore failed to exercise reasonable care or competence in obtaining or communicating the above information.

210.    SNB justifiably relied on the above information in processing the transactions.

211.    As a consequence of these transactions, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, EFT, Transact First, EnComPay, Mr. Hannelius, and Ms. Moore are liable for "costs as well as for . . . reasonable attorneys' fees."  Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge the EFT, Transact First, and EnComPay accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action." As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

### Sixth Claim for Relief – Deceit

212.    SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

213.    Defendants willfully deceived SNB in violation of Oklahoma law.  In particular, when acting for certain Business Defendants, the Individual Defendants falsely represented that

certain Business Defendants were not marijuana-related and/or that they did not operate cashless ATMs. Mr. Hannelius additionally made false representations regarding approximately $8.4 million in wire transfers into a Transact First account during December 2021, and Ms. Moore, acting as an agent and at the direction of Mr. Hannelius, falsely represented she had the authority to conduct numerous transactions from the EFT, Transact First, and EnComPay accounts.

214.    When acting for certain Business Defendants, the Individual Defendants willfully deceived SNB. Specifically, the Individual Defendants represented that certain Business Defendants were not marijuana-related businesses when in fact they were. Mr. Hannelius moreover represented that certain Business Defendants did not process transactions for cashless ATMs when in fact they did.

215.    The Individual Defendants made these representations with the intention of inducing SNB to incur injury or additional risk by opening accounts.

216.    As a consequence of opening these accounts, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations. Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, the Defendants are liable for "costs as well as for . . . reasonable attorneys' fees." Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge certain Business Defendants' accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action." As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

217.    Additionally, Mr. Hannelius, in his capacity as a beneficial owner of Transact First, willfully deceived SNB. Specifically, Mr. Hannelius represented that the approximately $8.4

million in wire transfers from December 2021 was from investors when in fact it was related to Mr. Shvartsman's insider trading activities.

218.    Mr. Hannelius made these representations with the intention of inducing SNB to incur injury or additional risk by leaving open the Transact First accounts.

219.    As a consequence of leaving open these accounts, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, Transact First and Mr. Hannelius are liable for "costs as well as for . . . reasonable attorneys' fees."  Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge the Transact First accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action."  As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

220.    Additionally, Ms. Moore, in her capacity as a representative of EFT, Transact First, and EnComPay and while acting as an agent and at the direction of Mr. Hannelius, willfully deceived SNB.  Specifically, in violation of the Terms and Conditions of Your Account and the Origination Agreements, Ms. Moore represented she had authority to conduct transactions when in fact she did not have that authority.

221.    Ms. Moore made these representations with the intention of inducing SNB to incur injury or additional risk by processing unauthorized transactions.

222.    As a consequence of these transactions, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, EFT, Transact First, EnComPay, Mr. Hannelius, and Ms. Moore are liable for "costs as well as for . . . reasonable attorneys' fees."  Moreover, pursuant to

the Terms and Conditions of Your Account § 30, SNB may charge the EFT, Transact First, and EnComPay accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action." As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

### Seventh Claim for Relief – Tortious Interference

223.    SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

224.    Defendants tortiously interfered with SNB's delicate relationships with federal banking regulators and related federal agencies in violation of Oklahoma law.  In particular, Defendants placed SNB in the unfair position of having to investigate and explain fraudulent and otherwise improper transactions as a part of multiple ongoing government investigations and examinations.

225.    By virtue of their actions, omissions, and misrepresentations, the Individual Defendants, acting for certain Business Defendants, interfered with SNB's relationships with federal banking regulators and the federal agencies involved in investigating the facts and circumstances of the accounts of certain Business Defendants, namely, the United States Attorney's Office for the Southern District of Florida, the United States Attorney's Office for the Southern District of New York, and HSI.

226.    In particular, the Individual Defendants placed SNB in the unfair position of having to investigate and explain their fraudulent and otherwise improper transactions as a part of multiple ongoing government investigations and inquiries.

227.    The Individual Defendants' interference was malicious and wrongful.

228.  The Individual Defendants' interference was not justified, privileged, or excusable.

229.  As a consequence of this interference, SNB could be subject to federal penalties and has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, the Defendants are liable for "costs as well as for . . . reasonable attorneys' fees."  Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge certain Business Defendants' accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action."  As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

### Eighth Claim for Relief –
### Oklahoma Deceptive Trade Practices Act, Okla. Stat. tit. 78, § 54

230.  SNB realleges and repleads all the allegations of paragraphs 1-147 of this Petition and incorporates them by reference.

231.  Defendants engaged in deceptive trade practices, in violation of Okla. Stat. tit. 78, § 54.  In particular, when acting for certain Business Defendants, the Individual Defendants falsely represented that certain Business Defendants were not marijuana-related and/or that they did not operate cashless ATMs.

232.  Specifically, when acting for certain Business Defendants, the Individual Defendants, in the course of business with SNB, knowingly made false representations "as to affiliation, connection, [or] association with . . . another."  Okla. Stat. tit. 78, § 53(A)(3).  The Individual Defendants represented that certain Business Defendants were not marijuana-related businesses when in fact they were.  Mr. Hannelius moreover represented that certain Business Defendants did not process transactions for cashless ATMs when in fact they did.

233.    After opening the accounts based on false representations, SNB processed Defendant's improper transactions, including the four December 2021 wire transfers and Ms. Moore's transactions.

234.    As a consequence of opening these accounts, SNB has incurred substantial damages in an effort to fully comply with the ongoing government investigations.  Pursuant to the Terms and Conditions of Your Account §§ 2 and 3, the Defendants are liable for "costs as well as for . . . reasonable attorneys' fees."  Moreover, pursuant to the Terms and Conditions of Your Account § 30, SNB may charge certain Business Defendants' accounts for "[a]ny fees or expenses . . . incur[red] in responding to any legal action."  As a consequence of these investigations, SNB has additionally incurred substantial damages in the form of reputational harm, lost business resources, missed opportunities, and a lower return on capital.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment in their favor ordering

1.    Defendants to pay, indemnify, and otherwise hold harmless Plaintiffs for past and future damages and costs resulting from the ongoing government investigations, including, but not limited to, the costs of internal investigations, external counsel assistance with subpoenas, and document production services;

2.    Defendants to pay Plaintiffs for past and future damages in the form of personnel costs, including benefits, and reputational harm, lost business resources, missed opportunities, and a lower return on capital resulting from the ongoing government investigations;

3.    Pursuant to the Terms and Conditions of Your Account § 3, Defendants to pay for Plaintiffs' past and future "costs as well as for . . . reasonable attorneys' fees" incurred as a part of the ongoing government investigations and this litigation, which was caused by Defendants' tortious actions and omissions and breaches of contract; and

4.    Any other relief as the Court may deem just, proper, and appropriate.

### JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for all the issues pleaded herein so triable.  Okla. Const. Art. 2, § 19.


May 24, 2024                                    Respectfully submitted,


                                               *Lawrence D. Rosenberg*
                                               Lawrence D. Rosenberg
                                               JONES DAY
                                               51 Louisiana Avenue, N.W.
                                               Washington, DC  20001.2113
                                               +1.202.879.3939
                                               ldrosenberg@jonesday.com
                                               *(pro hac admission pending)*


                                               Ryan E. Price, OBA # 19547
                                               SIMS, PRICE & PRICE, PLLC
                                               1517 Main Street – P.O. Box 1086
                                               Woodward, OK 73802.1086
                                               Telephone: +1.580.256.9900
                                               Facsimile: +1.580.256.9902

                                               *Counsel for Plaintiffs Shattuck Bancshares,*
                                               *Inc., and SNB Bank, N.A.*


41

# Exhibit A

## ACCOUNT AGREEMENT

| | |
|---|---|
| SNB BANK, NATIONAL ASSOCIATION<br>P O BOX 39<br>SHATTUCK OK 73858 | **Account** 10511067<br>**Number:** |
| | **Account Owner(s) Name & Address**<br>EFT BUSINESS SERVICES, LLC |

Agreement Date: ___03/05/2021___ By: 01 LESTA STEVENS

☐ EXISTING Account - This agreement replaces previous agreement(s).

**Account Description:**

---

☒ Checking ☐ Savings ☐ NOW ☒ Business Checking

Initial Deposit $ 0.00     Source: _____

21550 BISCAYNE BLVD, STE 400
AVENTURA    FL 33180

**Additional Information:** Date: 03/05/2021

**Ownership of Account - CONSUMER Purpose**

☐ Individual ☐ _____

☐ Joint - With Survivorship *(and not as tenants in common)*

☐ Joint - No Survivorship *(as tenants in common)*

☐ Trust - Separate Agreement:

☐ Revocable Trust   or   ☐ Pay-on-Death Designation
as Defined in this Agreement
(Name and Address of Beneficiaries):

Port: 1004356

Distributions from POD accounts shall be consistent with 6 Okl. St. 901 for banks and 18 Okl. St. 381.39a for savings associations.

**Signature(s). The undersigned certifies the accuracy of the information he/she has provided and acknowledges receipt of a completed copy of this form. The undersigned authorizes the financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following agreement(s) and/or disclosure(s):**

☒ Terms & Conditions ☒ Truth in Savings ☒ Funds Availability
☒ Electronic Fund Transfers ☒ Privacy ☒ Substitute Checks
☐ Common Features ☐ _____

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

(1): X *Eric Hannelius*
Eric Hannelius - 2021-03-05, 20:36:57 UTC
ERIC H HANNELIUS (AUTHORIZED SIGNER)
I.D. # ▮▮▮▮    D.O.B. ▮▮▮▮

(2): X *Oksana Moore*
Oksana Moore - 2021-03-05, 19:44:00 UTC
OKSANA MOORE (AUTHORIZED SIGNER)
I.D. # ▮▮▮▮    D.O.B. ▮▮▮▮

(3): X
I.D. # _____ D.O.B. _____

(4): X
I.D. # _____ D.O.B. _____

☐ Authorized Signer (Individual Accounts Only)

X
I.D. # _____ D.O.B. _____

**Ownership of Account - BUSINESS Purpose**

☐ Sole Proprietorship ☐ Single-Member LLC ☐ Partnership

☒ LLC *(LLC tax classification.* ☐ C Corp ☐ S Corp ☐ *Partnership)*

☐ C Corporation ☐ S Corporation ☐ *Non-Profit*

☐ _____

Business:

**Backup Withholding Certifications** *(Non-"U.S. Persons" - Use separate Form W8)*

☒ By signing at right, I, ERIC H HANNELIUS
certify under penalties of perjury that the statements made in this section are true.

☒ **TIN:** ▮▮▮▮ The Taxpayer Identification
Number (TIN) shown is my correct taxpayer identification number.

☒ **Not Subject to Backup Withholding.** I am NOT subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ **Exempt Recipient.** I am an exempt recipient under the Internal Revenue Service Regulations. Exempt payee code (if any) _____

**FATCA Code.** The FATCA code entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**U.S. Person. I am a U.S. citizen or other U.S. person (as defined in the instructions).**

Signature Card-OK
Bankers Systems™ VMP®
Wolters Kluwer Financial Services ©2016

MPSC-LAZ-OK 1/15/2016
Page 1 of 1

# ZIX SNB Bank, N.A. Secure Messaging
E-SIGNATURE CERTIFICATE

---

## Certificate Summary

ENVELOPE SUBJECT: **EFT Documents**
DOCUMENT: **EFT NEW ACCOUNT.pdf**
DOCUMENT ORIGINATOR: **Lesta Stevens (lesta.stevens@snbbankna.com)**

ENVELOPE ID: **02fec0ee-13dc-4eb4-9ca5-08820b8a91b8**
DOCUMENT ID: **8fc67b19-81fc-4780-886f-04c41a176790**
ORIGINATOR IP ADDRESS: **208.95.204.50**

CERTIFICATE STATUS: **Completed**
DELIVERED: **Mar 05, 2021 7:41 PM UTC**
DOCUMENT PAGES: **8** CERTIFICATE PAGES: **1** TOTAL ENVELOPE PAGES: **9**

COMPLETED SIGNATORIES: **1 / 1**
COMPLETED IN PLACE SIGNATURES: **4 / 4**
COMPLETED IN PLACE INITIALS: **0 / 0**
CARBON COPY RECIPIENTS: **0**

---

## Signatures

E-SIGNED BY: **Oksana Moore (oksana@transactfirst.com)**
SECURITY LEVEL: **Secure Email (Authenticated)**
E-SIGNATURE ID: **5cd9d984-5f96-49cf-b91c-91590078e51c**

## Timeline

SENT: **Mar 05, 2021 7:41 PM UTC**
VIEWED: **Mar 05, 2021 7:42 PM UTC**
SIGNED: **Mar 05, 2021 7:44 PM UTC**
USING IP ADDRESS: **96.84.9.153**

*Oksana Moore*

I AGREE TO THE CONTENTS OF ALL PAGES ABOVE WITH AN ELECTRONIC SIGNATURE

PRINT NAME: **Oksana Moore** EMAIL: **oksana@transactfirst.com**



# ZIX SNB Bank, N.A. Secure Messaging
E-SIGNATURE CERTIFICATE

## Certificate Summary

ENVELOPE SUBJECT: **EFT Business Services Docs**
DOCUMENT: **EFT NEW ACCOUNT_signed.pdf**
DOCUMENT ORIGINATOR: **Lesta Stevens (lesta.stevens@snbbankna.com)**

ENVELOPE ID: **2a4cb3dd-2897-4716-8c22-d83851c3bcf1**
DOCUMENT ID: **92be1b10-1f34-42b2-9956-b4c08e0c66f6**
ORIGINATOR IP ADDRESS: **208.95.204.50**

CERTIFICATE STATUS: **Completed**
DELIVERED: **Mar 05, 2021 8:03 PM UTC**
DOCUMENT PAGES: **9** CERTIFICATE PAGES: **1** TOTAL ENVELOPE PAGES: **10**

COMPLETED SIGNATORIES: **1 / 1**
COMPLETED IN PLACE SIGNATURES: **4 / 4**
COMPLETED IN PLACE INITIALS: **0 / 0**
CARBON COPY RECIPIENTS: **0**

## Signatures

E-SIGNED BY: **Eric Hannelius (ehannelius@mac.com)**
SECURITY LEVEL: **Secure Email (Authenticated)**
E-SIGNATURE ID: **2b02454f-91d0-4e4c-b987-fe757e0497a0**

## Timeline

SENT: **Mar 05, 2021 8:03 PM UTC**
VIEWED: **Mar 05, 2021 8:30 PM UTC**
SIGNED: **Mar 05, 2021 8:36 PM UTC**
USING IP ADDRESS: **104.182.175.67**

*Eric Hannelius*

I AGREE TO THE CONTENTS OF ALL PAGES ABOVE WITH AN ELECTRONIC SIGNATURE
PRINT NAME: **Eric Hannelius** EMAIL: **ehannelius@mac.com**

Exhibit B

# Terms and Conditions of Your Account

**Contents:**

(1)  Important Information about Procedures for Opening a New Account
(2)  Agreement
(3)  Liability
(4)  Deposits
(5)  Withdrawals
       *Generally*
       *Postdated Checks*
       *Checks and Withdrawal Rules*
       *A Temporary Debit Authorization Hold Affects Your Account Balance*
       *Overdrafts*
       *Multiple Signatures, Electronic Check Conversion, and Similar Transactions*
       *Notice of Withdrawal*
(6)  Ownership of Account and Beneficiary Designation
       *Individual Account*
       *Joint Account — With Survivorship*
       *Joint Account — No Survivorship*
       *Revocable Trust or Pay-on-Death Account*
(7)  Business, Organization, and Association Accounts
(8)  Stop Payments
(9)  Telephone Transfers
(10) Amendments and Termination
(11) Notices
(12) Statements
       *Your Duty to Report Unauthorized Signatures, Alterations, and Forgeries*
       *Your Duty to Report Other Errors*
       *Errors Relating to Electronic Fund Transfers or Substitute Checks*
(13) Direct Deposits
(14) Temporary Account Agreement
(15) Setoff
(16) Check Processing
(17) Check Cashing
(18) Truncation, Substitute Checks, and Other Check Images
(19) Remotely Created Checks
(20) Unlawful Internet Gambling Notice
(21) ACH and Wire Transfers
(22) Facsimile Signatures
(23) Authorized Signer
(24) Restrictive Legends or Indorsements
(25) Account Transfer
(26) Indorsements
(27) Death or Incompetence
(28) Fiduciary Accounts
(29) Credit Verification
(30) Legal Actions Affecting Your Account
(31) Security
(32) Telephonic Instructions
(33) Monitoring and Recording Telephone Calls and Consent to Receive Communications
(34) Claim of Loss
(35) Early Withdrawal Penalties
(36) Address or Name Changes
(37) Resolving Account Disputes
(38) Waiver of Notices
(39) Additional Terms

**(1) Important Information about Procedures for Opening a New Account.** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**(2) Agreement.** This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement is subject to applicable federal laws, the laws of the state of Oklahoma and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:
1. summarize some laws that apply to common transactions;
2. establish rules to cover transactions or events which the law does not regulate;

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

3. establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

4. give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document. Nothing in this document is intended to vary our duty to act in good faith and with ordinary care when required by law.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**(3) Liability.** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and we can deduct any amounts deposited into the account and apply those amounts to the shortage. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs

and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

**(4) Deposits.** We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of indorsement or lack of indorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing indorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check for deposit, we may require any third-party indorsers to verify or guarantee their indorsements, or indorse in our presence.

**(5) Withdrawals.**

**Generally.** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated Checks.** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and Withdrawal Rules.** If you do not purchase your check blanks from us, you must be certain that we

Terms and Conditions-OK.
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified.

Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**A Temporary Debit Authorization Hold Affects Your Account Balance.** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money when the merchant does not know the exact amount of the purchase at the time the card is authorized. The amount of the temporary hold may be more than the actual amount of your purchase. Some common transactions where this occurs involve purchases of gasoline, hotel rooms, or meals at restaurants. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it could be three calendar days, or even longer in some cases, before the adjustment is made. Until the adjustment

is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

**Overdrafts.** You understand that we may, at our discretion, honor withdrawal requests' that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying, or not paying, discretionary overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

**Multiple Signatures, Electronic Check Conversion, and Similar Transactions.** An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

**Notice of Withdrawal.** We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit or demand deposit, or from any other savings account as defined by Regulation D. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-OK 1/1/2019
(1901).00
Page 3 of 9

**(6) Ownership of Account and Beneficiary Designation.** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account.** This is an account in the name of one person.

**Joint Account - With Survivorship** *(And Not As Tenants In Common).* This is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship** *(As Tenants In Common).* This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust or Pay-on-Death Account.** If two or more of you create such an account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If, at the death of the owner(s) of this account, the beneficiary is not living, the beneficiary's estate acquires ownership of the account. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either of these account types reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**(7) Business, Organization, and Association Accounts.** Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

**(8) Stop Payments.** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we

have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not. Your stop-payment order is effective for six months if it is given to us in writing or by another type of record (Generally, a "record" is information that is stored in such a way that it can be retrieved and can be heard or read and understood - you can ask us what type of stop-payment records you can give us). Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. If the original stop-payment order was oral your stop-payment order will lapse after 14 calendar days if it is not confirmed in writing or by another type of record within that time period. We are not obligated to notify you when a stop-payment order expires. A release of the stop-payment request may be made only by the person who initiated the stop-payment order.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**(9) Telephone Transfers.** A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Unless a different limitation is disclosed in writing, we restrict the number of transfers from a savings account to another account or to third parties, to a maximum of six per month (less the number of "preauthorized transfers" during the month). Other account transfer restrictions may be described elsewhere.

**(10) Amendments and Termination.** We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**(11) Notices.** Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice you give us is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you.

**(12) Statements.**

**Your Duty to Report Unauthorized Signatures, Alterations, and Forgeries.** You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we used ordinary care. The

limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**Your Duty to Report Other Errors.** In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error - such as an encoding error. In addition, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

**Errors Relating to Electronic Fund Transfers or Substitute Checks** *(For consumer accounts only)*. For information on errors relating to electronic fund transfers (e.g., on-line, mobile, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**(13) Direct Deposits.** If we are required for any reason to reimburse the federal government for all or any portion of a benefit payment that was directly deposited into your account, you authorize us to deduct the amount of our liability to the federal government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**(14) Temporary Account Agreement.** If the account documentation indicates that this is a temporary account agreement, each person who signs to open the account or has authority to make withdrawals (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**(15) Setoff.** We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt any of you owe us now or in the future. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

of the balance for which we have properly accelerated the due date.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**(16) Check Processing.** We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and indorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have exercised ordinary care if our automated processing is consistent with general banking practice, even though we do not inspect each item. Because we do not inspect each item, if you write a check to multiple payees, we can properly pay the check regardless of the number of indorsements unless you notify us in writing that the check requires multiple indorsements. We must receive the notice in time for us to have a reasonable opportunity to act on it, and you must tell us the precise date of the check, amount, check number and payee. We are not responsible for any unauthorized signature or alteration that would not be identified by a reasonable inspection of the item. Using an automated process helps us keep costs down for you and all account holders.

**(17) Check Cashing.** We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

**(18) Truncation, Substitute Checks, and Other Check Images.** If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our internal policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute

checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**(19) Remotely Created Checks.** Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.

You warrant and agree to the following for every remotely created check we receive from you for deposit or collection: (1) you have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check; (2) you will maintain proof of the authorization for at least 2 years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned you owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount you owe us, and if there are insufficient funds in your account, you still owe us the remaining balance.

**(20) Unlawful Internet Gambling Notice.** Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**(21) ACH and Wire Transfers.** This agreement is subject to Article 4A of the Uniform Commercial Code – Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. Credit entries may be

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-OK 1/1/2019
(1901).00
Page 6 of 9

made by ACH. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**(22) Facsimile Signatures.** Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

**(23) Authorized Signer** *(Individual Accounts only).* A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf. The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of an authorized signer.

**(24) Restrictive Legends or Indorsements.** The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends, restrictive indorsements or other special instructions on every check. For this reason, we are not required to honor any restrictive legend or indorsement or other special instruction placed on checks you write unless we have agreed in writing to the restriction or instruction. Unless we have agreed in writing, we are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive indorsement.

**(25) Account Transfer.** This account may not be transferred or assigned without our prior written consent.

**(26) Indorsements.** We may accept for deposit any item payable to you or your order, even if they are not indorsed

by you. We may give cash back to any one of you. We may supply any missing indorsement(s) for any item we accept for deposit or collection, and you warrant that all indorsements are genuine.

To ensure that your check or share draft is processed without delay, you must indorse it (sign it on the back) in a specific area. Your entire indorsement (whether a signature or a stamp) along with any other indorsement information (e.g., additional indorsements, ID information, driver's license number, etc.) must fall within 1 1/2" of the "trailing edge" of a check. Indorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all indorsement information within 1 1/2" of that edge.



It is important that you confine the indorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed indorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your indorsement, another indorsement, or information you have printed on the back of the check obscures our indorsement. These indorsement guidelines apply to both personal and business checks.

**(27) Death or Incompetence.** You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-OK 1/1/2019
(1901).00
Page 7 of 9

agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

**(28) Fiduciary Accounts.** Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

**(29) Credit Verification.** You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

**(30) Legal Actions Affecting Your Account.** If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

**(31) Security.** It is your responsibility to protect the account numbers and electronic access devices (e.g., an ATM card) we provide you for your account(s). Do not discuss, compare, or share information about your account number(s) with anyone unless you are willing to give them full use of your money. An account number can be used by thieves to issue an electronic debit or to encode your number on a false demand draft which looks like and functions like an authorized check. If you furnish your access device and grant actual authority to make transfers to another person (a family member or coworker, for example) who then exceeds that authority, you are liable for the transfers unless we have been notified that transfers by that person are no longer authorized. Your account number can also be used to electronically remove money from your account, and payment can be made from your account even though you

did not contact us directly and order the payment. You must also take precaution in safeguarding your blank checks. Notify us at once if you believe your checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself or share the loss with us (we may have to share some of the loss if we failed to use ordinary care and if we substantially contributed to the loss).

Except for consumer electronic fund transfers subject to Regulation E, you agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, such as positive pay or commercially reasonable security procedures, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered, unless we acted in bad faith or to the extent our negligence contributed to the loss. If we offered you a commercially reasonable security procedure which you reject, you agree that you are responsible for any payment order, whether authorized or not, that we accept in compliance with an alternative security procedure that you have selected.

**(32) Telephonic Instructions.** Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission or leave by voice mail or on a telephone answering machine.

**(33) Monitoring and Recording Telephone Calls and Consent to Receive Communications.** Subject to federal and state law, we may monitor or record phone calls for security reasons, to maintain a record and to ensure that you receive courteous and efficient service. You consent in advance to any such recording.

To provide you with the best possible service in our ongoing business relationship for your account we may need to contact you about your account from time to time by telephone, text messaging or email. However, we first obtain your consent to contact you about your account in compliance with applicable consumer protection provisions in the federal Telephone Consumer Protection Act of 1991 (TCPA), CAN-SPAM Act and their related federal regulations and orders issued by the Federal Communications Commission (FCC).

◆ Your consent is limited to your account, and as authorized by applicable law and regulations.
◆ Your consent is voluntary and not conditioned on the purchase of any product or service from us.

With the above understandings, you authorize us to contact you regarding your account throughout its existence using any telephone numbers or email addresses that you have previously provided to us by virtue of an existing business relationship or that you may subsequently provide to us.

This consent is regardless of whether the number we use to contact you is assigned to a landline, a paging service, a

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

cellular wireless service, a specialized mobile radio service, other radio common carrier service or any other service for which you may be charged for the call. You further authorize us to contact you through the use of voice, voice mail and text messaging, including the use of pre-recorded or artificial voice messages and an automated dialing device.

If necessary, you may change or remove any of the telephone numbers or email addresses at any time using any reasonable means to notify us.

**(34) Claim of Loss.** If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you. You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**(35) Early Withdrawal Penalties** *(and involuntary withdrawals)*. We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account or as a result of an attachment or other legal process. We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your notice of penalty for early withdrawals for additional information.

**(36) Address or Name Changes.** You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

**(37) Resolving Account Disputes.** We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or

(3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

**(38) Waiver of Notices.** To the extent permitted by law, you waive any notice of non-payment, dishonor or protest regarding any items credited to your account or charged against your account. For example, if you deposit a check and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

**(39) Additional Terms.**

Terms and Conditions-OK
© 2019 Wolters Kluwer Financial Services, Inc.
All rights reserved.

TC-OK 1/1/2019
(1901).00
Page 9 of 9

Exhibit C

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

**ATM AND DEBIT**
**SPONSORSHIP AGREEMENT**

   This ATM and Debit Sponsorship Agreement (the "Agreement") dated as of July 12, 2023 (the "Effective Date") is between **Pepper Pay, LLC,** whose address is 2029 Century Park East, Suite 400, Los Angeles, CA 90067 ("Client") and **SNB Bank, National Association,** whose address is 503 S. Main, Shattuck, OK 73858 ("Bank"). Each may be referred to herein as a "Party" or collectively as "Parties."

**RECITALS**

   (a)  Bank is a member of the various Network(s) and is in the business of sponsoring clients as Independent Sales Organizations ("ISO") enabling clients to connect to the various Network(s).

   (b)  Whereas Bank provides sponsorship into certain ATM and Debit card networks ("Debit Networks").

   (c)  Each Network allows the Member to sponsor the Terminals of an ISO to connect to the Network providing the Member assumes the responsibility of the ISO.

   (d)  Client desires to be an ISO to deploy and operate Terminals in various locations which will be connected to various Networks under Client's name.

   (e)  Bank is willing to sponsor Client Terminals for ATM and PIN-Debit Transactions at this time and may, in the future and at Bank's sole discretion, sponsor Client Terminals for other debit transactions.

**NOW, THEREFORE,** in consideration of the mutual covenants and conditions hereinafter set forth, the Parties hereto, intending to be legally bound, agree as follows:

**ARTICLE I - DEFINITIONS**

**SECTION 1.1**    **Definitions**
Except as otherwise specifically indicated, the following terms shall have the following meanings in this Agreement (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

   "Account" means a depository account which is maintained with an Issuer and which may be accessed by a Cardholder.

   "Acquirer" means a Network member that sponsors and is responsible for the operational control of a Terminal in accordance with the rules and regulations of each Network.

   "Acquirer Processor" means a Direct Acquirer Processor or an Indirect Acquirer Processor.

   "ATM" means an automated teller machine which dispenses cash by use of a card. The term does not include so-called "cashless ATMs."

   "ATM/Debit Transactions" means any of the following functions initiated by a Cardholder at a Terminal:

     (i)  "Withdrawal" means the accessing of funds by a Cardholder from a Cardholder's Account; or
     (ii)  "Purchase" means the accessing of funds by a Cardholder from the Cardholder's Account to complete a retail purchase transaction;
     (iii)  "Transfer" means the transfer of funds by a Cardholder between two depository Accounts maintained with the same Issuer; or

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

(iii)    "Inquiry" means an inquiry by a Cardholder as to the balance of the Cardholder's Account.

"Bank Indemnitees" shall have the meaning set forth in Section 12.1(a) of this Agreement.

"By-Laws and Operating Rules" means the By-Laws and Operating Rules of the Network as amended from time to time.

"Card" means a debit card that is issued by a member of any Network Issuer with the prior express written approval of a financial institution.

"Cardholder" means (i) the person who maintains or is authorized to access an Account or a Card with an Issuer (and if such Account or Card is maintained with an Issuer in the name of, or may be accessed by, more than one person, all of such persons), and (ii) uses a Card to originate a Transaction.

"Cash Services" means the services furnished by Client which may include but is not limited to supplying the cash for one or more of the Terminals deployed and operated under this Agreement.

"Client Contractors" shall have the meaning set forth in Section 12.1(a) of this Agreement.

"Client Indemnitees" shall have the meaning set forth in Section 12.1(b) of this Agreement.

"Compliance Regulations" means Regulation E, and any other federal, state, or local statute, law, Rule or regulation that may be applicable to the Network, any Participant or a Transaction.

"Default" means any event, which is, or after notice or passage of time would be, an Event of Default.

"Eligible Transaction" means an authorized ATM or PIN Debit Transaction initiated by Cardholder upon which a Surcharge Fee may be applied or authorized.

"Fees" means a Switch Fee and Interchange Fee as established from time to time by Networks.

"Government Requirements" means collectively all applicable statutes, codes, ordinances, laws, regulations (including Regulation E), rules, orders and decrees of all governmental authorities (including without limitation federal, state and local governments, governmental agencies and quasi-governmental agencies).

"Graphic Standards" means all standards, policies and other requirements adopted by the Networks from time to time with respect to use of their Marks.

"Indemnified Party" shall have the meaning set forth in Section 12.1(c) of this Agreement.

"Indemnifying Party" shall have the meaning set forth in Section 12.1(c) of this Agreement.

"Independent Contractor" or "IC" means an entity that is not a Member, and that is under an agreement with Client to deploy Terminals under Client's name, as provided for in this Agreement.

"Independent Sales Organization" or "ISO" means an entity that is not a Member which is registered with the Network by Bank as an Independent Sale Organization to deploy Terminals as provided in this Agreement.

"Interchange Fee" means the fee paid to the Acquirer for an ATM/Debit Transaction as established by the Network from time to time.

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

"Issuer" means a Network member that issues Cards to Cardholders for use in performing Transactions.

"Item" means the electronic messages which communicate and effect a Transaction between an Issuer and its Cardholder through the use of a Terminal.

"Losses" shall have the meaning set forth in Section 12.1(a) of this Agreement.

"Mark" means the service marks and trademarks of Networks and Bank, including, but not limited to, the names and any other distinctive marks or logos which identify the Networks or Bank.

"Member" or "Membership" means the membership in a Network and licensing rights thereto obtained by Bank.

"Merchant" means a seller of goods in whose location Client has installed a Terminal by Client sponsored by the Bank.

"Merchant Agreement" means any agreement between a Merchant and Client relating to Processing Services.

"Network" means, Star, Accel, Pulse, AFFN, or such other credit, debit, and stored value card proprietary network for transmitting Items and other electronic messages and settling Transactions between Participants, as may be from time to time designated by Bank and includes, but is not limited to, a Switch, Terminals, Cards, all related computer hardware and software, telecommunications facilities and equipment, Rules, Regulatory Authorities, technical specifications, logos, and Marks.

"Operator" shall have the meaning set forth in Section 3.6 of the Agreement.

"Participant" means an Issuer, Processor, or Independent Contractor.

"PIN Debit Transactions" means a debit transaction initiated by a Cardholder at a Terminal in person with the Card present:

"Prior Agreement" shall have the meaning set forth in Section 2.1(b) of this Agreement.

"Processing Services" means those services which are necessary to operate a Terminal in accordance with the By-Laws and Operating Rules of the Networks, including without limitation, Transaction processing, Settlement, Fees, Network access, Cardholder dispute resolution, Terminal support and Transaction reporting to Networks.

"Processor" means Fiserv Solutions, LLC.

"PIN Security and Encryption Keys Audit" means the self- audit review mailed to Client annually to determine if Client is following the policies and procedures established by the Networks to ensure security and control is maintained in any access device that manages Cardholder PINs and encryption keys.

"Regulation E" means (i) the regulation, all amendments thereto and official interpretations thereof (12 C.F.R. Part 205) adopted by the Consumer Finance Protection Bureau implementing Title IX (Electronic Funds Transfer Act) of the Consumer Credit Protection Act as amended (15 U.S.C. 1601 et seq.) and (ii) the Electronic Fund Transfer Act and any amendments thereto.

"Regulatory Authority" means, as the context requires, Federal Financial Institutions Examination Council, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, and any other federal or state agency having jurisdiction over Bank or Client.

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

"Rules" means any By-Laws or Operating Rules and procedures of any Network, or Issuer, and the published policies and procedures of Bank, as promulgated by Bank's Board of Directors in good faith to ensure the continued safety and soundness of Bank as amended from time to time.

"Settlement" means the movement and reconciliation of funds between Participants in accordance with the Rules.

"Settlement Bank" means the Bank as the depository agent for Settlement.

"Sponsorship" means the steps the Bank takes to enable the Client to process Transactions using a Network.

"Surcharge Fee" means a fee deducted from a Cardholders Account by an Acquirer or Acquirer Processor for an ATM/Debit Transaction initiated at a Terminal.

"Switch" means a mainframe computer that recognizes electronic Transactions and transmits them to the appropriate bank, Network, or Issuer.

"Terminal" means any electronic device that is Triple Data Encryption Security (TDES) certified, and when activated by a Cardholder is capable of performing any of the ATM/Debit Transactions.

"Third Party Claim" shall have the meaning set forth in Section 12.1(c) of this Agreement.

"Transaction" means any transaction that is initiated at a Terminal through the use of a Card to include but not limited to ATM/Debit Transactions and non-financial transactions.

## ARTICLE II – GENERAL DESCRIPTION OF THE PROGRAM

**SECTION 2.1        Purpose**
The purpose of this program is to offer Bank Sponsorship to the Networks for Terminals placed and managed by Client in compliance with the Network Rules and operating regulations.  While this agreement is in place, the parties acknowledge all Terminals, will be owned by Client.

## ARTICLE III - DUTIES OF CLIENT

**SECTION 3.1        Terminal Deployment**
Client may, from time to time, market, deploy and install Terminals in  Merchant locations. The Merchant Agreement must be in the name of Client but will acknowledge Bank's role as Sponsor of the Terminal, and a full and complete executed copy of which must be submitted to Bank monthly or upon request of Bank.  Bank may reject or terminate any Sponsorship in its sole discretion Bank may from time to time in its sole discretion designate if the particular Transactions from particular Terminals will be considered "High Risk" for fee purposes.  If not initially designated "High Risk", Bank may change the designation in its sole discretion to "High Risk" upon notice to Client..

**SECTION 3.2        Terminal Maintenance and Repair**
Client will be solely responsible for installation, maintenance and repair of each Terminal including, but not limited to electrical, and for communication connections in compliance with the Terminal manufacturer specifications, the applicable Network's Rules, and Compliance Regulations, Graphic Standards and technical specifications established by Networks for operation thereof and/or written requirements published by Networks from time to time (collectively, the "Network Requirements"), as may be amended or modified from time to time, all of which are incorporated herein by reference as if fully set forth herein.. Client acknowledges having received a copy of the Network Requirements as of the Effective Date.

**SECTION 3.3        Application and Network Registration**
Client shall complete the following:

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

(a)       Client application as defined in **Exhibit A** along with any due diligence information; and

(b)       Network registration and requirements.

**SECTION 3.4          Access to Program Documents and Information**
(a)       Client shall provide to Bank the following:

(i)        Notification of new Terminal installations including all applicable information required pursuant to Section 3.1 and such additional ownership and collateral documentation, as requested, including, but not limited to financial and other information on the Merchant sufficient for the Bank to satisfy its obligations to Regulatory Authority.

(ii)       Prior notification of the use of Terminal sales company or representatives selling or placing Terminals who are not direct or 1099 employees, including collateral documentation, as requested.

(iii)      Quarterly updates of Terminal locations as of the end of each calendar quarter.

(iv)      On the Execution Date and thereafter or as Bank or a Network requires, but no less often than annually, such audits, reviews, or examinations as may be required by the Bank or Network, including but not limited to, a PCI Audit and any back up documentation as may be required to ensure policies and procedures provided for in the PCI Audit are being followed.

(v)       Current Federal Income Tax Returns, as required by Section 5.1.

(vi)      Year-End Business Financials, as required by Section 5.1.

(vii)     Client will have thirty (30) business days to provide the information in this Section 3.4, after notification by Bank that the information was not received or incomplete. If documentation is not provided, an on-site compliance review may be scheduled at the expense of Client, such expense to include time on location at a reasonable rate, but not less than $75.00 per hour, travel to and from Client's location, hotel for the duration of the review and per diem of $75.00 per day.

(viii)    Client will have thirty (30) business days to respond to the on-site review after receiving Bank's exception report. No Terminals may be installed while Client is out of compliance or has provided acceptable dates to the Network as to when Client will be in compliance. If Client remains out of compliance for more than ninety (90) days after receiving Bank exception report, Client will be terminated per Article IX, Sections 9.2 and 9.3.

(b)       Bank shall have access to all information and documents it reasonably requests concerning Merchants and Terminals in order to sponsor the Terminals. If requested, Client will provide Bank copies of all third-party contracts with such providers within thirty (30) business days of receipt of such request.

**SECTION 3.5          Release of Information**
By signing this Agreement, Client hereby gives consent and authorization to Processors utilized by Client to release any and all Terminal information that is required by any Network for Bank to remain in compliance with Network Rules, regulations, procedures or any other request made by the Network to Bank for any information maintained by the processor. Bank will notify Client of any request for information to be sent to Processor.

**SECTION 3.6          Terminal Inventory**
Client shall provide from time to time as defined by Bank or as required by the Network pursuant to Section 5.1 (e) an inventory for Terminals which Bank provides Sponsorship pursuant to this Agreement.

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF CLIENT

**SECTION 4.1**          **Representations and Warranties**
Client represents and warrants to Bank as follows:

(a)     This Agreement is valid, binding and enforceable against Client in accordance with its terms.

(b)     Client operates as a limited liability company duly organized, validly existing and in good standing under the laws of the state where licensed and registered and is authorized to do business in each state in which the nature of Client's activities makes such authorization necessary.

(c)     Client has the full power and authority to execute and deliver this Agreement and to perform all its obligations under this Agreement. The provisions of this Agreement and the performance by Client of its obligations under this Agreement are not in conflict with Client's Articles of Incorporation, bylaws or any other agreement, contract, lease or obligation to which Client is a party or by which it is bound.          .

(d)     Neither Client nor any principal of Client has been subject to the following:

(i)     Criminal conviction (except minor traffic offenses and other petty offenses);

(ii)    Federal or state tax lien;

(iii)   Administrative or enforcement proceedings commenced by the Securities and Exchange Commission, any state securities regulatory authority, Federal Trade commission, federal or state bank regulator, or any other state or federal regulatory agency; or

(iv)    Restraining order, decree, injunction, or judgment in any proceeding or lawsuit, alleging fraud or deceptive practice on the part of Client or any principal thereof.

For purpose of this subparagraph, the word "principal" shall include any person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owning twenty five percent (25%) or more of Client, and the controlling officer or director of Client.

(e)     There is not pending or threatened against Client, any litigation or proceeding, judicial, tax or administrative, except as described on attached Exhibit B.

(f)     Client's financial statements, subject to any limitation stated therein, which have been or which hereafter will be furnished to Bank to induce it to enter into or continue performance under this Agreement, do or will fairly represent the financial condition of Client, and all other information, reports and other papers furnished Bank will be, at the time the same are furnished, accurate and complete in all material respects and complete insofar as completeness may be necessary to give Bank a true and accurate knowledge of the subject matter. The financial statements are in accordance with the books and records of Client were prepared in accordance with generally accepted accounting principles ("GAAP") as in effect in the United States, as consistently applied, and in accordance with all pronouncements of the Financial Accounting Standards Board.

(g)     Client agrees that at Bank's sole discretion, Bank, its authorized representatives, or agents and any Regulatory Authority (collectively the "Auditing Party"), shall have the right to inspect, audit, and examine all of Client's facilities, records and personnel relating to the Program at any time during normal business hours upon at least thirty (30 days) prior notice, subject to Client's standard confidentiality requirements, including execution of a confidentiality agreement by the Auditing Party. The Auditing Party shall have the right to make abstracts from Client's books, accounts, data, reports, papers, and computer records directly pertaining to the subject matter of this Agreement, and Client shall make all such facilities, records, personnel, books, accounts, data, reports, papers, and computer records available to the Auditing Party for the

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

purpose of conducting such inspections and audits. Absent evidence of fraud or malfeasance, Bank will endeavor, but is not required, to limit such examinations to no more than one (1) per year.

(h)     Client, its agents and/or Merchant will provide a safe and secure environment at each location to ensure Terminal PIN security is maintained.

(i)     Client shall be solely responsible for all security of Cardholders, third parties who service the Terminal, and Network compliance and signage at each location.

(j)     All operational responsibilities are completed in compliance with Rules and Regulations, and Client has policies and procedures in place to document compliance.

## ARTICLE V - COVENANTS OF CLIENT

**SECTION 5.1          Covenants**
Client covenants and agrees with Bank as follows:

(a)     It and its Client Contractors, if any, will comply with all Government Requirements and the Rules, and any rules, orders and regulations issued by the Regulatory Authorities (collectively "Legal Requirements") that relate to Client's business, this Agreement, or the matters, Transactions, and Terminals contemplated by this Agreement which govern the specific market where Terminals are located.

(b)     Terminals sponsored under this Agreement may only be placed in service if the Terminals are in compliance with and will remain in compliance with Network Requirements.

(c)     Client will provide to Bank accurate and complete information as required by the Network to complete all required Network reports.

(d)     Client will provide to Bank on the 10th day of each calendar month a report of all Sponsored Terminals and the Merchant where the Terminal is located as of the end of the prior month and all due diligence completed in the prior month in such detail as Bank may from time to time require.

(e)     Client shall complete all necessary due diligence on potential Merchants, ICs, Client Contractors, Sales Representatives or Sales Organizations in the program. Due diligence shall include but may not be limited to personal and/or business credit checks, criminal background check, and OFAC review.

(f)     Client shall only process Eligible Transactions and shall process all Eligible Transactions initiated at a Terminal in accordance with the Rules.

(g)     Client will fully and completely comply, and cause each Merchant to comply, with the terms of each Merchant Agreement. Client will not modify any Merchant Agreement nor waive compliance with any condition thereof without prior written consent of the Bank.

(h)     Client shall timely pay all obligations to third parties as they become due, whether (i) to Merchants or (ii) arising under the Network Requirements or otherwise, in connection with its provision of Processing Services, including but not limited to, obligations to the Networks or any other participant in the Networks.

(i)     Client will establish a non-interest-bearing reserve account at Bank in Client's name designating for which Merchant the account is established (the "Reserve Account") in such amount as Bank from time to time may determine in its sole discretion is sufficient to satisfy Merchant's current or future obligations to Bank and Client under the Merchant Agreement, including, without limitation, obligations related to transactions processed or losses, costs, fees or expenses otherwise incurred by Bank or by Client on Merchant's behalf under the Merchant Agreement, applicable law or private regulation, including amounts owed to cover any Chargebacks, refunds, fees, fines, actual or potential losses, or risks. The Reserve Account

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

will be maintained for a minimum of nine months after the date on which the Merchant Agreement terminates and shall not be released without the prior consent of Bank.

(j)     Client shall deliver to Bank, within five (5) business days of receipt, a copy of any and all notices or correspondence it receives from (i) any Network, (ii) any federal, state or local governmental authority, (iii) Merchant, or (iv) any other third party, including, without limitation, any financial or depository institution, relating to a Network, the Sponsorship, Terminals, Merchant, or the performance of this Agreement.

(k)     Client agrees to provide to Bank such reports and other information as reasonably may be requested by Bank from time to time to monitor the activities of Client with respect to the Sponsorship. In addition, Client shall furnish to Bank, within thirty (30) days of Bank's written request, an analysis reflecting all transactions at Terminals hereunder for all periods requested and provide information reasonably specified by Bank relative thereto, all in sufficient information and detail to support an audit, all subject to the applicable confidentiality requirements under the Network Requirements.

**SECTION 5.2          Complaints and Error Resolution**
(a)     All Cardholder complaints received by a Party relating to a Card or its use ("Cardholder Complaint") shall be promptly (i) reported to the other Party, and (ii) addressed and resolved by Client in accordance with Client's error resolution procedures, which procedures must be approved in advance by Bank.

(b)     Client agrees to maintain the results of any investigation relating to a Cardholder Complaint and an audit trail of information pertinent to the matter, all within any timeframes required by Applicable Law. The audit trail of information shall be sufficiently detailed to allow Bank to fully respond to a Regulatory Authority if such Regulatory Authority inquires about a Cardholder Complaint.

(c)     Either Party shall provide the other Party with notice and copies of any complaint regarding any Transaction or Terminal received by such Party from any System or the Better Business Bureau and any other material third party complaint received by senior management of such Party related to a Transaction or Terminal (each, a "**Third Party Complaint**") within two (2) business days of receipt of such Third Party Complaint. Client shall promptly investigate each Third Party Complaint and any similar complaints received by Bank that are forwarded to Client and propose an appropriate response. Client and Bank shall jointly approve the final responses for all Third Party Complaints.

(d)     Client shall provide Bank with prompt notice and copies of all subpoenas, levies, garnishments or other legal requests received by Client related to Bank's Sponsorship or the Processing Services under this Agreement, whether from a governmental authority, Regulatory Authority, private attorney, court or otherwise, relating to a Cardholder, a Card, a Transaction, a Terminal or this Agreement ("**Legal Documents**"). With regard to any Legal Documents received directly by Bank, Bank shall forward such Legal Documents to Client, and Client shall promptly provide to Bank any requested information as set forth within such Legal Documents, and in no event later than three (3) days prior to the response deadline of the Legal Document in order for Bank to timely meet such response deadline.

(e)     Client shall catalog and maintain copies of all Criticisms, Regulatory Communications, Legal Documents, Third Party Complaints and Cardholder Complaints (collectively, "**Complaints**"), and responses thereto for seven years or such longer period as may be required by Applicable Law or specified by Bank in a written notice to Client. Client shall provide Bank, upon request, with a summary of all Complaints in the form and manner determined by or acceptable to Bank (each, a "**Complaint Summary**"). Bank (i) shall have access at all times to pending and closed Complaints and responses, and (ii) in Bank's sole discretion, may audit a reasonable number of such Complaints.

**ARTICLE VI - DUTIES OF BANK**

**SECTION 6.1          Memberships in Network**
Bank shall obtain and maintain at its sole expense a principal license with each applicable Network, and shall timely pay all fees, dues, and assessments associated therewith. Bank shall retain its Membership in Network

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

in good standing and shall abide in all material respects by all the rules and regulations applicable to Bank. If Bank elects to terminate its membership in any Network at any time, Bank will give Client one hundred eighty (180) days notice of its intention to terminate Membership. Nothing herein shall be deemed to obligate Bank to attempt to maintain Membership if the Network elects to terminate Bank's Membership for any reason.

**SECTION 6.2           Terminal Sponsorship**
Bank shall sponsor each Terminal deployed by Client in accordance with this Agreement and with the Rules of the applicable Network in which Bank holds a Membership. Bank shall be under no obligation to provide services beyond those services agreed to in this Agreement. While this Agreement is in effect, Bank will have the ability, upon at least thirty (30) days prior written notice to Client, to cancel the Sponsorship of any Terminal.

## ARTICLE VII - COMPENSATION AND EXPENSES

**SECTION 7.1           Expenses of Bank**
Bank shall be solely responsible for the following expenses: Except as otherwise provided in this Agreement, all annual Membership fees related to Bank's license with and Membership in any Network utilized by a Program, and any fees and penalties assessed by any such Network or Regulatory Authority due to the gross negligence or willful misconduct of Bank or of any third party retained by Bank.

**SECTION 7.2           Compensation Payable to Bank**
Client agrees to compensate Bank the agreed per Transaction fee as set forth in **Exhibit A**, as may be amended from time to time, for all Transactions processed on Terminals.

**SECTION 7.3           Compensation Payable to Client**
Bank Interchange Fee and Surcharge Fee Income will be the income of Client and distributed according to Processor/ISO agreement. The amount of any Surcharge Fees shall be prominently displayed on the screen of each Terminal and shall state that such a fee is being charged.

**SECTION 7.4           Expenses of Client**
Client shall be solely responsible for the following:

(a)     Purchase of Terminals

(b)     Deployment, Installation and maintenance of Terminals

(c)     Federal and State Registration Fees

(d)     Network Application and Registration Fees

(e)     Cost of any due diligence, background investigation, credit report, OFAC inquiry, and/or on-site inspection required by the Network, by Bank or by Bank's regulatory authority. This due diligence may include Client's principal place of business or any Terminal location.

(f)     Processor Fees and Charges

(g)     Network Switch Fees

(h)     Program Marketing and Advertising (including signage)

(i)     Cash Servicing

(j)     Processing Services

(k)     Cardholder Customer Service (including transaction disputes)

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

(l)    Network penalties and fines assessed against Bank that are a direct cause of Client's action or inaction.

(m)   Reimbursement to Bank for any expenses it incurs on behalf of Client, including any direct expenses for program, Network or processor audits required by any Network, Bank or Regulatory Authority as set forth herein.

## ARTICLE VIII - LIMITATION OF LIABILITY

**SECTION 8.1      No Special Damages**

Neither Party shall be liable to the other for any indirect, incidental, consequential, punitive or exemplary damages, however, the limitations set forth in this Section shall not apply to or in any way limit the indemnity obligations under this Agreement.

**SECTION 8.2      Disclaimers of Warranties**

The Bank specifically disclaims all warranties of any kind, express or implied, arising out of or related to the Networks, the Sponsorship services, the Marks or this Agreement, including without limitation, any warranty of marketability, fitness for a particular purpose or non-infringement, each of which is hereby excluded by agreement of the Parties except as may be described in Paragraph 12.1(a).

**SECTION 8.3      Liabilities of Client for Network and Regulatory Claims**

Client shall be liable to Bank for any and all liabilities and every loss, cost, expense, claim, demand, and cause of action (including, without limitation, the cost of investigating the claim, the cost of litigation and reasonable attorneys' fees, whether or not legal proceedings are instituted and whether paid or incurred, as the case may be) by or on behalf of any Cardholder, Regulatory Authority, Network, or other third party as a result of Client's failure to fully comply with the Legal Requirements.

## ARTICLE IX - TERM AND TERMINATION OF AGREEMENT

**SECTION 9.1      Term**

The initial term of this Agreement shall be five (5) years, commencing on the Effective Date and shall renew automatically for two (2) year periods, unless prior to the expiration of the initial five (5) year term or a two (2) year extension period either Party gives the other not less than one hundred eighty (180) days' written notice of its election not to renew or extend this Agreement.

**SECTION 9.2      Termination of Agreement For Cause**

(a)    Either Bank or Client shall have the right to terminate this Agreement upon occurrence of one or more of the following events:

(i)     Failure by the other Party to observe or perform, in any material respect, that Party's obligations to the other Party hereunder, so long as the failure is not due to the actions or failure to act of the terminating Party, which failure is not cured within thirty (30) days after written notice specifying the failure;

(ii)    In the event any financial statement, representation, warranty, statement or certificate furnished to it by the other Party in connection with or arising out of this Agreement is materially adverse to the terminating Party and intentionally untrue as of the date made or delivered;

(iii)   The other Party (A) voluntarily or involuntarily (and such involuntary petition or proceeding is not dismissed within ninety (90) days) commences (or is the subject of, as the case may be) any proceeding or filing any petition seeking relief under Title 11 of the United States Code or any other Federal, state or foreign bankruptcy, insolvency, liquidation or similar law, (B) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator or similar official for such Party or for a substantial part of its property or assets, (C) making a general assignment for the

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

benefit of creditors, or (D) taking corporate action for the purpose of effecting any of the foregoing. The occurrence of the foregoing, will terminate this Agreement without further action;

(iv)     Upon any change to or enactment of or change in interpretation or enforcement of any law or regulation which would have a material adverse effect upon such Party's ability to perform its obligations under this Agreement; or

(v)     Violation by the other Party of any federal or applicable state law relating to the performance of this Agreement.

(b)     Notwithstanding any provision in this Agreement to the contrary, Bank may terminate (A) this Agreement immediately at any time by giving oral or written notice to Client if (i) all its Memberships are involuntarily terminated, (ii) Client fails to pay when due any obligation owed to Bank, (iii) Client is in material breach of any Rule or Governmental Requirements, (iv) Bank is required to do so by Regulatory Authority or Bank believes, after due inquiry, that continuing this Agreement may cause it to violate any federal, state, or local law, regulation or ordinance or the Network Requirements; (v) Client no longer meets a Network's participation eligibility requirements in effect from time to time; (vi) a Network terminates or suspends the rights of Client to participate in the Network as a sponsored entity or (B) sponsorship of any Terminal immediately at any time by giving oral or written notice to Client if Bank is required to do so by Regulatory Authority or Bank believes, after due inquiry, that continuing such sponsorship may cause it to violate any federal, state, or local law, regulation or ordinance or the Network Requirements or damage the Bank's reputation.

**SECTION 9.3          Liquidated Damages**
The Parties agree that it would be difficult or impossible to ascertain a Party's actual damages upon a termination of this Agreement.  The Parties further agree that in a termination of this Agreement the non-defaulting Party is entitled to: (i) all fees earned but not paid prior to the date of termination, (ii) any direct costs as a result of the termination, and (iii) an amount equal to the number of months remaining in the term multiplied by an average monthly fee (whereby the average monthly fee is calculated by averaging the prior six (6) consecutive months in the term), such amount not to exceed $250,000. Each Party agree this is a reasonable estimation of the actual damages it would suffer if it did not receive the expected benefits to be derived from this Agreement for the full Term.  Each Party furthermore agrees such cancellation fee will be paid immediately upon written notice of termination.

Each Party acknowledges and agrees, after taking into account the terms of this Agreement and all relevant circumstances at the date hereof, that the Liquidated Damages payable under this Section 9.3 represent a reasonable and genuine pre-estimate of the damages which would be suffered in the event of early termination of this Agreement and does not constitute a penalty.

Nothing in this Agreement shall limit the right of any Party to seek injunctive relief, to the extent available, with respect to breaches of this Agreement.

## ARTICLE X – CONFIDENTIALITY

**SECTION 10.1          Confidential Information**
The term "Confidential Information" shall mean this Agreement and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever which (a) a Party ("Discloser") discloses, in writing, orally or visually, to the other Party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement, and which (b) relates to (i) the Discloser, (ii) in the case of Client, Bank and its customers and or associates, or (iii)  consumers who have made confidential or proprietary information available to Client and/or Bank.  The definition of Confidential Information shall include Customer Information as described below.

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

**SECTION 10.2        Compliance with the Gramm-Leach-Bliley Act**

The purpose of this section is to ensure that this Agreement conforms to the applicable provisions of the Gramm-Leach-Bliley Act (the "Act"). Each Party acknowledges and agrees that "Non-Public Personal Information" and "Personally Identifiable Financial Information" (as defined in Sections 573.3(n) and (o) respectively of the Office of the Comptroller of the Currency Regulations on Privacy of Consumer Information published at 12 CFR Chapter V) about Bank's customers and Cardholders shall be considered as confidential and proprietary information, and shall not be disclosed to or shared with any third party without prior written consent of both Parties. Each Party agrees to implement and maintain appropriate measures designed to meet the objectives of the guidelines establishing standards for safeguarding Non-Public Personal Information and Personally Identifiable Financial Information as adopted from time to time by the Office of Comptroller of the Currency. Except as provided in, and subject to the limitations stated herein, Client will not compile, use, sell or otherwise distribute any lists of Bank's customers or Cardholders nor use the names, account numbers or any other Non-Public Personal Information and Personally Identifiable Financial Information about Bank Customers or Cardholders to compile, use, sell or distribute lists or data for use by Client, its subsidiaries or affiliates, or by any third parties. Client will instruct its employees, agents and contractors (including the Processor) as to the confidentiality of the Non-Public Personal Information and Personally Identifiable Financial Information and will not disclose any such Non-Public Personal Information or Personally Identifiable Financial Information to any third party or entity. Each Party also agrees that any dissemination of the aforementioned confidential Non-Public Information or Personally Identifiable Financial Information within its own business entity and to agents and contractors shall be restricted to "a need to know basis" for the purpose of performance hereunder. Each Party shall protect any Non-Public Personal Information and Personally Identifiable Financial Information from disclosure with no less than the same degree of care afforded to its own Confidential Information. The foregoing restrictions on disclosure of Non-Public Personal Information and Personally Identifiable Financial Information shall apply for so long as is required under applicable statutes and regulations. All obligations and undertakings relating to Non-Public Personal Information and Personally Identifiable Financial Information shall survive the termination of this Agreement for whatever reason.

Each Party agrees and represents that it will, to the extent applicable, implement a security program including measures designed to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information (the "Guidelines"). Bank has the right to make reasonable requests to inspect, during normal business hours and upon thirty (30) days advance written notice, Client's program, associated audit reports, summaries of test results or equivalent measures taken by Client to ensure that its security measures meet the objectives of the Guidelines in accordance with the Rules and this Agreement.

In carrying out the above-described obligations to secure and protect the respective Confidential Information, each Party agrees that it will protect the Confidential Information of the other Party and will require any of its service providers or subcontractors to protect and safeguard the Confidential Information of the other Party to the same degree.

Each Party agrees that in the event there is a breach of security resulting in unauthorized disclosure of the Confidential Information of the other Party, the breached Party will promptly notify the other Party of such breach, the nature of such breach, and the corrective action taken to respond to the breach.

**SECTION 10.3        Disclosure to Employees and Agents.**

Each of the Parties, as Recipient, hereby agrees on behalf of itself and its employees, officers, affiliates and subcontractors that Confidential Information will not be disclosed or made available to any person for any reason whatsoever, other than on a "need to know basis" and then only to: (a) its employees and officers; (b) subcontractors and other third-parties specifically permitted under this Agreement, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; (c) independent contractors, agents, and consultants hired or engaged by Recipient, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; and (d) as required by law or as otherwise permitted by this Agreement, either during the term of this Agreement or after the termination of this Agreement. Prior to any disclosure of Confidential Information as required by law, the Recipient shall (i) notify the Discloser of any, actual or threatened legal compulsion of

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

disclosure, and any actual legal obligation of disclosure immediately upon becoming so obligated, and (ii) cooperate with the Discloser's reasonable, lawful efforts to resist, limit or delay disclosure, at no out of pocket expense to Recipient.

**SECTION 10.4       Return of Materials**
Upon the termination or expiration of this Agreement, or at any time upon the request of a Party, the other Party shall return or destroy all Confidential Information, including Customer Information, in the possession of such Party or in the possession of any third Party over which such Party has or may exercise control. If destroyed, such destruction of Confidential Information shall be designated by a certificate executed by an officer of the Party which was responsible for such destruction. The foregoing notwithstanding, a Party shall be permitted to retain the Confidential Information, subject to the continuing confidentiality obligations under this Agreement: (a) to the extent required by policies and procedures implemented to comply with applicable law or Regulatory Authority, professional standards or bona fide internal document retention policies, or (b) contained on any backup tapes or other media pursuant to automated archival processes in such Party's ordinary course of business.

**SECTION 10.5       Non-Solicitation of Employees**
The Parties agree that during the term of this Agreement each Party will not seek out or induce any person (by offering employment or otherwise) who is an employee of the other Party to terminate their employment.

**SECTION 10.6       Exceptions**
With the exception of the obligations related to Customer Information, the obligations of confidentiality in this Section shall not apply to any information which a Party rightfully has in its possession when disclosed to it by the other Party, information which a party independently develops, information which is or becomes known to the public other than by breach of this Section or information rightfully received by a party from a third party without the obligation of confidentiality.

**SECTION 10.7       Media Releases and Use of Marks**
All media releases, public announcements and public disclosures by either Party, or their representatives, employees or agents, relating to this Agreement or the name or logo of Bank or Client, any Bank or Client affiliate or supplier, including, without limitation, promotional or marketing material, but not including any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the releasing Party, shall be coordinated with and approved by the other Party in writing prior to the release thereof. Client may accurately describe its relationship with Bank as an independent third-party customer relationship, and not as an agent, in response to questions and in its dealings with the ISOs, location owners and operators, merchants and any other third party. Client shall not use any Network's Marks except in compliance with the Rules, Regulations, and Graphic Standards for the applicable Network.

**ARTICLE XI - INSURANCE**

**SECTION 11.1       Insurance**
Client shall maintain, throughout the term of this Agreement, a comprehensive general liability policy (which shall include contractual liability), the limit of which shall be no less than a combined single limit of $1,000,000 per occurrence. A copy of each policy and any certificates of insurance evidencing the existence of such policy, or any other documentation reasonably requested by Bank, shall be provided to Bank upon Bank's request.

**ARTICLE XII - GENERAL PROVISIONS**

**SECTION 12.1       Indemnification**
     (a)       Client covenants and agrees to indemnify and hold harmless Bank and its parents, subsidiaries and affiliates and their respective officers, directors, employees and permitted assigns, as such (collectively, the "Bank Indemnitees"), from and against any damages, awards, judgments, settlement amounts, fines, penalties, losses, costs and expenses (including reasonable legal fees and expenses and costs of investigation) and other liabilities (collectively, the "Losses") arising out of any law suit, action, claim, demand, administrative action, arbitration or other legal proceeding (each a "Third Party Claim") brought or

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

asserted against any Bank Indemnitee as a result of or in connection with: (i) any untrue or inaccurate representation or warranty made by Client under or pursuant to this Agreement, or (ii) any failure on the part of Client to perform or comply with any covenant or obligation required to be performed or complied with by Client under or pursuant to this Agreement; or (iii) any violation of or noncompliance with Legal Requirements by Client or any of its contractors, agents or representatives , which includes without limitation Processor (all such contractors, agents and representatives, the "Client Contractors"); (iv) claim of infringement or contribution to the infringement of any patents, trademarks or copyrights; or (v) any failure on the part of Client or any Client Contractor to comply with or discharge any of its or their obligations, liabilities or other amounts due or owing by Client or such Client Contractor to any third party, including, in the case of Client, due or owing to any Client Contractor; provided, however, that in no event shall any Bank Indemnitee be entitled to be indemnified for any Losses pursuant to this clause (a) to the extent that such Losses arise out of (A) an act of fraud, embezzlement or criminal activity by a Bank Indemnitee, (B) the gross negligence or willful misconduct by a Bank Indemnitee, or (C) the failure of a Bank Indemnitee to comply with, or to perform its obligations under, this Agreement.

(b)      Bank covenants and agrees to indemnify and hold harmless Client and its parents, subsidiaries and affiliates and their respective officers, directors, employees and permitted assigns, as such (collectively, the "Client Indemnitees"), from and against any Losses arising out of any Third Party Claim brought or asserted against any Client Indemnitee as a result of or in connection with: (i) any untrue or inaccurate representation or warranty made by Bank under or pursuant to this Agreement, or (ii) any failure on the part of Bank to perform or comply with any covenant or obligation required to be performed or complied with by Bank under or pursuant to this Agreement; or (iii) any violation of or noncompliance with Legal Requirements by Bank or any of its contractors, agents or representatives (all such contractors, agents and representatives, the "Bank Contractors"); or (iv) any failure on the part of Bank or any Bank Contractor to comply with or discharge any of its or their obligations, liabilities or other amounts due or owing by Bank or such Bank Contractor to any third party, including, in the case of Bank, due or owing to any Bank Contractor; provided, however, that in no event shall any Client Indemnitee be entitled to be indemnified for any Losses pursuant to this clause (b) to the extent that such Losses arise out of (A) an act of fraud, embezzlement or criminal activity by such Client Indemnitee, (B) the negligence, willful misconduct or bad faith by such Client Indemnitee, or (C) the failure of such Client Indemnitee to comply with, or to perform its obligations under, this Agreement.

(c)      If any Third Party Claim is asserted against any Bank Indemnitee or Client Indemnitee, as the case may be (as such, the "Indemnified Party") by any Person who is not a party to this Agreement in respect of which the Indemnified Party may be entitled to indemnification under the provisions of subsections (a) or (b) of this Section 12.1, as the case may be, the Indemnified Party shall give written notice of such Third Party Claim promptly to the Party against whom indemnification may be sought hereunder (the "Indemnifying Party"); provided that the failure to give such notice shall not relieve the Indemnifying Party of its obligations to indemnify the Indemnified Party hereunder except to the extent that the Indemnifying Party is materially and adversely prejudiced thereby. The Indemnifying Party shall have the right, by notifying the Indemnified Party within ten (10) business days of its receipt of notice of such Third Party Claim, to assume the entire control (subject to the right of the Indemnified Party to participate at the Indemnified Party's expense and with counsel of the Indemnified Party's choice) of the defense and settlement of such Third Party Claim, including, at the Indemnifying Party's expense, employment of counsel subject to the approval of Indemnified Party, which approval shall not be unreasonably withheld. The Indemnifying Party shall not compromise or settle such Third Party Claim without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld, unless such settlement involves only the payment of money by or on behalf of the Indemnifying Party and does not involve any admission or other adverse action by the Indemnified Party. If the Indemnifying Party gives notice to any Indemnified Party that the Indemnifying Party will assume control of the defense of such Third Party Claim, the Indemnifying Party will be deemed to have waived all defenses to the claims for indemnification by the Indemnified Party with respect to such Third Party Claim. Any damage to the assets or business of the Indemnified Party caused by a failure of the Indemnifying Party to defend, compromise or settle a Third Party Claim in a reasonable and expeditious manner, after the Indemnifying Party has given notice that it will assume control of the defense of such Third Party Claim, shall be included in the damages for which the Indemnifying Party shall be obligated to indemnify the Indemnified Party hereunder.

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

In the event that the Indemnifying Party does not assume the entire control of the defense and settlement of such Third Party Claim, any attorneys' fees or other expenses, including the amount of a settlement or judgment, incurred by the Indemnified Party in defending such Third Party Claim, shall be included in the damages for which the Indemnifying Party shall be obligated to the Indemnified Party, provided that the Indemnified Party can show that the Indemnifying Party was obligated to provide indemnification hereunder, and provided further that in the event that the Indemnified Party does show that the Indemnifying Party was obligated to provide indemnification hereunder, the Indemnified Party shall further be entitled to its attorneys' fees and expenses incurred in making such a showing. Notwithstanding anything to the contrary contained herein, in no event shall the Indemnifying Party have the right to control the defense or settlement of any Third Party Claim to the extent that such Third Party Claim seeks an order, injunction, non-monetary or other equitable relief against the Indemnified Party which, if successful, could result in a material adverse effect upon the business, affairs, financial condition or results of operations of the Indemnified Party (as determined in its good faith judgment).

**SECTION 12.2**      **Disclosure**
(a)      Each Party shall promptly notify the other of any action, suit, proceeding, facts and circumstances, and the threat of reasonable prospect of same, which might give rise to any indemnification hereunder or which might materially and adversely affect either Party's ability to perform this Agreement.

(b)      Each Party represents and warrants to the other that it has no knowledge of any pending or threatened suit, action, arbitration or other proceedings of a legal, administrative or regulatory nature, or any governmental investigation, against it or any of its affiliates or any officer, director, or employee which has not been previously disclosed in writing and which would materially and adversely affect its financial condition, or its ability to perform this Agreement.

**SECTION 12.3**      **Legal Compliance**
Each Party represents and warrants to the other that it is familiar with the Legal Requirements which relate to the Program and its obligations hereunder, and agrees that it will comply, in all material respects, with such Legal Requirements relating to its activities under this Agreement.

**SECTION 12.4**      **Relationship of Parties**
The authority of a Party shall extend no further than is expressly stated in this Agreement. Bank and Client agree they are independent contractors to each other in performing their respective obligations hereunder. Nothing in this Agreement or in the working relationship being established and developed hereunder shall be deemed, nor shall it cause, Bank and Client to be treated as partners, joint ventures, or otherwise as joint associates for profit.

**SECTION 12.5**      **Regulatory Examinations and Financial Information**
Client agrees to submit to any examination which may be required by any Regulatory Authority or Network with audit and examination authority over Bank. Client shall also provide to Bank any information which may be required by any Regulatory Authority or Network in connection with their audit or review of Bank or the Program and shall reasonably cooperate with such Regulatory Authority or Network in connection with any audit or review of Bank. Client shall also provide such other information as Bank, Regulatory Authorities, or the Network may from time to time reasonably request with respect to the financial condition of Client and such other information as Bank may from time to time reasonably request with respect to third parties contracted with Client.

**SECTION 12.6**      **Governing Law**
The Parties acknowledge that Bank, as a federally-chartered bank, is regulated by the Office of the Comptroller of the Currency, and is therefore subject to federal law, and entitled to preemption from state laws to the fullest extent permitted by law. In any matters not so preempted this Agreement shall be governed by the internal laws, and not by the laws regarding conflicts of laws, of the State of Oklahoma. Subject to the reservation of preemption rights above, each Party hereby submits to the jurisdiction of the courts of such state, and waives any objection to venue with respect to actions brought in such courts.

**SECTION 12.7        Severability**

In the event that any part of this Agreement is deemed by a court, Regulatory Authority, Network, or other public or private tribunal of competent jurisdiction to be invalid or unenforceable, such provision shall be deemed to have been omitted from this Agreement. The remainder of this Agreement shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions, but only to such extent.

**SECTION 12.8        Survival**

All representations and warranties herein shall survive any termination or expiration of this Agreement. In addition, Article VIII (Limitation of Liability), Article X (Confidentiality), and Article XII (General Provisions) shall survive the termination or expiration of this Agreement.

**SECTION 12.9        Successors and Third Parties**

Except as limited by Section 12.10, this Agreement and the rights and obligations hereunder shall bind, and inure to the benefit of the Parties and their successors and permitted assigns and no other person shall acquire or have any right under or by virtue of this Agreement. Nothing herein expressed or implied is intended or shall be construed to confer upon or give any rights or remedies as a third party beneficiary, or otherwise, under or by reason of this Agreement to any persons, firm or corporation.

**SECTION 12.10        Assignments**

The rights and obligations of Client under this Agreement are personal and may not be assigned either voluntarily or by operation of law, without prior written consent from Bank, which will not be unreasonably withheld or delayed. Bank may assign this Agreement to any party upon written notice to Client provided that such assignee of Bank is capable of performing the duties and obligations of Bank hereunder.

**SECTION 12.11        Notices**

All notices, requests and approvals required by this Agreement shall be in writing addressed/directed to the other Party at the address set forth below. All such notices, requests, and approvals shall be deemed given upon the business day following the date of facsimile or email transmission, or upon actual receipt, refusal or failure thereof if delivered by mail or courier as noted on the delivery receipt. In the event of use of email notice, the sender shall request a read receipt or also send a hard copy by mail or courier to ensure delivery. All such notices, requests and approvals shall be addressed to the attention of:

Bank to:    **SNB Bank, National Association**
            PO Box 39
            503 S. Main
            Shattuck, OK 73858
            Attention: CEO or CFO
            Facsimile Number: 888-554-1518
            Email: clay.stuart@snbbankna.com and debby.turzo@snbbankna.com

Client to:  **Pepper Pay LLC**
            2029 Century Park East, Suite 400
            Los Angeles, CA 90067
            Attention: General Counsel
            Email: legal@pepperpay.com
            Tax Identification Number: ████████

**SECTION 12.12        Waivers**

Neither Party shall be deemed to have waived any of its rights, power, or remedies hereunder except in writing signed by an authorized agent or representative of the Party to be charged. Either Party may, by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement on the part of the other Party to be performed or complied with. The waiver by either Party of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

**SECTION 12.13          Entire Agreement; Amendments**
This Agreement constitutes the entire Agreement between the Parties and supersedes all prior agreements, understandings, and arrangements, oral or written, between the Parties with respect to the subject matter hereof. This Agreement may not be modified or amended except by an instrument or instruments in writing signed by both Parties.

**SECTION 12.14          Counterparts; Execution and Delivery**
This Agreement may be executed and delivered by the Parties in counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same instrument. Execution and delivery may be made via electronic means. An electronic copy of this fully executed Agreement shall be treated as an original for all purposes.

**SECTION 12.15          Force Majeure**
Neither Party shall be liable to the other for any claim, damage, loss or expense arising out of this Agreement to the extent such claim, damage, loss or expense is due to any natural disaster, epidemic, fire, strike, war, terrorism, riot, act of God, court order, statute, governmental regulation, act or order, computer or associated equipment outages, shortages or significant fluctuations in electric power, or any other cause beyond its reasonable control, for the duration of such cause; provided, however, that nothing in this Section 12.15 shall excuse Client from promptly paying when due amounts that are due and owing under the terms of this Agreement.

**SECTION 12.16          Disputes**
(a)          Duty to Notify.  In the event of any dispute, controversy, or claim arising out of or relating to this Agreement or the construction, interpretation, performance, breach, termination, enforceability or validity thereof (hereinafter, a "Dispute"), the Party raising such Dispute shall notify the other Party promptly and no later than sixty (60) days from the date of its discovery of the Dispute.  In the case of a Dispute relating to account or transaction statements or similar matter, the failure of a Party to notify the other Party of such Dispute within sixty (60) days from the date of its receipt shall result in such matter being deemed undisputed and accepted by the Party attempting to raise such Dispute.

(b)          Cooperation to Resolve Disputes.  The Parties shall cooperate and attempt in good faith to resolve any Dispute promptly by negotiating between persons who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration and performance of the provisions or obligations of this Agreement that are the subject of the Dispute.

(c)          Arbitration.  Any Dispute which cannot otherwise be resolved as provided in paragraph (b) above shall be resolved by binding arbitration conducted in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitral tribunal may be entered in any court having jurisdiction thereof.  The arbitration tribunal shall consist of a single arbitrator mutually agreed upon by the Parties, or in the absence of such agreement within 30 days from the first referral of the Dispute to the American Arbitration Association, designated by the American Arbitration Association. The place of arbitration shall be Shattuck, Oklahoma, unless the Parties shall have agreed to another location within 15 days from the first referral of the Dispute to the American Arbitration Association.  The arbitration proceeding shall be conducted via video conference, unless the Parties shall have agreed to in person proceedings. The arbitral award shall be final and binding.  The Parties waive any right to appeal the arbitral award, to the extent a right to appeal may be lawfully waived.  Each Party retains the right to seek judicial assistance: (i) to compel arbitration, (ii) to obtain interim measures of protection prior to or pending arbitration, (iii) to seek injunctive relief in the courts of any jurisdiction as may be necessary and appropriate to protect the unauthorized disclosure of its proprietary or confidential information, and (iv) to enforce any decision of the arbitrator, including the final award.  In no event shall either Party be entitled to punitive, exemplary or similar damages.

(d)          Confidentiality of Proceedings.  The arbitration proceedings contemplated by this Section shall be as confidential and private as permitted by law.  To that end, the Parties shall not disclose the existence, content or results of any proceedings conducted in accordance with this Section, and materials submitted in

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

connection with such proceedings shall not be admissible in any other proceeding, provided, however, that this confidentiality provision shall not prevent a petition to vacate or enforce an arbitral award, and shall not bar disclosures required by any laws or regulations.

(e)    Attorneys' fees and costs: In the event either Party to this Agreement is required to enforce any provision hereof, it shall be entitled to recover its attorneys' fees and costs for doing so regardless of whether or not formal legal proceedings are commenced by the enforcing Party. In the event such are in fact initiated, the prevailing Party shall be entitled to recover its attorneys' fees and costs incurred at all levels, including any and all appeals.

**SECTION 12.17        Headings**
The various captions and section headings in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.  References in this Agreement to any Section are to such Section of this Agreement.

**SECTION 12.18        Drafting Presumption**
Client and Bank agree that they participated in the drafting of this Agreement and, in the event that any dispute arises in the interpretation or construction of this Agreement, no presumption shall arise that either one Party or the other drafted this Agreement.

**IN WITNESS WHEREOF**, this Agreement is executed by the Parties' authorized officers or representatives and shall be effective as of the date first above written.

**Pepper Pay, LLC**                                    **SNB Bank, National Association**

By: _____                   By: *Clay Stuart* _____

Name: Eric Hannelius                               Name: Clay Stuart _____

Title: Manager _____                   Title: CEO _____

DocuSign Envelope ID: E6A7860A-78EB-48C0-A87E-1C66D9DD252B

**Exhibit A**

I.     **Fees**

    (a)  Application Fee: $500.00 (one time)

    (b)  Transaction Fee:

          i.   Bank shall charge a fee for each Eligible Transaction according to the table below, which shall be based on monthly volume achievement, meaning the Transactions are totaled at each month's end and the price is determined when the total Transaction count "lands on" the applicable tier within the table below.

          ii.  An additional Transaction Fee of $0.03 per Transaction will be added to each tier in the table below for Terminals deployed pursuant to a High-Risk determination by Bank.

         iii. There is a minimum monthly fee of $40,000, which will be waived for the first 6 months following the first transaction date (go live date).

         •   By way of example, if the High-Risk Transaction count in Month 1 is 900,000, the price per Transaction is $0.03375, and the total High-Risk Transaction Fee would be is $30,375. Accordingly, the monthly minimum of $40,000 would apply. If the High-Risk Transaction count in Month 2 is 1,900,000, the price per Transaction is $0.03325, and the total High-Risk Transaction Fee would be $63,175. Accordingly, no monthly minimum would be due.

| Monthly Transaction Tiers | ATM/Debit Transaction Fee | High-Risk Transaction Fee |
|---|---|---|
| 0 – 500,000 | $0.00450 per Transaction | $0.03450 per Transaction |
| 500,001 – 1,000,000 | $0.00375 per Transaction | $0.03375 per Transaction |
| 1,000,001 – 1,500,000 | $0.00350 per Transaction | $0.03350 per Transaction |
| 1,500,001 – 2,000,000 | $0.00325 per Transaction | $0.03325 per Transaction |
| 2,000,001 – 3,000,000 | $0.00285 per Transaction | $0.03285 per Transaction |
| In excess of 3,000,000 | $0.00235 per Transaction | $0.03235 per Transaction |

Exhibit D

**From:** Eric Hannelius <ehannelius@me.com>
**Sent:** Monday, November 16, 2020 12:09 PM
**To:** Kurt Benjamin; L. Clay Stuart
**Subject:** Re: Eric meet Clay Stuart, Clay meet Eric Hannelius

Thank You Kurt.

Hi Clay,

Nice speaking with you last week. Hope your weekend was good as well.

Please see flow of funds schematic per our call. I thought this would be helpful for you and the bank to understand how our business works. And just to reiterate, we are not involved in the cash handling at the ATMs at all. That is all handled by the merchants and ATM owners. Which are not us. We are just the processor, and push the ACH.



Very Best Regards,

Eric Hannelius
617.877.4464 (mobile)


On Nov 16, 2020, at 8:55 AM, Kurt Benjamin <kurt@hookipacapital.com> wrote:

@Eric, per the telephone introduction to Clay Stuart, CEO of SNB Bank you are now connected via email.

@Clay, per the introduction to Eric Hannelius, CEO Three Sixty One Payments Group, you too are now connected vias email.

Respectfully,


Kurt Benjamin
CEO

HO'OKIPA CAPITAL PARTNERS INC.
Direct +1 (310) 713-5533
kurt@hookipacapital.com

2

Exhibit E

**ACCOUNTS:**
10509879
10510770
10510803
10510814
10510825
10510836
10510847
10510858
10510869
10510880

Internal use only.
OMMA.OK.GOV All website files checked? __2/19/2021__ __LLS__
(Date)   (Initials)

## SNB BANK
### NATIONAL ASSOCIATION
Member FDIC

503 S Main  PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2047

010 S Main  PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?

☐ Yes _OM_  No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes _OM_ No

Will you have an ATM on your property or at your business?

☐ Yes _OM_ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company _OM_ I/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No _OM_ I/A

If you have an ATM, who services it?  _____

Do you have a bank account at another institution?

_OM_ Yes    ☐ No

Customer Signature: *Oksana Moore*
Oksana Moore – 2021-02-22, 14:51:02 UTC

Date: _____

Customer Name (Print): _____

Account Title (Print): _____



# ZIX SNB Bank, N.A. Secure Messaging
E-SIGNATURE CERTIFICATE

---

## Certificate Summary

ENVELOPE SUBJECT: **Signatures**
DOCUMENT: **02 19 21 Signature Cards_signed 1.pdf**
DOCUMENT ORIGINATOR: **Lesta Stevens (lesta.stevens@snbbankna.com)**

ENVELOPE ID: **9299b649-ec8b-412d-ad64-ed15017561f2**
DOCUMENT ID: **e9cecad7-f939-4cca-887e-7e9469bf8b47**
ORIGINATOR IP ADDRESS: **208.95.204.50**

CERTIFICATE STATUS: **Completed**
DELIVERED: **Feb 19, 2021 9:52 PM UTC**
DOCUMENT PAGES: **15** CERTIFICATE PAGES: **1** TOTAL ENVELOPE PAGES: **16**

COMPLETED SIGNATORIES: **1 / 1**
COMPLETED IN PLACE SIGNATURES: **12 / 12**
COMPLETED IN PLACE INITIALS: **6 / 6**
CARBON COPY RECIPIENTS: **0**

---

## Signatures

E-SIGNED BY: **Oksana Moore (oksana@transactfirst.com)**
SECURITY LEVEL: **Secure Email (Authenticated)**
E-SIGNATURE ID: **f21230c5-724e-457d-b290-4dab44d6db83**

## Timeline

SENT: **Feb 19, 2021 9:52 PM UTC**
VIEWED: **Feb 22, 2021 2:49 PM UTC**
SIGNED: **Feb 22, 2021 2:51 PM UTC**
USING IP ADDRESS: **96.84.9.153**

*Oksana Moore*

I AGREE TO THE CONTENTS OF ALL PAGES ABOVE WITH AN ELECTRONIC SIGNATURE

PRINT NAME: **Oksana Moore** EMAIL: **oksana@transactfirst.com**

# Exhibit F

**From:** Eric Hannelius <gkheh45.kk@gmail.com>
**Sent:** Monday, February 22, 2021 12:51 PM
**To:** L. Clay Stuart
**Cc:** Lesta Stevens
**Subject:** Re: Due Diligence

Totally Understand Clay!

Absolutely will not be.

Very Best Regards,

Eric Hannelius
617.877.4464 (mobile)

On Feb 22, 2021, at 9:34 AM, L. Clay Stuart <clay.stuart@snbbankna.com> wrote:

Good morning Eric!!

Thank you for that response.  We appreciate it.

Due to our current policies and the current state of federal law, any time marijuana comes up, we have two investigate that issue.  Anytime we see the M word, we are required to investigate.  As long as there are no proceeds from a marijuana related business flowing through the account, its should not be an issue.

Thanks!!

L. Clay Stuart
President & CEO

<image001.jpg>
<image002.png>

503 South Main  •  P.O. Box 39  •  Shattuck, OK  73858
Phone:  (580) 938-2571  •  Fax:  (888) 554-1518
www.snbbankna.com

**From:** Eric Hannelius <gkheh45.kk@gmail.com>
**Sent:** Friday, February 19, 2021 4:35 PM
**To:** Lesta Stevens <Lesta.Stevens@snbbankna.com>
**Cc:** L. Clay Stuart <clay.stuart@snbbankna.com>
**Subject:** Re: Due Diligence

Hi Lesta,

1

That is a company I setup several years ago to do e-commerce CBD and consulting. The company is not operational. I have several operating companies that are in the merchant services business including 360-one.com and visionpayments.com.

Very Best Regards,

Eric Hannelius
617.877.4464 (mobile)

On Feb 19, 2021, at 2:14 PM, Lesta Stevens <Lesta.Stevens@snbbankna.com> wrote:

Eric,
Upon doing research for due diligence your name shows up as being president for a company called Cannabis Payments Online INC. Is this correct?

Thank you,

*Lesta Stevens*
*Assistant Vice President*
*Cashier*

<image002.jpg>
<image004.png>
503 South Main
P.O. Box 39
Shattuck, OK  73858

Phone:  580.938.2571
Fax:    580.938.2947
www.snbbankna.com
Account assistance email: bookkeeping@snbbankna.com

"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender´ and immediately and permanently delete the message. You may not disseminate, distribute or forward this e-mail message or disclose its contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.

Please consider the environment before printing this email

"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender and immediately and permanently delete

the message. You may not disseminate, distribute or forward this e-mail message or disclose its contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.

 Please consider the environment before printing this email

Exhibit G

10511067

Internal use only.
OMMA.OK.GOV All website files checked? **3/5/2021**  **LLS**
(Date)    (Initials)



# SNB BANK
## NATIONAL ASSOCIATION
Member FDIC

503 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2255
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?              ☐ Yes    ☒ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds,
Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education,
Payment Processors, or Industry Consultants?              ☐ Yes    ☒ No

Will you have an ATM on your property or at your business?         ☐ Yes    ☒ No

If you have an ATM, who owns it?         ☐ Myself    ☐ An ATM company    ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?
                                                          ☐ Yes    ☐ No    ☒ N/A

If you have an ATM, who services it?      _____

Do you have a bank account at another institution?            ☒ Yes    ☐ No

Customer Signature:    *Oksana Moore*
                       Oksana Moore – 2021-03-05, 19:44:00 UTC          Date: _____

Customer Name (Print):    OKSANA MOORE

Account Title (Print):    EFT BUSINESS SERVICES, LLC



## ZIX SNB Bank, N.A. Secure Messaging
E-SIGNATURE CERTIFICATE

## Certificate Summary

ENVELOPE SUBJECT: **EFT Documents**
DOCUMENT: **EFT NEW ACCOUNT.pdf**
DOCUMENT ORIGINATOR: Lesta Stevens (lesta.stevens@snbbankna.com)

ENVELOPE ID: **02fec0ee-13dc-4eb4-9ca5-08820b8a91b8**
DOCUMENT ID: **8fc67b19-81fc-4780-886f-04c41a176790**
ORIGINATOR IP ADDRESS: **208.95.204.50**

CERTIFICATE STATUS: **Completed**
DELIVERED: **Mar 05, 2021 7:41 PM UTC**
DOCUMENT PAGES: **8** CERTIFICATE PAGES: **1** TOTAL ENVELOPE PAGES: **9**

COMPLETED SIGNATORIES: **1 / 1**
COMPLETED IN PLACE SIGNATURES: **4 / 4**
COMPLETED IN PLACE INITIALS: **0 / 0**
CARBON COPY RECIPIENTS: **0**

## Signatures

E-SIGNED BY: **Oksana Moore (oksana@transactfirst.com)**
SECURITY LEVEL: **Secure Email (Authenticated)**
E-SIGNATURE ID: **5cd9d984-5f96-49cf-b91c-91590078e51c**

## Timeline

SENT: **Mar 05, 2021 7:41 PM UTC**
VIEWED: **Mar 05, 2021 7:42 PM UTC**
SIGNED: **Mar 05, 2021 7:44 PM UTC**
USING IP ADDRESS: **96.84.9.153**

*Oksana Moore*

I AGREE TO THE CONTENTS OF ALL PAGES ABOVE WITH AN ELECTRONIC SIGNATURE
PRINT NAME: **Oksana Moore** EMAIL: **oksana@transactfirst.com**

10511067

Internal use only.
OMMA.OK.GOV All website files checked?  3/5/2021  LLS
                                                    (Date)    (Initials)



**SNB BANK**
**NATIONAL ASSOCIATION**
Member FDIC

503 S Main · PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2371
Fax: 580.938.2947

910 S Main · PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana Related Business?                      ☐ Yes    ☒ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds,
Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education,
Payment Processors, or Industry Consultants?                      ☐ Yes    ☒ No

Will you have an ATM on your property or at your business?         ☐ Yes    ☒ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company    ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?
                                                          ☐ Yes    ☐ No    ☒ N/A

If you have an ATM, who services it?       _____

Do you have a bank account at another institution?                ☒ Yes    ☐ No

Customer Signature:    *Eric Hannelius*
                       Eric Hannelius – 2021-03-05, 20:36:57 UTC         Date: _____

Customer Name (Print):    ERIC H HANNELIUS

Account Title (Print):    EFT BUSINESS SERVICES, LLC



# ZIX SNB Bank, N.A. Secure Messaging
E-SIGNATURE CERTIFICATE

## Certificate Summary

ENVELOPE SUBJECT: EFT Business Services Docs
DOCUMENT: EFT NEW ACCOUNT_signed.pdf
DOCUMENT ORIGINATOR: Lesta Stevens (lesta.stevens@snbbankna.com)

CERTIFICATE STATUS: **Completed**
DELIVERED: **Mar 05, 2021 8:03 PM UTC**
DOCUMENT PAGES: **9** CERTIFICATE PAGES: **1** TOTAL ENVELOPE PAGES: **10**

ENVELOPE ID: **2a4cb3dd-2897-4716-8c22-d83851c3bcf1**
DOCUMENT ID: **92be1b10-1f34-42b2-9956-b4c08e0c66f6**
ORIGINATOR IP ADDRESS: **208.95.204.50**

COMPLETED SIGNATORIES: **1 / 1**
COMPLETED IN PLACE SIGNATURES: **4 / 4**
COMPLETED IN PLACE INITIALS: **0 / 0**
CARBON COPY RECIPIENTS: **0**

## Signatures

E-SIGNED BY: Eric Hannelius (ehannelius@mac.com)
SECURITY LEVEL: **Secure Email (Authenticated)**
E-SIGNATURE ID: **2b02454f-91d0-4e4c-b987-fe757e0497a0**

## Timeline

SENT: **Mar 05, 2021 8:03 PM UTC**
VIEWED: **Mar 05, 2021 8:30 PM UTC**
SIGNED: **Mar 05, 2021 8:36 PM UTC**
USING IP ADDRESS: **104.182.175.67**

*Eric Hannelius*

I AGREE TO THE CONTENTS OF ALL PAGES ABOVE WITH AN ELECTRONIC SIGNATURE
PRINT NAME: **Eric Hannelius** EMAIL: **ehannelius@mac.com**

# Exhibit H

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/18/22 | LLS |
| | (Date) | (Initials) |



**SNB BANK**
**NATIONAL ASSOCIATION**
Member FDIC

503 S Main · PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main · PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana Related Business?                ☐ Yes  *EH*  No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?                ☐ Yes  *EH*  No

Will you have an ATM on your property or at your business?                ☐ Yes  *EH*  No

If you have an ATM, who owns it?                ☐ Myself    ☐ An ATM company  *EH*  N/A

If you have an ATM, is it registered with the state where the property or business is located?
                ☐ Yes    ☐ No  *EH*  N/A

If you have an ATM, who services it?                _____

Do you have a bank account at another institution?                *EH*  Yes    ☐ No

Customer Signature:    *Eric Hannelius*
Eric Hannelius – 2022-02-23, 02:06:57 UTC                Date: _____

Customer Name (Print):    Eric Hannelius

Account Title (Print):    Transaction Processing Service, INC

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/18/22 | LLS |
| | (Date) | (Initials) |



**SNB BANK**
**NATIONAL ASSOCIATION**
Member FDIC

563 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2574
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana Related Business?                          ☐ Yes  *OM*  No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?                          ☐ Yes  *OM*  No

Will you have an ATM on your property or at your business?                          ☐ Yes  *OM*  No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company  *OM*  N/A

If you have an ATM, is it registered with the state where the property or business is located?
                          ☐ Yes   ☐ No  *OM*  N/A

If you have an ATM, who services it?                          _____

Do you have a bank account at another institution?                          *OM*  ☐ Yes   ☐ No

| | | |
|---|---|---|
| Customer Signature: | *Oksana Moore*<br>Oksana Moore – 2022-02-23, 21:12:08 UTC | Date: _____ |
| Customer Name (Print): | Oksana Moore | |
| Account Title (Print): | Transaction Processing Service, INC | |

# ZIX SNB Bank, N.A. Secure Messaging
E-SIGNATURE CERTIFICATE

## Certificate Summary

ENVELOPE SUBJECT: Signatures for Transaction Processing Services, INC
DOCUMENT: Signature Cards and Acc Forms.pdf
DOCUMENT ORIGINATOR: Lesta Stevens (lesta.stevens@snbbankna.com)

ENVELOPE ID: f8dd5536-7f2f-4f01-b362-811d397a4188
DOCUMENT ID: febabe64-f227-4891-ac7b-960c3a93c9a1
ORIGINATOR IP ADDRESS: 208.95.204.50

CERTIFICATE STATUS: Completed
DELIVERED: Feb 23, 2022 12:59 AM UTC
DOCUMENT PAGES: 14 CERTIFICATE PAGES: 1 TOTAL ENVELOPE PAGES: 15

COMPLETED SIGNATORIES: 1 / 1
COMPLETED IN PLACE SIGNATURES: 10 / 10
COMPLETED IN PLACE INITIALS: 6 / 6
CARBON COPY RECIPIENTS: 0

## Signatures

E-SIGNED BY: Eric Hannelius (ehannelius@mac.com)
SECURITY LEVEL: Secure Email (Authenticated)
E-SIGNATURE ID: f473eea2-3b25-4a9d-98e5-85ba77f9f7ac

## Timeline

SENT: Feb 23, 2022 12:59 AM UTC
VIEWED: Feb 23, 2022 2:00 AM UTC
SIGNED: Feb 23, 2022 2:06 AM UTC
USING IP ADDRESS: 104.182.175.67

*Eric Hannelius*

I AGREE TO THE CONTENTS OF ALL PAGES ABOVE WITH AN ELECTRONIC SIGNATURE
PRINT NAME: Eric Hannelius EMAIL: ehannelius@mac.com

zix | appriver

# ZIX SNB Bank, N.A. Secure Messaging
### E-SIGNATURE CERTIFICATE

## Certificate Summary

ENVELOPE SUBJECT: **Signature for Transaction Processing Services**
DOCUMENT: **Signature Cards and Acc Forms_signed.pdf**
DOCUMENT ORIGINATOR: **Lesta Stevens (lesta.stevens@snbbankna.com)**

ENVELOPE ID: **6e8587ff-1615-4e7a-8765-fe105026efc5**
DOCUMENT ID: **cac4b8a5-8a7b-4414-bfa3-a10ce98bab02**
ORIGINATOR IP ADDRESS: **208.95.204.50**

CERTIFICATE STATUS: **Completed**
DELIVERED: **Feb 23, 2022 5:13 PM UTC**
DOCUMENT PAGES: **15** CERTIFICATE PAGES: **1** TOTAL ENVELOPE PAGES: **16**

COMPLETED SIGNATORIES: **1 / 1**
COMPLETED IN PLACE SIGNATURES: **8 / 8**
COMPLETED IN PLACE INITIALS: **6 / 6**
CARBON COPY RECIPIENTS: **0**

## Signatures

E-SIGNED BY: **Oksana Moore (oksana@transactfirst.com)**
SECURITY LEVEL: **Secure Email (Authenticated)**
E-SIGNATURE ID: **4235e87b-6e17-4bb5-af40-1db6be5c6c80**

## Timeline

SENT: **Feb 23, 2022 5:13 PM UTC**
VIEWED: **Feb 23, 2022 9:10 PM UTC**
SIGNED: **Feb 23, 2022 9:12 PM UTC**
USING IP ADDRESS: **96.84.9.158**

*Oksana Moore*

I AGREE TO THE CONTENTS OF ALL PAGES ABOVE WITH AN ELECTRONIC SIGNATURE
PRINT NAME: **Oksana Moore** EMAIL: **oksana@transactfirst.com**



# Exhibit I

10513438
10513443



Internal use only.
OMMA.OK.GOV All website files checked? _____ (Date) (Initial)





## SNB BANK
### NATIONAL ASSOCIATION
Member FDIC

603 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2371
Fax: 580.938.2947

910 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2310

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana Related Business?  ☐ Yes  ☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?  ☐ Yes  ☒ No

Will you have an ATM on your property or at your business?  ☐ Yes  ☒ No

If you have an ATM, who owns it?  ☐ Myself  ☐ An ATM company  ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?
☐ Yes  ☐ No  ☒ N/A

If you have an ATM, who services it?  _____

Do you have a bank account at another institution?  ☒ Yes  ☐ No

Customer Signature: *Eric Hannelius*
Eric Hannelius – 2022-07-08, 14:52:23 UTC    Date: 7-6-22

Customer Name (Print): Eric Hannelius

Account Title (Print): Bill My Bnk LLC

10513432
10513443

Internal use only.
OMMA.OK.GOV All website files checked? 7-6-22 ___
(Date)    (Initial)



**SNB BANK**
**NATIONAL ASSOCIATION**
Member FDIC

503 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2047

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?                    ☐ Yes   ☑ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?                    ☐ Yes   ☑ No

Will you have an ATM on your property or at your business?          ☐ Yes   ☑ No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company   ☑ N/A

If you have an ATM, is it registered with the state where the property or business is located?
                                                   ☐ Yes   ☐ No   ☑ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          ☑ Yes   ☐ No

Customer Signature: *Elena finance@rocketonecapital.com*
Elena finance@rocketonecapital.com - 2022-07-08, 16:11:10 UTC          Date: 7-6-22

Customer Name (Print): Elena Popova

Account Title (Print): Bill My Bnk LLC

1051343ð

1051341B

Internal use only.
OMMA OK.GOV All website files checked? 7-6-22  RM
(Date)  (Initials)



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main  PO Box 30          010 S Main  PO Box 430
Shattuck, Oklahoma 73858       Booker, Texas 79005
Phone 580.938.2571            Phone 806.658.9265
Fax 580.938.2947              Fax 806.658.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?                    ☐ Yes   ☑ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?              ☐ Yes   ☑ No

Will you have an ATM on your property or at your business?       ☐ Yes   ☑ No

If you have an ATM, who owns it?        ☐ Myself   ☐ An ATM company   ☑ N/A

If you have an ATM, is it registered with the state where the property or business is located?
                                          ☐ Yes   ☐ No   ☑ N/A

If you have an ATM, who services it?     _____

Do you have a bank account at another institution?              ☑ Yes   ☐ No

Customer Signature:  *Oksana Moore*
                     Oksana Moore – 2022-07-11, 17:33:19 UTC          Date: 7-6-22

Customer Name (Print):  OKsana Moore

Account Title (Print):  Bill My BNK LLC

# Exhibit J

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 1/5/23 | lls |
| | (Date) | (initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main · PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main · PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2540

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?                    ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?          ☐ Yes    ☒ No

Will you have an ATM on your property or at your business?        ☐ Yes    ☒ No

If you have an ATM, who owns it?          ☒ Myself    ☐ An ATM company    ☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?
                                        ☐ Yes    ☐ No    ☒ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          ☒ Yes    ☐ No

Customer Signature: *Eric Hannelius*          Date: 1/6/2023

Customer Name (Print): ERIC H HANNELIUS

Account Title (Print): SALT MONEY INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | 1/5/23 | lls |
|---|---|---|
| OMMA.OK.GOV All website files checked? | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2540

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?     ☐ Yes    ☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?     ☐ Yes    ☒ No

Will you have an ATM on your property or at your business?     ☐ Yes    ☒ No

If you have an ATM, who owns it?     ☐ Myself    ☐ An ATM company    ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?
☐ Yes    ☐ No    ☒ N/A

If you have an ATM, who services it?     _____

Do you have a bank account at another institution?     ☐ Yes    ☒ No

Customer Signature: _Oksana Moore_     Date: 1/5/2023
DocuSigned by: 285E9CE82CE64E5...

Customer Name (Print): OKSANA MOORE

Account Title (Print): SALT MONEY INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | 1/5/23 | lls |
|---|---|---|
| OMMA.OK.GOV All website files checked? | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main · PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main · PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?  ☐ Yes  ☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?  ☐ Yes  ☒ No

Will you have an ATM on your property or at your business?  ☐ Yes  ☒ No

If you have an ATM, who owns it?  ☐ Myself  ☐ An ATM company  ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?
☐ Yes  ☐ No  ☒ N/A

If you have an ATM, who services it?  _____

Do you have a bank account at another institution?  ☒ Yes  ☐ No

Customer Signature: _Elena Popova_  Date: 1/5/2023
4C2D04789E334C9...

Customer Name (Print): ELENA POPOVA

Account Title (Print): SALT MONEY INC

Exhibit K

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

Internal use only.
OMMA.OK.GOV All website files checked? 2/3/23   LLS
                                         (Date)    (Initials)



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes   x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

                                                      ☐ Yes   x☐ No

Will you have an ATM on your property or at your business?          ☐ Yes   X☐ No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company   X☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

                                               ☐ Yes   ☐ No   X☐ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          ☐ Yes   x☐ No

Customer Signature: *Oksana Moore*          Date: 2/6/2023
                   286E0CE82CE64E5...

Customer Name (Print): Oksana Moore (Authorized Signer)

Account Title (Print): BT Assets Group INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | 2/3/23 | LLS |
|---|---|---|
| OMMA.OK.GOV All website files checked? | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

| 509 S Main / PO Box 30 | 010 S Main / PO Box 430 |
|---|---|
| Shattuck, Oklahoma 73858 | Booker, Texas 79005 |
| Phone: 580.938.2371 | Phone: 806.650.2265 |
| Fax: 580.938.2947 | Fax: 806.650.2510 |

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?    ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes    x☐ No

Will you have an ATM on your property or at your business?    ☐ Yes    x☐ No

If you have an ATM, who owns it?    ☐ Myself    ☐ An ATM company    x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No    x☐ N/A

If you have an ATM, who services it?    _____

Do you have a bank account at another institution?    ☐ Yes    x☐ No

Customer Signature:    *Elena Popova*    DocuSigned by: 4C2D91789E234C9...    Date: 2/7/2023

Customer Name (Print):    Elena Popova, Authorized Signer

Account Title (Print):    BT Assets Group INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | | |
| --- | --- | --- |
| OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
| | (Date) | (Initials) |



## SNB BANK
### NATIONAL ASSOCIATION
#### Member FDIC

| 568 S Main / PO Box 30 | 610 S Main / PO Box 430 |
| --- | --- |
| Shattuck, Oklahoma 73858 | Booker, Texas 79005 |
| Phone: 580.938.2571 | Phone: 806.650.2265 |
| Fax: 580.938.2047 | Fax: 806.650.2510 |

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

                                                                      ☐ Yes    X☐ No

Will you have an ATM on your property or at your business?          ☐ Yes    x☐ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company   X☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

                                                                      ☐ Yes    ☐ No   X☐ N/A

If you have an ATM, who services it?    _____

Do you have a bank account at another institution?          ☐ Yes    x☐ No

Customer Signature: _karla knight_ (DocuSigned by) E39D37677DD54BA...          Date: 2/3/2023

Customer Name (Print): Karla Knight, Trustee

Account Title (Print): BT Assets Group INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only.<br>OMMA.OK.GOV All website files checked? | 2/3/23 | |
|---|---|---|
| | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

| | |
|---|---|
| 503 S Main / PO Box 39<br>Shattuck, Oklahoma 73858<br>Phone: 580.938.2571<br>Fax: 580.938.2917 | 010 S Main / PO Box 430<br>Booker, Texas 79005<br>Phone: 806.650.9265<br>Fax: 806.650.2510 |

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?    x⃞ Yes    x⃞ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

⃞ Yes    x⃞ No

Will you have an ATM on your property or at your business?    ⃞ Yes    x⃞ No

If you have an ATM, who owns it?    ⃞ Myself    ⃞ An ATM company    x⃞ N/A

If you have an ATM, is it registered with the state where the property or business is located?

⃞ Yes    ⃞ No    x⃞ N/A

If you have an ATM, who services it?    _____

Do you have a bank account at another institution?    ⃞ Yes    x⃞ No

Customer Signature:    *Eric Hannelius*
DocuSigned by:
110B06E8DF64416...
Date: 2/3/2023

Customer Name (Print):    Eric Hannelius , Trustee

Account Title (Print):    BT Assets Group INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | 2/3/23 | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

563 S Main / PO Box 39  910 S Main / PO Box 430
Shattuck, Oklahoma 73858  Booker, Texas 79005
Phone: 580.938.2571  Phone: 806.658.2265
Fax: 580.938.2947  Fax: 806.658.2510
www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?  ☐ Yes x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?
  ☐ Yes X☐ No

Will you have an ATM on your property or at your business?  ☐ Yes X☐ No

If you have an ATM, who owns it?  ☐ Myself ☐ An ATM company X☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?
  ☐ Yes ☐ No X☐ N/A

If you have an ATM, who services it? _____

Do you have a bank account at another institution?  X☐ Yes ☐ No

Customer Signature: *Michael Shvartsman* Date: 2/3/2023
  C5DF2F102D904AD...

Customer Name (Print): Michael Shvartsman, Trustee

Account Title (Print): BT Assets Group INC

# Exhibit L

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
| | (Date) | (Initials) |



## SNB BANK
### NATIONAL ASSOCIATION
Member FDIC

509 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2047

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2255
Fax: 806.650.2510

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes   x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes   x☐ No

Will you have an ATM on your property or at your business?          ☐ Yes   x☐ No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company   x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes   ☐ No   x☐ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          ☐ Yes   x☐ No

Customer Signature: *Oksana Moore*
DocuSigned by:
286E0CE82CE64E5.          Date: 2/6/2023

Customer Name (Print): Oksana Moore (Authorized Signer)

Account Title (Print): Skylight Business Services LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. OMMA.OK.GOV All website files checked? | 2/3/23 (Date) | LLS (Initials) |
|---|---|---|



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

| 503 S Main / PO Box 30 | 010 S Main / PO Box 430 |
|---|---|
| Shattuck, Oklahoma 73858 | Booker, Texas 79005 |
| Phone: 580.938.2371 | Phone: 806.650.2265 |
| Fax: 580.938.2947 | Fax: 806.650.2510 |

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes   x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes   X☐ No

Will you have an ATM on your property or at your business?          ☐ Yes   X☐ No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company   x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes   ☐ No   X☐ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          x☐ Yes   ☐ No

Customer Signature:   *Elena Popova*   Date: 2/7/2023
                      DocuSigned by: 4C2D91789E234C9...

Customer Name (Print):   Elena Popova, Authorized Signer

Account Title (Print):   Skylight Business Services LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
|---|---|---|
| | (Date) | (Initials) |



## SNB BANK
### NATIONAL ASSOCIATION
**Member FDIC**

| 503 S Main · PO Box 30 | 010 S Main · PO Box 430 |
|---|---|
| Shattuck, Oklahoma 73858 | Booker, Texas 79005 |
| Phone: 580.938.2571 | Phone: 806.650.2265 |
| Fax: 580.938.2942 | Fax: 806.650.8510 |

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes   ☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes   ☒ No

Will you have an ATM on your property or at your business?          ☐ Yes   ☒ No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company   ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes   ☐ No   ☒ N/A

If you have an ATM, who services it? _____

Do you have a bank account at another institution?          ☐ Yes   ☒ No

Customer Signature: _*karla knight*_   Date: 2/3/2023
DocuSign by: E39D37677DD54BA...

Customer Name (Print): Karla Knight, Trustee

Account Title (Print): Skylight Business Services LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8



Internal use only.
OMMA.OK.GOV All website files checked? 2/3/23
(Date)



## SNB BANK
### NATIONAL ASSOCIATION
Member FDIC

503 S Main / PO Box 30    010 S Main / PO Box 430
Shattuck, Oklahoma 73858    Booker, Texas 79005
Phone: 580.938.2571    Phone: 806.650.2265
Fax: 580.938.2947    Fax: 806.650.2510
www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?    ☐ Yes  x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

    ☐ Yes  x☐ No

Will you have an ATM on your property or at your business?    ☐ Yes  X☐ No

If you have an ATM, who owns it?    ☐ Myself  ☐ An ATM company  x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

    ☐ Yes  ☐ No  x☐ N/A

If you have an ATM, who services it?    _____

Do you have a bank account at another institution?    ☐ Yes  x☐ No

Customer Signature: *Eric Hannelius*    Date: 2/3/2023

Customer Name (Print): Eric Hannelius , Trustee

Account Title (Print): Skylight Business Services LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. OMMA.OK.GOV All website files checked? | 2/3/23 (Date) | (Initials) |
| --- | --- | --- |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

| 503 S Main / PO Box 30 | 010 S Main / PO Box 430 |
| --- | --- |
| Shattuck, Oklahoma 73858 | Booker, Texas 79005 |
| Phone: 580.938.2571 | Phone: 806.650.2205 |
| Fax: 580.938.2047 | Fax: 806.650.2510 |

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?  ☐ Yes  x ☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes  x☐ No

Will you have an ATM on your property or at your business?  ☐ Yes  X☐ No

If you have an ATM, who owns it?  ☐ Myself  ☐ An ATM company  x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes  ☐ No  x☐ N/A

If you have an ATM, who services it?  _____

Do you have a bank account at another institution?  x☐ Yes  ☐ No

Customer Signature: *Michael Shwartsman*  Date: 2/3/2023
DocuSigned by:
C5DF2F102D904AD

Customer Name (Print): Michael Shwartsman Trustee

Account Title (Print): Skylight Business Services LLC

# Exhibit M

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
| | (Date) | (Initials) |



## SNB BANK
### NATIONAL ASSOCIATION
Member FDIC

503 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.658.2265
Fax: 806.658.2510

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?       ☐ Yes    ☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes    ☒ No

Will you have an ATM on your property or at your business?       ☐ Yes    ☒ No

If you have an ATM, who owns it?       ☐ Myself    ☐ An ATM company    ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No    ☒ N/A

If you have an ATM, who services it?       _____

Do you have a bank account at another institution?       ☐ Yes    ☒ No

Customer Signature:  *Oksana Moore*          Date: 2/6/2023
                     286E0CE82CE64E5...

Customer Name (Print):  Oksana Moore  (Authorized Signer)

Account Title (Print):  Encompay INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
| | (Date) | (Initials) |



## SNB BANK
### NATIONAL ASSOCIATION
**Member FDIC**

509 S Main / PO Box 30
Shattuck, Oklahoma 73858
Phone: 580.938.2371
Fax: 580.938.2947

610 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?   ☐ Yes   ☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?
                                                                  ☐ Yes   ☒ No

Will you have an ATM on your property or at your business?       ☐ Yes   ☒ No

If you have an ATM, who owns it?        ☐ Myself   ☐ An ATM company   ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?
                                                        ☐ Yes   ☐ No   ☒ N/A

If you have an ATM, who services it?      _____

Do you have a bank account at another institution?       ☒ Yes   ☐ No

Customer Signature: *Elena Popova* ─DocuSigned by: 4C2D91789E234C9...     Date: 2/7/2023

Customer Name (Print): Elena Popova, Authorized Signer

Account Title (Print): Encompay INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
|---|---|---|
| | (Date) | (Initials) |



## SNB BANK
### NATIONAL ASSOCIATION
Member FDIC

568 S Main / PO Box 30
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

610 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

                                                            ☐ Yes    x☐ No

Will you have an ATM on your property or at your business?          ☐ Yes    x☐ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company    x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

                                                    ☐ Yes    ☐ No    x☐ N/A

If you have an ATM, who services it?    _____

Do you have a bank account at another institution?          ☐ Yes    x☐ No

Customer Signature:    *karla knight*
                       DocuSigned by:
                       E39D37677DD54BA...          Date:  2/3/2023

Customer Name (Print):    Karla Knight, Trustee

Account Title (Print):    Encompay INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. OMMA.OK.GOV All website files checked? | 2/3/23 (Date) | (Initials) |



**SNB BANK**
**NATIONAL ASSOCIATION**
Member FDIC

503 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2310

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?   ☐ Yes   x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes   x☐ No

Will you have an ATM on your property or at your business?   ☐ Yes   X☐ No

If you have an ATM, who owns it?   ☐ Myself   ☐ An ATM company   x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes   ☐ No   X☐ N/A

If you have an ATM, who services it? _____

Do you have a bank account at another institution?   ☐ Yes   x☐ No

Customer Signature:  *Eric Hannelius*
—110B06E8DF64416...
Date: 2/3/2023

Customer Name (Print):  Eric Hannelius, Trustee

Account Title (Print):  Encompay INC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | 2/3/23 | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

| 503 S Main / PO Box 39 | 910 S Main / PO Box 430 |
|---|---|
| Shattuck, Oklahoma 73858 | Booker, Texas 79005 |
| Phone: 580.938.2571 | Phone: 806.650.2265 |
| Fax: 580.938.2947 | Fax: 806.650.2510 |

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?                    ☐ Yes   ☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

                                                        ☐ Yes   ☒ No

Will you have an ATM on your property or at your business?          ☐ Yes   ☒ No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company   ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?

                                        ☐ Yes   ☐ No   ☒ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          ☐ Yes   ☒ No

Customer Signature:     *Michael Shvartsman*          Date: 2/3/2023
                        C5DF2F102D904AD...

Customer Name (Print):   Michael Shvartsman, Trustee

Account Title (Print):   Encompay INC

# Exhibit N

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
| | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

**503 S Main / PO Box 39**
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

**910 S Main / PO Box 430**
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes   x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes   x☐ No

Will you have an ATM on your property or at your business?          ☐ Yes   x☐ No

If you have an ATM, who owns it?          ☐ Myself   ☐ An ATM company   x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes   ☐ No   x☐ N/A

If you have an ATM, who services it? _____

Do you have a bank account at another institution?          ☐ Yes   x☐ No

Customer Signature: *Oksana Moore*          Date: 2/6/2023
                    DocuSigned by:
                    286E0CE82CE64E5...

Customer Name (Print): Oksana Moore (Authorized Signer)

Account Title (Print): One Pay Cloud LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

Internal use only.
OMMA.OK.GOV All website files checked?  2/3/23  · LLS
(Date)      (Initials)



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

593 S Main / PO Box 30
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.660.2265
Fax: 806.660.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes    x☐ No

Will you have an ATM on your property or at your business?          ☐ Yes    x☐ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company    x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No    x☐ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          x☐ Yes    ☐ No

Customer Signature: *Elena Popova* (DocuSigned by: 4C2D91789E234C9...)          Date: 2/7/2023

Customer Name (Print): Elena Popova, Authorized Signer

Account Title (Print): One Pay Cloud LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

| Internal use only. OMMA.OK.GOV All website files checked? | 2/3/23 | LLS |
|---|---|---|
| | (Date) | (Initials) |



**SNB BANK**
NATIONAL ASSOCIATION
Member FDIC

568 S Main / PO Box 39          010 S Main / PO Box 490
Shattuck, Oklahoma 73858       Booker, Texas 79005
Phone: 580.938.2571            Phone: 806.658.2265
Fax: 580.938.2947              Fax: 806.658.2510
www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?         ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes    x☐ No

Will you have an ATM on your property or at your business?         ☐ Yes    x☐ No

If you have an ATM, who owns it?         ☐ Myself    ☐ An ATM company   x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No    x☐ N/A

If you have an ATM, who services it?         _____

Do you have a bank account at another institution?         ☐ Yes    x☐ No

Customer Signature: _karla knight_____    Date: 2/3/2023
DocuSigned by:
E39D37677DD54BA...

Customer Name (Print): Karla Knight, Trustee

Account Title (Print): One Pay Cloud LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

Internal use only.
OMMA.OK.GOV All website files checked?  2/3/23
(Date)    (Initials)



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?                    ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes    x☐ No

Will you have an ATM on your property or at your business?              ☐ Yes    x☐ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company    x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No    x☐ N/A

If you have an ATM, who services it?    _____

Do you have a bank account at another institution?                    ☐ Yes    x☐ No

Customer Signature:   *Eric Hannelius*
                      DocuSigned by:
                      110B06E8DF64416...          Date: 2/3/2023

Customer Name (Print):   Eric Hannelius, Trustee

Account Title (Print):   One Pay Cloud LLC

DocuSign Envelope ID: 8F8D185A-92B6-49BD-8D17-8E75109F05F8

Internal use only.
OMMA.OK.GOV All website files checked? 2/3/23 (Date) (Initials)



**SNB BANK**
**NATIONAL ASSOCIATION**
Member FDIC

503 S Main / PO Box 39
Sluttuck, Oklahoma 73858
Phone: 580.938.2371
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2205
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?                ☐ Yes   x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

                                                                ☐ Yes   x☐ No

Will you have an ATM on your property or at your business?              ☐ Yes   x☐ No

If you have an ATM, who owns it?        ☐ Myself   ☐ An ATM company   x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

                                                        ☐ Yes   ☐ No   x☐ N/A

If you have an ATM, who services it?        _____

Do you have a bank account at another institution?              ☐ Yes   x☐ No

Customer Signature:   *Michael Shwartsman*   Date: 2/3/2023

Customer Name (Print):   Michael Shwartsman, Trustee

Account Title (Print):   One Pay Cloud LLC

# Exhibit O

DocuSign Envelope ID: 0020089A-3D09-4DCA-A48F-EE8A078A4077

| Internal use only. OMMA.OK.GOV All website files checked? | 2/22/23 (Date) | LLS (Initials) |



## SNB BANK
### NATIONAL ASSOCIATION
Member FDIC

603 S Main / PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main / PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

### Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?　　　　　□ Yes　　☒ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

　　　　　　　　　　　　　　　　　　　　　　　　　　　　□ Yes　　☒ No

Will you have an ATM on your property or at your business?　　　　□ Yes　　☒ No

If you have an ATM, who owns it?　　　□ Myself　　□ An ATM company　　☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?

　　　　　　　　　　　　　　　　　　　　　　　□ Yes　　□ No　　☒ N/A

If you have an ATM, who services it?　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Do you have a bank account at another institution?　　　　　☒ Yes　　□ No

Customer Signature: _Eric Hannelius_　　　　　　Date: 2/22/2023

Customer Name (Print): Eric Hannelius, Trustee

Account Title (Print): OST, LLC

# Exhibit P

DocuSign Envelope ID: BAE20CCA-7365-4921-8250-AA06C91FF086

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/27/2023 | lls |
| | (Date) | (Initials) |



**SNB BANK**
NATIONAL ASSOCIATION
Member FDIC

563 S Main / PO Box 39          610 S Main / PO Box 430
Shattuck, Oklahoma 73858          Booker, Texas 79005
Phone: 580.938.2574          Phone: 806.650.2265
Fax: 580.938.2947          Fax: 806.650.2510

www.snbbankna.com

Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes     x☐ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?
                                                                                    ☐ Yes     x☐ No

Will you have an ATM on your property or at your business?          ☐ Yes     x☐ No

If you have an ATM, who owns it?          ☐ Myself     ☐ An ATM company     x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?
                                                                    ☐ Yes     ☐ No     x☐ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          ☐ Yes     x☐ No

Customer Signature:     *Michael Shvartsman*          Date: 3/13/2023
                        DocuSigned by:
                        C5DF2F102D994A0...

Customer Name (Print):     Michael Shartsman

Account Title (Print):     MG Family Trust

Exhibit Q

DocuSign Envelope ID: 1EEE0ABB-210F-4EFA-A2F5-BBE57F8AD550

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/27/2023 | lls |
| | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

| 503 S Main  PO Box 39 | 610 S Main  PO Box 430 |
|---|---|
| Shattuck, Oklahoma 73858 | Booker, Texas 79005 |
| Phone: 580.938.2574 | Phone: 806.650.2265 |
| Fax: 580.938.2947 | Fax: 806.650.2510 |

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?  ☐ Yes   x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes   x☐ No

Will you have an ATM on your property or at your business?   ☐ Yes   x☐ No

If you have an ATM, who owns it?   ☐ Myself   ☐ An ATM company   x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes   ☐ No   x☐ N/A

If you have an ATM, who services it?   _____

Do you have a bank account at another institution?   ☐ Yes   x☐ No

Customer Signature: _Michael Shvartsman_   Date: 3/8/2023

Customer Name (Print): Michael Shartsman

Account Title (Print): Rocket Holdings, LLC

DocuSign Envelope ID: 1EEE0ABB-210F-4EFA-A2F5-BBE57F8AD550

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/27/2023 | lls |
| | (Date) | (Initials) |



**SNB BANK**
**NATIONAL ASSOCIATION**
Member FDIC

563 S Main · PO Box 39      010 S Main · PO Box 430
Shattuck, Oklahoma 73858    Booker, Texas 79005
Phone: 580.938.2574         Phone: 806.650.2265
Fax: 580.938.2947           Fax: 806.650.2510
*www.snbbankna.com*

Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes    ☒ No

Does your account or will your account include, but are not limited to, the following categories:
Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused
Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp,
Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers,
Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes    ☒ No

Will you have an ATM on your property or at your business?          ☐ Yes    ☒ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company   ☒ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No    ☒ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          ☒ Yes    ☐ No

Customer Signature: _Elena Popova_____   Date: 3/10/2023

Customer Name (Print): __Elena Popova_____

Account Title (Print): __Rocket Holdings, LLC_____

DocuSign Envelope ID: 1EEE0ABB-210F-4EFA-A2F5-BBE57F8AD550

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 2/27/2023 | lls |
| | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main · PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

610 S Main · PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana/Cannabis Related Business?          ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana/Cannabis, Industrial Hemp, Marijuana/Cannabis Seeds, Marijuana/Cannabis Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?

☐ Yes    x☐ No

Will you have an ATM on your property or at your business?          ☐ Yes    x☐ No

If you have an ATM, who owns it?          ☐ Myself    ☐ An ATM company  x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?

☐ Yes    ☐ No   x☐ N/A

If you have an ATM, who services it?          _____

Do you have a bank account at another institution?          x☐ Yes    ☐ No

Customer Signature: _Oksana Moore_ _____  Date: 3/13/2023

Customer Name (Print): ___Oksana Moore_____

Account Title (Print):   ___Rocket Holdings, LLC_____

Exhibit R

| | |
|---|---|
| **From:** | Justin Soulen <justin.s@PEPPERPAY.COM> |
| **To:** | Lesta Stevens |
| **Sent:** | 2/8/2023 6:20:43 PM |
| **Subject:** | Re: Call |

Thanks so much again.  I just relayed our conversation to the signors confirming that "no" should be selected on the Account Practice Questionnaire as we are not plant-touching in any capacity.  They know to look out for the new packets.

Best Regards,

Justin Soulen
Assoc. General Counsel
justin.s@pepperpay.com



**From:** Lesta Stevens <Lesta.Stevens@snbbankna.com>
**Date:** Wednesday, February 8, 2023 at 1:06 PM
**To:** Justin Soulen <justin.s@PEPPERPAY.COM>
**Subject:** Call

Justin,
Can you give me a call at 580 938 1229 please?

Thank you,

*Lesta Stevens*
*Assistant Vice President*
*Cashier*



**SNB BANK**
NATIONAL ASSOCIATION
Member FDIC

503 South Main
P.O. Box 39
Shattuck, OK  73858

Phone:  580.938.2571
Fax:     580.938.2947
www.snbbankna.com
Account assistance email: bookkeeping@snbbankna.com



"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender and immediately and permanently delete the message. You

may not disseminate, distribute or forward this e-mail message or disclose its contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.

Please consider the environment before printing this email

Exhibit S

DocuSign Envelope ID: 0AA9681C-6593-4911-901E-22037D19372D

| Internal use only. | | |
|---|---|---|
| OMMA.OK.GOV All website files checked? | 6/30/23 | LLS |
| | (Date) | (Initials) |



# SNB BANK
## NATIONAL ASSOCIATION
### Member FDIC

503 S Main · PO Box 39
Shattuck, Oklahoma 73858
Phone: 580.938.2571
Fax: 580.938.2947

010 S Main · PO Box 430
Booker, Texas 79005
Phone: 806.650.2265
Fax: 806.650.2510

www.snbbankna.com

## Account Practice Questionnaire

Is your account a Marijuana Related Business?         ☐ Yes    x☐ No

Does your account or will your account include, but are not limited to, the following categories: Planting, Transporting, Harvesting, Cultivation, Retail Delivery, Wholesaling, Testing, Infused Products, Medical Dispensary, Packaging Marijuana, Industrial Hemp, Cannabis Seeds, Marijuana Consulting Firms, Packaging Suppliers, Hydroponic Supplies, Training & Education, Payment Processors, or Industry Consultants?         ☐ Yes    x☐ No

Will you have an ATM on your property or at your business?         ☐ Yes    x☐ No

If you have an ATM, who owns it?         ☐ Myself    ☐ An ATM company    x☐ N/A

If you have an ATM, is it registered with the state where the property or business is located?
☐ Yes    ☐ No    x☐ N/A

If you have an ATM, who services it?         _____

Do you have a bank account at another institution?         x☐ Yes    ☐ No

Customer Signature:  *Oksana Moore*  _____   Date: 7/3/2023
—DocuSigned by— 286E0CB62CB64E3

Customer Name (Print):  MG FAMILY TRUST

Account Title (Print):  OKSANA MOORE

Exhibit T

SNB Bank, National Association
## ODFI ORIGINATION AGREEMENT FOR CREDITS

This agreement is made this  2  day of  March 20 21  by and between
Transact First/CFT Business (the Company) and SNB Bank, National Association (the Financial Institution).

The Company has requested that the Financial Institution permit it to initiate electronic signals for paperless entries through the Financial Institution to accounts maintained at the Financial Institution and in other banks and financial institutions, by means of the Automated Clearing House (the ACH). Now, therefore, in consideration of the mutual promises contained herein, it is agreed as follows:

1. The Financial Institution will transmit credit and debit entries initiated by the Company to the ACH as provided in the ACH Rules (the Rules), as in effect from time to time and this Agreement.

2. The Company will comply with the Rules insofar as applicable. In the event the Company violates any of the applicable ACH Rules and NACHA imposes a fine on the Financial Institution because of the Company's violation, the Financial Institution may charge the fine to the Company. The specific duties of the Company provided in the following paragraphs of this Agreement in no way limit the foregoing undertaking.

3. It shall be the responsibility of the Company that the origination of ACH transactions complies with U.S. law. This includes, but is not limited to sanctions enforced by the Office of Foreign Assets Control (OFAC). It shall further be the responsibility of the Company to obtain information regarding such OFAC enforced sanctions. (This information may be obtained directly from the OFAC Compliance Hotline at 800-540-OFAC).

4. The Company will obtain proper authorizations for consumer entries in accordance with ACH rules and U.S. law and shall retain the original or a microfilm record for two (2) years after termination or revocation of such authorization.

5. The Company ___ will, _X_ will not send pre-notifications six banking days prior to initiating the first entry to a particular account. Such notice shall be provided to the Financial Institution in the format and on the medium provided in the ACH Rules. After the Company has received notice that any such notification has been rejected by a receiving bank, or that a receiving bank will not receive entries without having first received a copy of the authorization signed by its customer, the Company will not initiate any entry to such customers, except after providing the receiving bank with no such authorization, within the time limits provided in the Rules.

6. The Company will provide computer readable information in the format specified within the ACH Rules in the mutually agreed upon medium that provides a commercially reasonable level of security which complies with applicable regulatory requirements.

7. Each entry or file shall be delivered to the Financial Institution's Processing Control in accordance with an agreed upon processing schedule.

8. The Company will provide immediately available funds to cover any credit entry initiated by it not later than the Settlement Date applicable thereto.

9. The Company will receive immediately available funds for any electronic debit entry initiated by it on the Settlement Date applicable thereto.

10. If the Company discovers that any entry it has initiated was in error, it may notify the Financial Institution of such error. If such notice is received not later than 24 hours prior to the ACH receiving deadline, the Financial Institution will utilize its best efforts to initiate an adjusting entry or stop payment of any "on us" credit entry within the time limits provided by the Rules. If such notice from the Company is received after the time provided above, the Financial Institution will utilize its best efforts on behalf of the Company.

11. The Company shall notify the Receiver of any reversing entry initiated to correct an entry it has initiated in error. The notification to the Receiver must include the reason for the reversal and be made no later than the Settlement Date of the reversing entry.

12. In the event any entries are rejected by the ACH Operator for any reason whatsoever, it shall be the responsibility of the Company to remake such entries.

13. The Company will promptly provide immediately available funds to indemnify the Financial Institution if any debit entry is rejected after the Financial Institution has permitted the Company to withdraw immediately available funds in the amount thereof or if any adjustment memorandum that relates to any such entry is received by the Financial Institution.

14. The Financial Institution shall be responsible only for performing the services expressly provided for in this Agreement, and shall be liable only for its negligence in performing those services. The Financial Institution shall not be responsible for the Company's acts or omissions (including without limitation the amount, accuracy, timeliness of transmittal or due authorization of any entry received from the Company) or those of any other person, including without limitation any Federal Reserve Bank or transmission or communications facility, any Receiver or Receiving Depository Financial Institution (including without limitation the return of an entry by such Receiver or Receiving Depository Financial Institutions, and not such person shall be deemed the Financial Institution's agent. Company agrees to indemnify the Financial Institution against any loss, liability or expense (including attorneys' fees and expenses) resulting from any claim of any person that the Financial Institution is responsible for, any act of omission by the Company or any other person described in this contract.

15. The Company will indemnify the Financial Institution if the Financial Institution incurs any loss or liability on account of the breach with respect to any entries initiated by the Company, or any of the warranties of an Originating Bank contained in the Rules, except due to the Financial Institution's own negligence.

16. The Financial Institution's security procedures shall include the determination of certain exposure limits which includes, but may not be limited to (1) the value of ACH files, (2) the value or number of individual ACH entries, (3) the frequency of origination of ACH files and (4) the consideration of exposure over multiple settlement dates.  Your ACH file is limited to $(N/A) per month.

17. In the event the Company incurs any loss due to mishandling of a particular entry or entries, the Financial Institution's liability to the Company shall be limited to (i) liability for its own negligence or willful misconduct; and (ii) the amount recoverable by the Financial Institution from the ACH, or any third party pursuance to the Rules or any indemnity agreement.

18. The Financial Institution's liability for loss of interest resulting from its error or delay shall be calculated by using a rate equal to the average Federal Funds Rate at the Federal Reserve Bank of New York for the period involved. (At the Financial Institution's option, payment of such interest may be made by crediting the Account from any claim of any person that the Financial Institution is responsible for any act or omission of the Company or any other person described in Section 14)

19. This agreement is terminable on ten days written notice by either party, provided what applicable portions of this Agreement shall remain in effect with respect to any entries initiated by the Company prior to such termination.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement by their duly authorized officers.

_Transact First – EFT Business_
(The Company)

_Oksana Moore_
Member

_____
Member

SNB Bank, National Association

Lesta Stevens, Assistant Vice President
Officer

Page | 3
Updated 05/01/2019—lls

**SNB Bank, National Association**
**Origination Agreement Bill Collection**

This Agreement is made this _2_ day of _March_ , 20 _21_ , by and between _Transact First -EFT Business_ (the "Company") and SNB Bank, National Association (the "Financial Institution").

**RECITALS**

A. Company wishes to initiate credit and debit entries, by means of the Automated Clearing House (the ACH), pursuant to the terms of this Agreement and the *ACH Rules* (the *Rules*), and Financial Institution is willing to act as an Originating Depository Financial Institution (ODFI) with respect to such entries.

B. Unless otherwise defined herein, capitalized terms shall have the meanings provided in the *Rules*. The term "Entries" shall have the meaning provided in the *Rules* and shall also mean the data received from the Company hereunder from which the Financial Institution prepares entries.

**AGREEMENT**

1. *ACH Rules.* The Company acknowledges access to a copy of the *Rules.* The Company agrees to comply with and be bound by the *Rules.* In the event the Company violates any of the applicable *Rules* and NACHA imposes a fine on the Financial Institution because of the Company's violation, the Financial Institution may charge the fine to the Company. The Financial Institution agrees to inform the Company of revisions to the *Rules* of which the Financial Institution has knowledge.

2. U.S. Law. It shall be the responsibility of the Company that the origination of ACH transactions complies with U.S. law.

3. Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the state in which the account resides.

4. Security Procedures. The Company and the Financial Institution shall comply with the security procedure requirements described in the attached Schedule [A] with respect to entries transmitted by the Company to the Financial Institution.

5. Processing, Transmittal and Settlement by Financial Institution.

    (a) Except as provided in Section 4, the Financial Institution shall (i) process <u>daily billing</u> entries received from the Company to conform with the file specifications set forth in the *Rules*, (ii) company is to secure transmit such Entries as an Originating Depository to the Financial Institution to <u>the email, bookkeeping@snbbankna.com</u> (the "ACH Operator"), and (iii) settle for such entries as provided in the *Rules*.

    (b) The Financial Institution shall transmit such entries to the ACH Operator by the deadline set three days prior to the Effective Entry Date shown in such entries on such business day.

    (c) If any of the requirements of clause (i), (ii), or (iii) of Section 5(b) are not met, the Financial Institution shall use reasonable efforts to transmit such entries to the ACH Operator by the next deposit deadline on which the ACH Operator is open for business.

6. On-Us Entries. Except as provided in Section 5, in the case of an entry received for credit to an account maintained with the Financial Institution (an "On-Us Entry"), the Financial Institution shall credit the Receiver's account in the amount of such entry on the Effective Entry Date contained in such entry, provided the requirements set forth in Section 5(b) are met. If either of those requirements is not met, Financial Institution shall use reasonable efforts to credit the Receiver's account on the next business day following such Effective Entry Date.

7. Rejection of Entries. The Financial Institution shall reject any entry which does not comply with the requirements of Section 1 or 2, or which contains an Effective Entry Date more than ___3___ days after the business day such entry is received by the Financial Institution. The Financial Institution shall have the right to reject an on-us entry for any reason for which an entry may be returned under the *Rules*. The Financial Institution shall have the right to reject any entry if the Company has failed to comply with its account balance obligations under Section 12. The Financial Institution shall notify the Company by [phone] [electronic transmission] of such rejection no later than the business day such entry would otherwise have been transmitted by the Financial Institution to the ACH Operator, or in the case of an on-us entry, its Effective Entry Date. The Financial Institution shall have no liability to the Company by reason of the rejection of any such entry or the fact that such notice is not given at an earlier time than that provided for herein.

8. Cancellation or Amendment by Company. The Company shall have no right to the cancellation or amendment of any entry after its receipt by the Financial Institution. However, the Financial Institution shall use reasonable efforts to act on a request by the Company for cancellation of an entry prior to transmitting it to the ACH Operator, or in the case of an on-us entry, prior to crediting a Receiver's account.

9. Notice of Returned Entries. The Financial Institution shall notify the Company by mail of the receipt of a returned entry from the ACH Operator postmarked no later than three business days after the business day of such receipt.

10. Reinitiation of Entries. The Company may not reinitiate entries except as prescribed by the *Rules*.

11. Payment. The Company shall pay the Financial Institution the amount of each entry transmitted by the Financial Institution pursuant to this Agreement at such time on the [Settlement Date with respect to] [date of transmittal by Financial Institution of] such entry as the Financial Institution, at its discretion, may determine, and the amount of each on-us entry at such time on the Effective Entry Date of such entry as the Financial Institution, at its discretion, may determine.

12. The Account. The Financial Institution may, without prior notice or demand, obtain payment of any amount due and payable to it under the Agreement by debiting the account(s) of the Company, and shall credit the account for any amount received by the Financial Institution by reason of the return of an entry transmitted by the Financial Institution for which the Financial Institution has previously received payment from the Company. Such credit shall be made as of the day of such receipt by the Financial Institution. The Company shall at all times maintain a balance of available funds in the account sufficient to cover its payment obligations under this Agreement. In the event there are not sufficient available funds in the account to cover the Company's obligations under this Agreement, the Company agrees that the Financial Institution may debit any account maintained by the Company with the Financial Institution or any affiliate of the Financial Institution or that the Financial Institution may set off against any amount it

owes to the Company, in order to obtain payment of the Company's obligations under this Agreement.

13. Periodic Statement. The periodic statement issued by the Financial Institution for the Company's account will reflect entries credited and debited to the Company's account. The Company agrees to notify the Financial Institution promptly of any discrepancy between the Company's records and the information shown on any such periodic statement. If the Company fails to notify the Financial Institution within 30 days of receipt of a periodic statement, the Company agrees that the Financial Institution shall not be liable for any other losses resulting from the Company's failure to give such notice.

14. Company Representations and Agreements; Indemnity. The Company agrees that (a) each person shown as the Receiver on an entry received by the Financial Institution from the Company has authorized the initiation of such entry and the crediting of its account in the amount and on the Effective Entry Date shown on such entry, (b) such authorization is operative at the time of transmittal or crediting by the Financial Institution as provided herein, (c) the Company shall perform its obligations under this Agreement in accordance with all applicable laws and regulations, and (d) the Company shall be bound by and comply with the *Rules* as in effect from time to time, including without limitation the provision thereof making payment of an entry by the Receiving Depository Financial Institution to the Receiver provisional until receipt by the Receiving Depository Financial Institution of final settlement for such entry; and specifically acknowledges that if such settlement is not received, the Receiving Depository Financial Institution shall be entitled to a refund from the Receiver of the amount credited and the Company shall not be deemed to have been paid the Receiver. The Company shall indemnify the Financial Institution against any loss liability or expense (including attorneys' fees and expenses) resulting from any breach of any of the foregoing agreements.

15. Liability; Limitations On Liability; Indemnity.

   (a) The Financial Institution shall be responsible only for performing the services expressly provided for in this Agreement, and shall be liable only for its negligence in performing those services. The Financial Institution shall not be responsible for the Company's acts or omissions (including without limitation the amount, accuracy, timeliness of transmittal or due authorization of any entry received from the Company) or those of any other person, including without limitation any Federal Reserve Bank or transmission or communications facility, any Receiver or Receiving Depository Financial Institution (including without limitation the return of an entry by such Receiver or Receiving Depository Financial Institutions, and not such person shall be deemed the Financial Institution's agent. Company agrees to indemnify the Financial Institution against any loss, liability or expense (including attorneys' fees and expenses) resulting from any claim of any person that the Financial Institution is responsible for, any act of omission by the Company or any other person described in this Section.

   (b) In no event shall the Financial Institution be liable for any consequential, special punitive or indirect loss or damage that the Company may incur or suffer in connection with this Agreement, including losses or damage from subsequent wrongful dishonor resulting from the Financial Institution's acts or omissions pursuant to this Agreement.

(c) The Financial Institution's security procedures shall include the determination of certain exposure limits which includes, but may not be limited to (1) the value of ACH files, (2) the value or number of individual ACH entries, (3) the frequency of origination of ACH files and (4) the consideration of exposure over multiple settlement dates. Your ACH file total is limited to $(N/A) per day.

(d) The Financial Institution shall be excused from failing to act or delay in acting if such failure or delay is caused by legal constraint, interruption of transmission, or communication facilities, equipment failure, war, emergency conditions or other circumstances beyond the Financial Institution's control. In addition, the Financial Institution shall be excused from failing to transmit or delay in transmitting an entry, if such transmittal would result in Financial Institution's having exceeded any limitation upon its intra-day net funds position established pursuant to Federal Reserve guidelines or if the Financial Institution is otherwise violating any provision of any risk control program of the Federal Reserve or any rule or regulation of any other U.S. governmental regulatory authority.

(e) The Financial Institution's liability for loss of interest resulting from its error or delay shall be calculated by using a rate equal to the average Federal Funds Rate at the Federal Reserve Bank of New York for the period involved. (At the Financial Institution's option, payment of such interest may be made by crediting the Account from any claim of any person that the Financial Institution is responsible for any act or omission of the Company or any other person described in Section 15(a).)

16. Compliance with the Security Procedures.

(a) If an entry (or a request for cancellation or amendment of an entry) received by the Financial Institution purports to have been transmitted or authorized by the Company, it will be deemed effective as the Company's entry and the Company shall be obligated to pay the Financial Institution the amount of such entry even though the entry was not authorized by the Company, provided the Financial Institution acted in compliance with the security procedure. If signature comparison is to be used as a part of that security procedure, the Financial Institution shall be deemed to have complied with that part of such procedure if it compares the signature accompanying a file of entries with the signature of an authorized representative of the Company and, on the basis of such comparison, believes the signature to be that of such authorized representative.

(b) If an entry received by the Financial Institution was transmitted or authorized by the Company, the Company shall be obligated to pay the amount of the entry as provided herein, whether or not the Financial Institution complied with the security and whether or not that entry was erroneous in any respect or that error would have been detected if the Financial Institution had complied with such procedure.

17. Inconsistency of Name and Account Number. The Company acknowledges and agrees that, if an entry describes the Receiver inconsistently by name and account number, payment of the entry transmitted to the Receiving Depository Financial Institution might be made by the Receiving Depository Financial Institution (or by the Financial Institution in the case of an on-us entry) on the basis of the account number even if it identifies a person different from the named Receiver, and that the Company's obligation to pay the amount of the entry to the Financial Institution is not excused in such circumstances.

18. Notifications of Change. The Financial Institution shall notify Company of all notifications of change received by the Financial Institution related to entries transmitted by the Company by (mail, fax, electronic transmission, etc) no later than two banking days after receipt thereof.

19. Payment for Services. The Company shall pay the Financial Institution the charges for the services provided for herein set forth in account disclosure of fees. Such charges do not include, and the Company shall be responsible for payment of, any sales, use, excise, value-added, utility or other similar taxes relating to the services provided for herein, and any fees or charges provided for in the agreement between the Financial Institution and the Company with respect to the account.

20. Amendments. From time to time the Financial Institution may amend any of the terms and conditions contained in this Agreement, including without limitation, any cut-off time, any business day, and any part of the Schedules attached hereto. Such amendments shall become effective upon receipt of notice by the Company or such later date as may be stated in the Financial Institution's notice to the Company.

21. Notices, Instructions, Etc.
(a) Except as otherwise expressly provided herein, the Financial Institution shall not be required to act upon any notice or instruction received from the Company or any other person, or to provide any notice or advice to the Company or any other person with respect to any matter.

(b) The Financial Institution shall be entitled to rely on any written notice or other written communication believed by it in good faith to be genuine and to have been signed by an Authorized Representative, and any such communication shall be deemed to have been signed by such person. The names and signatures of Authorized Representatives are set forth in the company's corporate resolutions. The Company may add or delete any Authorized Representative by written notice to the Financial Institution signed by at least two Authorized Representatives other than that being added or deleted. Such notice shall be effective on the [e.g., second business day] following the day of the Financial Institution's receipt.

(c) Except as otherwise expressly provided herein, any written Agreement shall be delivered, or sent to:

Attention:_____
Address: _____
City, State, Zip: _____

And, if to Company, addressed to:
Attention:_____
Address: _____
City, State, Zip: _____

unless another address is substituted by notice delivered or sent as provided herein. Except as otherwise expressly provided herein, any such notice shall be deemed given when received.

22. Data Retention. The Company shall retain data on file adequate to permit remaking of entries for 30 days following the date of their transmittal by the Financial Institution as provided here, and shall provide such data to the Financial Institution upon its request.

23. Third Parties. The Company shall assume full liability for any action made by any third-party processor used by the Company at its discretion to initiate entries on its behalf. The Financial Institution does not allow third-party ACH transactions.

24. Reversing Entries. The Company shall notify the Receiver that a reversing entry has been transmitted to the Receiver's account no later than the settlement date of the reversing entry. This notification may be made by the Company's method of choice (fax, telephone, etc.)

25. Termination. The Financial Institution or Company may terminate this Agreement at any time. Such termination shall be effective on the third business day following the day of receipt of written notice of such termination or such later date as in specified in that notice. Any termination of this Agreement shall not affect any of the Company's obligations arising prior to such termination. The Financial Institution may terminate or suspend the agreement for breach of the Rules by the Company. The Financial Institution reserves the right to audit the Company's compliance with the agreement and the Rules.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed by their duly authorized officers.

Company: _Transact First – EFT Business_

By: _Oksana Klooze_

Title _Messenger_


Financial Institution SNB Bank, National Association

By _Leida Stevens_

Title _AVP_

Exhibit U

| | |
|---|---|
| **From:** | Oksana Moore <oksana@transactfirst.com> |
| **Sent:** | Friday, November 3, 2023 5:26 PM |
| **To:** | L. Clay Stuart |
| **Cc:** | Eric Hannelius; Sherri Nieman; Debby Terzo; Lesta Stevens; Mike Park; Oksana Moore |
| **Subject:** | RE: KYC Information Request |

Funds received by dispensaries

------- Original Message -------
On Friday, November 3rd, 2023 at 5:19 PM, L. Clay Stuart <clay.stuart@snbbankna.com> wrote:


Oksana,


You are exactly right.  I was not downloading it.  Thank you.


Quick question, it appears that the cashless ATMS or rather point of banking terminals may be owned by the dispensaries.  Can you confirm if this is true?  Also, are the ultimate receivers of the funds the dispensaries or another party?  If they are another party, do they have the same ownership as a dispensary?


Thanks in advance!!


L. Clay Stuart

President & CEO



**SNB BANK**
NATIONAL ASSOCIATION
Member FDIC


503 South Main • P.O. Box 39 • Shattuck, OK  73858

1

Phone: (580) 938-2571 • Fax: (888) 554-1518

www.snbbankna.com



**From:** Oksana Moore <oksana@transactfirst.com>
**Sent:** Friday, November 3, 2023 4:11 PM
**To:** L. Clay Stuart <clay.stuart@snbbankna.com>
**Cc:** Eric Hannelius <eric.h@PEPPERPAY.COM>; Sherri Nieman
<Sherri.Nieman@snbbankna.com>; Debby Terzo <Debby.Terzo@snbbankna.com>; Lesta
Stevens <Lesta.Stevens@snbbankna.com>; Mike Park <mikepark@PEPPERPAY.COM>;
Oksana Moore <oksana@PEPPERPAY.COM>
**Subject:** RE: KYC Information Request

Clay,

If you not able to see if from nextcloud, please download it to you desktop.

I will double check why you not able to see it without downloading.

I already uploaded:

**1).Learner Report** - it has all employees and they work under different project , but we all take these
courses (ethics, BSA and AMC, risk, compliance etc) under PepperPay. Under employees you can
sort out me (Oksana Moore ), Mike Park/ legal, Elena Popova/ accounting and you will se which
courses we took.

**2). The following Policies and Procedures we uploaded:**

- Compliance Management Policy
- Compliance Procedures and Merchant
- Onboarding Checklist

**3). I uploaded some examples of Merchant due diligence packages** (owners information,
license, bank letter, ID)

2

------- Original Message -------

On Friday, November 3rd, 2023 at 3:42 PM, L. Clay Stuart <clay.stuart@snbbankna.com> wrote:

Oksana,

I was able to view the document after I downloaded it.  Sorry.

Thanks!!

L. Clay Stuart

President & CEO


SNB BANK
NATIONAL ASSOCIATION
Member FDIC

503 South Main • P.O. Box 39 • Shattuck, OK 73858

Phone: (580) 938-2571 • Fax: (888) 554-1518

www.snbbankna.com



3

**From:** Oksana Moore <oksana@transactfirst.com>
**Sent:** Friday, November 3, 2023 2:02 PM
**To:** L. Clay Stuart <clay.stuart@snbbankna.com>
**Cc:** Eric Hannelius <eric.h@PEPPERPAY.COM>; Sherri Nieman
<Sherri.Nieman@snbbankna.com>; Debby Terzo
<Debby.Terzo@snbbankna.com>; Lesta Stevens
<Lesta.Stevens@snbbankna.com>; Mike Park
<mikepark@PEPPERPAY.COM>; Oksana Moore
<oksana@PEPPERPAY.COM>
**Subject:** RE: KYC Information Request

Hello Clay,

Please see link to
folder https://nextcloud.transactfirst.com/index.php/s/YQ2yZJLx6HGgyMf, to which I
will upload all information

Our employees including myself do take BSA/ AML courses. I will upload report to
folder as well.

Please see which courses we completed

| Course Title | |
|---|---|
| **BSA & AML** | The Bank Secrecy Act (BSA) (kno |
| BSA and AML Requirements for Money Services Businesses | The Bank Secrecy Act (BSA) Cor |
| BSA and AML:  Risk Assessment [Mini-Course] | Compliance Plus Newsletter Vo |
| BSA and AML: Comprehensive | Introduction to Anti-Money Lau  · |
| Compliance Officer: BSA Examination Management | Security Doc: Ethics - Anti-Mon |
| Frontline: BSA and AML | Ethics: Anti-Money Laundering ( |
| Money Laundering, Fraud, and Suspicious Activities [Mini-Course] | |
| Executive Leadership: BSA, AML, and Terrorist Financing | |
| | |
| **Business Continuity Planning** | Business Conduct Series: Busir |

We use https://app.cannabiz.media/licenses/search to verify information.

4

We pay subscription to have access to this data, I can create a user for someone from your team (let me know who needs it).

First we will have to create transactfirst email for that person and then we can add as a user to this data base.

Please let me know who needs access

Thank you

------- Original Message -------
On Friday, November 3rd, 2023 at 12:56 PM, L. Clay Stuart <clay.stuart@snbbankna.com> wrote:

> Thanks Oksana,

> In the interest of maximizing everyone's efforts, can you at a minimum forward me your most recent BSA/AML audit so we can start our review?

> Thanks in advance!!

> L. Clay Stuart

> President & CEO



> 503 South Main • P.O. Box 39 • Shattuck, OK 73858

> Phone: (580) 938-2571 • Fax: (888) 554-1518

> www.snbbankna.com



**From:** Oksana Moore <oksana@transactfirst.com>
**Sent:** Friday, November 3, 2023 11:39 AM
**To:** L. Clay Stuart <clay.stuart@snbbankna.com>
**Cc:** Eric Hannelius <eric.h@PEPPERPAY.COM>; Sherri Nieman
<Sherri.Nieman@snbbankna.com>; Debby Terzo
<Debby.Terzo@snbbankna.com>; Lesta Stevens
<Lesta.Stevens@snbbankna.com>; Mike Park
<mikepark@PEPPERPAY.COM>; Oksana Moore
<oksana@PEPPERPAY.COM>
**Subject:** RE: KYC Information Request

Hello Clay

I am working on providing requested information.

Thank you

------- Original Message -------
On Thursday, November 2nd, 2023 at 8:27 PM, L. Clay Stuart
<clay.stuart@snbbankna.com> wrote:

> Eric,
>
> Sherri and I are continuing to review the
> information we have for Transact First, EFT
> Business Services, and Transaction Processing
> Services. Other entities which would be
> included are any other related entity that is
> either receiving or transmitting money that is
> either received from Cashless ATMS or
> transmitting money where the money was
> originated at a cashless ATM. (Potentially One
> Pay, Skylight or Encompay)

6

We are not in possession of the BSA/AML policies for any of these entities.  I apologize for this late request, but prior to this morning, SNB was not of the opinion that BSA/AML was necessary for these entities.

Let me know if you have any questions.

Have a great evening.

L. Clay Stuart

President & CEO



503 South Main • P.O. Box 39 • Shattuck, OK 73858

Phone: (580) 938-2571 • Fax: (888) 554-1518

www.snbbankna.com

**From:** Eric Hannelius
<eric.h@PEPPERPAY.COM>
**Sent:** Thursday, November 2, 2023 6:20 PM
**To:** L. Clay Stuart
<clay.stuart@snbbankna.com>
**Cc:** oksana@transactfirst.com; Sherri Nieman
<Sherri.Nieman@snbbankna.com>; Debby

Terzo <Debby.Terzo@snbbankna.com>; Lesta
Stevens <Lesta.Stevens@snbbankna.com>;
Mike Park <mikepark@PEPPERPAY.COM>;
Oksana Moore <oksana@PEPPERPAY.COM>
**Subject:** Re: KYC Information Request

Hi Clay,

We will start work on all of the requested items
first thing in the morning.

Thank You.

Best Regards,

Eric Hannelius

818-415-5710 (Mobile)

> On Nov 2, 2023, at 6:33 PM, L. Clay
> Stuart
> <clay.stuart@snbbankna.com>
> wrote:

Good evening.

In order to comply with SNB
policy, I am requesting the
following information for:

1. All merchants utilizing
   cashless ATM's
2. All entities receiving
   proceeds from cashless
   ATMS

8

Information Requested:

1. Risk Assessment procedure/scoring as it relates to Bank Secrecy Act (BSA)/Anti Money Laundering (AML)
2. Name, Address, Industry of merchants/entities either utilizing cashless ATMS or ultimately receiving funds from Cashless ATMs
3. Beneficial Ownership forms of all merchants/entities
4. Bank Secrecy Act/AML risk assignment of each merchant/entity
5. Current and in force licensing/approval from the State of Domicile of those merchants/entities
6. Number of Aggregate Suspicious Activity Reports filed:

   a. YTD 2023
   b. For the year 2022
   c. For the year 2021

7. Copy of most recent BSA/AML Audit, findings and responses

I acknowledge this is a lot of information requested.  However, I request that this information be provided as soon as possible.

Thank you!!

L. Clay Stuart

President & CEO



503 South Main • P.O. Box 39 •
Shattuck, OK  73858

Phone:  (580) 938-
2571 • Fax: (888) 554-1518

www.snbbankna.com



"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender and immediately and permanently delete the message. You may not disseminate, distribute or forward this e-mail message or disclose its contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.



"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender and immediately and permanently delete the message. You may not disseminate, distribute or forward this e-mail message or disclose its

contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.



"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender and immediately and permanently delete the message. You may not disseminate, distribute or forward this e-mail message or disclose its contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.



"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender and immediately and permanently delete the message. You may not disseminate, distribute or forward this e-mail message or disclose its contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.



"CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named or intended recipient, please notify the sender and immediately and permanently delete the message. You may not disseminate, distribute or forward this e-mail message or disclose its contents to any other person or entity. Copyright and any other intellectual property rights in its contents are the sole property of SNB Bank, N.A. E-mail transmission cannot be guaranteed to be secure or error-free. The sender therefore does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required, please request via a hard copy version. We make no representation or warranty as to the absence of viruses in this e-mail or any attachments. Please note that to ensure regulatory compliance and for the protection of our customers and business, we may monitor and read emails sent to and from our servers.

